Lisa T. Belenky (CA Bar # 203225)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(510) 844-7107
lbelenky@biologicaldiversity.org

Roger Flynn, (CO Bar #21078) *Pro Hac Vice Application To Be Filed*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org

Talasi B. Brooks (Idaho Bar #9712), *Pro Hac Vice Application To Be Filed*
Western Watersheds Project
P.O. Box 2863
Boise ID 83714
(208) 336-9077
tbrooks@westernwatersheds.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF THE INYO;<br>WESTERN WATERSHEDS PROJECT;<br>CENTER FOR BIOLOGICAL DIVERSITY;<br>and THE SIERRA CLUB,<br><br>         Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE;<br>LEEANN MURPHY, Acting Mammoth<br>District Ranger,<br><br>         Defendants. | Case No.:<br><br>COMPLAINT FOR VACATUR,<br>EQUITABLE, DECLARATORY<br>AND INJUNCTIVE RELIEF |

## **INTRODUCTION**

1.     Plaintiffs Friends of the Inyo (FOI), Western Watersheds Project (WWP), Center for Biological Diversity (Center), and Sierra Club, file this suit for vacatur, and equitable, declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§701-

1

706, the National Environmental Policy Act (NEPA), 42 U.S.C. §§4321 *et. seq.*, the Forest Service Organic Administration Act of 1897 (Organic Act), 16 U.S.C. §§478, 551, and their implementing regulations and policies, challenging the decisions of the United States Department of Agriculture's Forest Service (USFS) to approve the Long Valley Exploration Drilling Project (Project), a large mineral exploration drilling project on USFS-managed public lands near Mammoth Lakes, California proposed by KORE Mining Ltd. (KORE).

2.      The Defendant USFS approved the exploration project via a Decision Memo (Decision) issued by Defendant Acting USFS Mammoth District Ranger Leeann Murphy on September 27, 2021. On September 29, 2021, District Ranger Murphy also approved KORE's Plan of Operation (PoO) for the drilling project, authorizing operations to begin.

3.      The Decision authorized KORE to conduct extensive mineral exploration drilling, road construction and reconstruction, and other ground-disturbing operations on public lands in the Long Valley area on the eastern flank of the Sierra Nevada mountain range in Mono County east of the town of Mammoth Lakes. These lands are occupied habitat of the imperiled Bi-State sage-grouse population of the greater sage-grouse (*Centrocercus urophasianus*) and the Project may impact surface and groundwater that feed the Owens River and Hot Creek, which support some of the best fisheries in the State, provide habitat for the endangered Owens tui chub (*Siphateles bicolor snyderi*), and supply water for the city of Los Angeles.

4.      Despite the significant adverse impacts to imperiled wildlife species, water, and other important public resources, the USFS purported to comply with the National Environmental Policy Act (NEPA) via a cursory "Categorical Exclusion" (CE), which severely limited public review of the project. By relying on a CE where extraordinary circumstances—significant impacts to imperiled species and their habitat—were present, the USFS violated NEPA.

5.      The agency also violated NEPA by relying on a CE that on its face does not apply to this Project. The CE the agency relied upon is for "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations," involving less than one acre of disturbance. 36 C.F.R. §220.6(e)(8) ("CE-8"). Yet the mineral exploration operations, by the agency's own admission,

will last more than one year, as the required reclamation of the exploration impacts will last at least another year, if not longer, after completion of the drilling. In addition, the agency failed to account for numerous sources of Project-associated disturbance in determining the Project disturbance would be less than one acre.

6.      In an attempt to bypass this strict 1-year operation limit in that CE category, when it issued the Decision the USFS informed the public for the first time that it was approving the required reclamation for the mining exploration as a completely separate project under a different and additional CE for "habitat restoration activities." 36 C.F.R. §220.6(e)(6) ("CE-6"). According to the agency, since the CE-6 category for habitat restoration does not have a one-year limit, by artificially splitting the project in two, the two projects together are not subject to any time limit and thus can be excluded from the full public review required by NEPA.

7.      As detailed below, this obvious attempt to shield the agency's decisions from full public review violates NEPA, its implementing regulations, and the USFS' own NEPA Handbook and policy.

8.      The illegality of this scheme is further shown by the approval of the "habitat restoration" aspect of the Project under the wrong regulatory structure. The Decision approves all aspects of the Project under a purported "right to explore" for minerals under federal mining laws. Yet, under the USFS's attempt to justify its artificial bifurcation of the Project, the agency asserts that the "habitat restoration" aspect of the Project is unrelated to the mineral exploration aspect of the Project, and thus federal mining laws would not apply.

9.      But if it were true that this new "habitat restoration project" was completely independent of the mineral exploration project and falls within a separate "habitat restoration" CE-6, the 1897 Organic Act and USFS regulations require these public land activities to be done under a Special Use Permit (SUP), subject to application, review, and approval requirements – requirements that the agency never applied here.

10.      For these and the related reasons addressed herein, Plaintiffs ask this Court to declare that the Decision, project approvals, and application of the two CEs violate federal law. Plaintiffs further ask this Court to set aside/vacate and remand the Decision to the USFS, and

enjoin any construction, operation, or development of the project(s) until the violations have been corrected.

## JURISDICTION AND VENUE

11.     This is a suit pursuant to the APA, NEPA, the Organic Act, and federal regulations and requirements. Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief).

12.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 (b) and (e). The USFS Mammoth Lakes District Office, and named Defendant Leeann Murphy, who issued the Decision and project approval decision, are located in Mono County, California. The exploration project, and purported "habitat restoration" project, are located in Mono County. Plaintiff Friends of the Inyo is located and resides in Mono County.

## PARTIES

13.     Plaintiff Friends of the Inyo (FOI) is a local non-profit organization based in Bishop, California that works to protect the natural and human resources of the Inyo National Forest, in which the two projects would be located. One of FOI's main goals is to identify the problems of mineral projects in important wildlife habitat. FOI works to find solutions that will preserve our natural ecosystems, public lands, open spaces, and quality of life for local communities. Members of FOI hike, view and photograph wild plant and animal life, and generally enjoy using the area at the project(s) site for recreational, historical, conservation, and aesthetic purposes. Members of FOI intend on continuing to use and value the lands at, and affected by, the projects during the rest of 2021 and in future years. These uses will be immediately, irreparably, and significantly harmed by the projects.

14.     Plaintiff Western Watersheds Project (WWP) is a non-profit organization with more than 12,000 members and supporters whose mission is to protect and restore western watersheds and wildlife through education, public policy initiatives and legal advocacy. WWP has longstanding interests in public land management in California and employs a California

Director. WWP and its staff and members use and enjoy the public lands and their wildlife, cultural and natural resources for health, recreational, scientific, spiritual, educational, aesthetic, and other purposes, at the projects' site. WWP also has a direct interest in mineral development that occurs in areas with sensitive wildlife populations and important wildlife habitat, such as the Bi-State sage-grouse. The projects would be located in and have effects on lands and waters where WWP staff and members have enjoyed—and intend to continue enjoying in the coming months and in the future—camping, hiking, photographing natural high desert beauty, appreciating the natural environment and sage-grouse and other wildlife in the area. These uses will be immediately, irreparably, and significantly harmed by the projects and related operations.

15. Plaintiff Center for Biological Diversity ("the Center") is a non-profit corporation headquartered in Tucson, Arizona, with offices and staff in a number of states, including California. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in protecting threatened and endangered species, and their habitat. The Center has over 84,000 members throughout the United States and the world. The Center brings this action on its own behalf, and on behalf of its members. The Center has worked on behalf of our members to protect the Bi-State sage-grouse which occupy the lands impacted by the Project and to protect Owens tui chub that may be impacted by the Project. The Center has members who regularly use and enjoy the federal public lands managed by the USFS within the Mammoth Lakes Ranger District, including the lands and waters within and near the lands affected by the projects for a variety of purposes, including hiking, photographing scenery, plants and wildlife, spiritual renewal, and engaging in other vocational, scientific, and recreational activities and plan to continue to do so in the upcoming year. The Center's members derive health, recreational, inspirational, religious, scientific, educational, and aesthetic benefits from their activities within these public lands and from the continued survival and recovery of the Bi-State sage-grouse and Owens tui chub populations in this area. These uses and the interests of the Center's members will be immediately, irreparably, and significantly harmed by the projects.

16.     The Sierra Club is one of the nation's oldest grassroots organizations whose mission is "to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments." Sierra Club has more than 2.7 million members and supporters. Its members have long been committed to protecting and enjoying the Inyo National Forest and have a significant interest in the proposed Long Valley projects and related activities. Club members, including members of the Range of Light Group of the Sierra Club and others, use and enjoy the lands and waters to be affected by the Projects and intend on continuing these uses in 2021 and in future years.

17.     In addition to the immediate and irreparable harm to the lands and waters used by Plaintiffs and their members, caused by the Project (both the drilling aspect and the reclamation/restoration aspects of the Project) and USFS' approval of the Project, Plaintiffs, and their members, have been, and are being, irreparably harmed by USFS' failure to conduct a proper NEPA analysis and to fully involve the public, and Plaintiffs, and their members, in the required NEPA and Organic Act process. Without the public process required by law, the USFS' action is not fully-informed and overlooks serious environmental impacts that would have been brought to light had the agency completed the required process, including fully soliciting public input and considering in detail environmental impacts and alternatives.

18.     Defendant U.S. Forest Service (USFS) is an agency of the United States Department of Agriculture. The USFS has oversight responsibility for the federal lands affected by the projects.

19.     Defendant Leeann Murphy, the Acting District Ranger for the USFS Mammoth Lakes Ranger District is the Authorized Officer for the challenged Decision, PoO approvals, and related decisions. She is sued in her official capacity.

///

///

6

## THE LONG VALLEY EXPLORATION PROJECT

20.     On July 24, 2020, the USFS District Office in Mammoth Lakes received the proposed Plan of Operations (PoO) for the KORE Mining Ltd Long Valley Exploration—a proposal to conduct exploration for gold on public lands.

21.     According to KORE's revised PoO (August 2021): "The Long Valley drilling program is a newly proposed exploration drilling project located in Mono County, CA. Its purpose is to evaluate the mineral potential within a claim block controlled by KORE on a portion of a claim area that includes 95 contiguous unpatented mineral claims on 1,848 acres." August 2021 PoO at 1.

22.     "The project boundary area proposed for exploration is within a claim block controlled by Kore Mining and encompasses 230 acres." USFS public "scoping letter" dated April 7, 2021, at 1.

23.     Although, in an effort to minimize the actual impacts, the agency asserts that the actual disturbed lands total only 0.82 acres, in truth, the project's impacts are much larger, as the drilling pads, existing road use and new road construction will be scattered throughout that large claim block. "Twelve drill pads, measuring 53 feet by 30 feet, will be constructed and up to 3 core borings will be drilled on each pad. The proposed drilling equipment will access the property across existing public roads and will utilize temporary access roads from the public roads to the drilling pad locations to minimize disturbance from road grading. Up to 1,700 feet (0.32 miles) of temporary access road will be created." Decision at 2.

24.     "Drilling on each pad will include up to 3 core, angle borings at a drill length between 820 feet (250 m) and 1,476 feet (450 m). Individual borings will be drilled at angles of 45 to 75 degrees from vertical. Total depths of the borings will range from approximately 580 feet to 1,424 feet below ground surface." August 2021 PoO at 13.

25.     This drilling will puncture the regional groundwater aquifer, as data indicates that current "[d]epths to water ranged from 69 to 425 feet" below the surface. Technical Memorandum prepared for KORE dated June 1, 2021.

26.     Endangered Owens tui chub rely on groundwater discharge down gradient from the project site and would be adversely affected by changes to water quality or quantity in Little Hot Creek and the Hot Creek Hatchery Spring in the Project area, but this potential impact is not addressed in the Decision.

27.     The exploration project has garnered significant public concern and opposition. Both Mono County and the Town of Mammoth Lakes voted unanimously to oppose the use of a CE to cut off public review.

28.     The Mammoth Lakes Town Council noted that there are extraordinary circumstances precluding the use of a CE including potentially adverse effects to Bi-State sage-grouse, a scenic corridor, Hot Creek and Little Hot Creek which are eligible for Wild and Scenic River designation, and cultural sites.

29.     Mono County raised similar concerns about the extraordinary circumstances and regarding the lack of needed information in the scoping notice as to water use and source, water quality impacts, waste storage, containment, and transportation which undermine public comment, lack of coordination with the County, and lack of appropriate consultation with local tribes. Mono County specifically asked USFS for additional public comment opportunities: "The County requests that going forward, the Inyo National Forest ("INF") ensure a complete and clear project description, scope, and any supporting documents (such as any revised EPO) be released simultaneously for future scoping or public comment periods. Provision of complete and timely information will provide both the County and the public a better understanding of the project to ensure meaningful comments and analysis." Mono County letter to USFS dated May 18, 2021 at 1. The USFS nevertheless refused to provide any further opportunities for public review and comment.

30.     The affected lands are a wildlife-rich and highly scenic area at the foot of the Sierra Nevada Mountains. On August 11, 2020, one of Plaintiffs' members took this photo of the Project site looking west from above Drill Sites 9, 10, and 11 towards Mt. Morrison:



31.     For instance, the Project area contains year-round habitat for the Bi-State sage-grouse, a genetically unique population of greater sage-grouse identified as a distinct population segment (DPS). The sage-grouse is a ground-nesting bird known for its famous mating dance performed on breeding grounds called leks. The species has high site fidelity and birds return to the same leks and seasonal habitats year after year.

32.     The Bi-State sage-grouse is gravely imperiled and the U.S. Fish and Wildlife Services has twice proposed—and withdrawn—rules listing the species under the Endangered Species Act. The USFS recognizes the Bi-State sage-grouse as a Sensitive Species deserving special protection.

33.     The Bi-State DPS occurs only within portions of five counties in western Nevada and three counties in eastern CA, including Mono County. The Project occurs in the Long Valley subpopulation within the South Mono Population Management Unit (PMU) for the Bi-State sage-grouse. The Project area is within three miles of seven primary and six satellite sage-grouse leks—including lek 8, which, in 2021, comprised the second largest concentration of breeding males in the PMU. The closest primary lek is located 0.4 miles from the project area boundary

9

and its satellite lek is located within the Project site itself. There are nesting and brooding locations strung out from one to four miles from the drill sites. Plaintiffs submitted to USFS photographs and GIS data of sage-grouse scat found in 26 locations within the Project area—showing recent and extensive use by the species.

34.     In 2012, the Bi-State Action Plan (BSAP) was developed to summarize and document the record of conservation actions completed to mitigate threats to the Bi-State sage-grouse since 2004, and to develop a comprehensive set of strategies, objectives and actions for effective long-term conservation. One of the primary conservation goals of the Bi-State Action Plan was to protect continuous blocks of unfragmented sagebrush habitat, such as that which exists in the Project area. *See* Inyo National Forest Plan, at 37-41.

35.     In scoping comments on the proposed exploration, the California Department of Fish and Wildlife (CDFW) stated that the Project would adversely affect the Bi-State sage-grouse through the direct loss and degradation of this contiguous, unfragmented sagebrush-steppe habitat:

> Based on radio-telemetry data provided by the U.S. Geological Survey (USGS), the Project area and vicinity is known to provide year-round habitat for the Bi-State sage-grouse. The sage-grouse is a sagebrush (Artemisia spp.) obligate species because it depends entirely on sagebrush for foraging, nesting and brood rearing. Sagebrush loss and disturbance resulting from construction of drill pads and temporary access routes would remove traditional nesting habitat and fragment sage-grouse foraging and brooding habitat.

CDFW May 3, 2021 letter at 2-3.

36.     The Project would further threaten sage-grouse habitat by increasing the risk of wildfire—"the greatest threat to sage-grouse habitat in the west" and "one of the primary factors linked to population declines." CDFW May 3, 2021 letter at 3. Wildfire could affect sagebrush habitat connectivity and cause "invasion of exotic annual grass species, such as cheatgrass." Id.

37.     CDFW also highlighted that sage-grouse would be harmed by the access routes along which the project's heavy equipment, drill rigs, and trucks would travel:

> Noise and other forms of human intrusion could result in disturbance to sage-grouse breeding, foraging, nesting and brood rearing activities. The primary

10

> access roads (Owens River Road and Antelope Springs Road) to the Project pass within proximity to four known sage-grouse leks. The Antelope Springs Road passes within approximately 150 meters to the south of lek 8, which in 2021 comprised the second largest concentration of breeding male sage-grouse in the Long Valley PMU. Noise and dust generated by daily vehicular traffic associated with the Project could potentially impact grouse breeding behavior and ultimately result in lek abandonment. Furthermore, human intrusion impacts in the Project area could result in the abandonment of sage-grouse nesting, foraging and brooding habitat.

CDFW May 3, 2021 letter at 3.

38.     In an apparent effort to avoid some of these disturbances to sage-grouse, the USFS' Decision imposes a timing limitation preventing the exploration activities from occurring between "March 1st through June 30th unless prior written approval from the Forest Wildlife Biologist is obtained." Decision at 15 (Appendix A). But these restrictions will not be sufficient: USGS data shows that late-nesting sage-grouse and broods use the Project area through mid-September. Birds that remain in the Project area after the end of June will still be subject to repeated disturbance from trucks multiple times per day on access roads such as the Antelope Springs Road, which bisects the brooding area, likely impacting many birds that bred on lek 8. Adverse impacts to these birds will reduce their likely of survival and recruitment.

39.     Indeed, one of Plaintiffs' members photographed several sage-grouse and sage-grouse tracks on a recent trip to the Project area on October 3, 2021 at 10 am.



40.     CDFW also raised potentially severe impacts to both water quality and quantity from the Project's drilling puncturing the regional aquifer:

The proposed exploratory drilling would include construction of several drill holes to depths of 300-500 feet to further assess mineral deposit. Based on the technical report as well as USGS Publications on the Long Valley Geothermal Aquifer (e.g. https://pubs.er.usgs.gov/publication/ofr20191063) the test holes will reach both the cold water (unconfined, surface aquifer) and geothermal (confined aquifer) in Long Valley. The technical report prepared by Kore Mining indicates that previous test holes have resulted in 'good [water] flow.' Based on the available literature, it is highly likely that these holes should be classified as 'artesian wells,' due to the positive hydraulic pressures documented in the area. Construction of artesian wells can reduce confined aquifer pressures and impact the quantity and quality of the groundwater discharged at adjacent springs. In addition, the project may increase the permeability of the confining layer separating the two surface and deep aquifer systems by constructing uncased holes through the confining layers. This leads to an influx of geothermal chemicals (such as arsenic, nitrate, phosphate, halogen anions, and cyanide) into the shallow water aquifer.

CDFW May 3, 2021 letter at 4. According to the Decision, the drilling depths would be much greater and "Total depths of the borings will range from approximately 580 feet to 1,424 feet below ground surface." Decision at 13.

41.     CDFW noted that federal and state-listed endangered Owens Tui Chub in Little Hot Creek and the Hot Creek Hatchery Spring rely on groundwater discharge and would be adversely affected by changes to water quality or quantity, as would the sole relict population of Long Valley Speckled Dace, a candidate for listing under the Endangered Species Act. The Hot Creek Hatchery, which supports recreational fishing as well as rearing of federally threatened Lahontan Cutthroat Trout, would also be harmed by impacts to its water supply springs, located one mile from the Project area. CDFW expressed further concerns about impacts to the cold and warm water springs, which provide water for both Hot Creek (a Fish and Game Commission-designated Wild Trout Water) and the Upper Owens River, a popular trophy trout fishery and water supply for the city of Los Angeles. CDFW May 3, 2021 letter at 4.

42.     Due to these, and other, potentially significant impacts from the Project, in July 2020, the USFS determined that NEPA required it to prepare an "Environmental Assessment" (EA) with full public review opportunities and detailed environmental analysis: "Our initial review of the Plan of Operation indicates that an Environmental Assessment will need to be

12

completed for this project." USFS District Ranger Gordon Martin letter to KORE dated July 28, 2020.

43.     Yet without any public explanation, the agency abruptly reversed course and in 2021 determined that it would not prepare and EA, but instead would truncate its review and utilize a Categorical Exclusion to expedite its approval of the Project. USFS public "scoping letter" dated April 7, 2021.

44.     In its April 7, 2021 scoping letter for the CE, USFS notified the public that it would review the entire Project under the CE category for "short term" mineral investigation projects lasting less than one year: "It is anticipated that this project can be completed under a categorical exclusion under the category established under 36 CFR 220.6 (e)(8), because it is a 'short term (1 year or less) mineral investigation and incidental support activities.'" Scoping letter at 2.

45.     During the limited 30-day public scoping period, on May 12, 2021, Plaintiffs submitted extensive comments detailing potential impacts and explained how the project would exceed the 1-year limit, because while the initial drilling might be done within a year, other required project operations, such as reclamation and monitoring, would last well into future years.

46.     The agency issued the Decision on September 27, 2021. But instead of relying on the "1 year or less" CE-8 category, which as Plaintiffs had shown it could not lawfully do, the agency advanced a new rationale for the Decision. For the first time, it claimed that the Project-associated required reclamation activities would be considered a completely separate project that fell within a new CE-6 category, for "habitat restoration projects" without the timing limitation applicable to the mineral exploration CE-8.

47.     In essence, faced with the evidence showing that all required aspects of the exploration Project could not be completed within 1 year, and thus the identified short-term mineral exploration CE-8 category could not be legally applied to the exploration Project, the agency split the Project in two and renamed the required reclamation for the exploration a

"habitat restoration" project in order to manufacture a rationale to circumvent the strict 1-year time limit in the drilling project CE-8.

48.     This new "habitat restoration" project was approved using a CE-6 category for "Timber stand improvement and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. §220.6(e)(6).

49.     The agency never subjected this newly-branded "habitat restoration project" to public review, nor ever informed the public that it was considering a new CE-6 category to approve the required reclamation for the Project. Nor did the agency conduct the required consultation with the public and affected Native American Tribes and communities under the National Historic Preservation Act (NHPA) regarding this new project.

50.     Had the agency solicited feedback on the new "habitat restoration project" from the public, Plaintiffs would have objected to the agency's segmentation of its NEPA analysis for a single mining exploration project into two separate CEs and would have raised issues with the improper use of the CE-6 for habitat restoration to circumvent the 1-year limit in CE-8 for mineral exploration. But USFS never invited or considered public comment on a separate restoration project.

51.     This scheme is illegal and the new rationale is belied by the agency's own admission that the Decision approves all of KORE's operations as solely a mineral exploration project where "KORE mining therefore has a legal right to explore/develop and conduct reasonably incident activities" under the General Mining Law of 1872." Decision at 1.

52.     Yet, in the same approval document, the agency argues that the "habitat restoration project" is not related to the mineral exploration: "These activities are not required to support the mineral exploration activities." Decision at 3. The habitat project activities "are not support activities necessary for mineral exploration; the mineral exploration can proceed without these actions and will be complete before these actions occur." Decision at 3-4.

53.     This is false on its face. Under USFS mineral regulations, the required reclamation of the impacts from the exploration are considered part of the mineral exploration

14

"operations" proposed by KORE. 36 C.F.R. §228.3(a). All aspects of the Project, including monitoring and reclamation, are considered part of the authorized "operation." The regulations define "operations" as "[a]ll functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto." 36 C.F.R. §228.3.

54.    Under these regulations, the agency can only approve activities that can be reclaimed. In detailing the reclamation requirements, the regulation specifically includes rehabilitation/restoration of wildlife habitat as part of reclamation component of a mineral exploration plan:

> [O]perator shall, where practicable, reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and off-site damage to the environment and forest surface resources including:
> (1) Control of erosion and landslides;
> (2) Control of water runoff;
> (3) Isolation, removal or control of toxic materials;
> **(4) Reshaping and revegetation of disturbed areas, where reasonably practicable; and**
> **(5) Rehabilitation of fisheries and wildlife habitat**.

36 CFR 228.8(g)(emphasis added).

55.    In addition, under USFS mining regulations, KORE is required to submit a "reclamation cost estimate/financial assurance" (or bond). 36 C.F.R. §228.13. KORE's Plan of Operations recognizes that KORE's submittal of this required reclamation bond must cover "costs for … seeding the temporary access roads and [drill] pads." PoO at 27.

56.     Recognizing that the exploration project and the required reclamation could not be accomplished within the one year limit of CE-8, the agency created the new "habitat restoration" project and labeled the required reclamation "seeding" as now part of "habitat restoration" that it admits "may continue past one year as needed for successful reclamation." Decision at 2.

57.    As noted in the USFS's *Anatomy of a Mine* regulatory guidance report, reclamation is a critical and required component of a mineral exploration plan:

> Satisfactory reclamation should emphasize three major objectives:

1. The productivity of the reclaimed land should at least equal that of the premine surface. This does not necessarily mean that the site must be restored to an approximation of its original condition, or that surface uses after mining will be the same as those existing prior to mining. For example, an area used for marginal grazing prior to mining may be changed to a useful and attractive recreational complex, or perhaps in another case to a housing area.

2. Satisfactory reclamation should leave the mined area in a condition that will not contribute to environmental degradation either in the form of air- or water-borne materials, or from chemical pollution.

3. The reclaimed area should be esthetically acceptable and it should be safe for the uses intended.

*"Anatomy of a Mine, From Prospect to Production,"* USDA Forest Service, General Technical Report INT-GTR-35, Revised February 1995, at 68-69.[1]

58.     USFS' effort to rebrand the Project reclamation as a separate "habitat restoration project" is thus contrary to its own regulation and policy which specifically provides that reclamation is part of the mineral exploration "operation."

59.     Here, there is no dispute that the Project, including the necessary reclamation, will not be completed in one year. The agency admitted in its scoping for the Project that the reclamation and monitoring for the Project would take at least three years. Scoping letter at 1.

60.     As KORE's PoO acknowledges, under the section entitled "Reclamation Success," reclamation obligations and work will continue "annually for three years or until success criteria are reached following the winter season to evaluate the progress of the revegetation effort." PoO at 26. This reclamation work could include "additional seeding, weed controls or repair." Id.

61.     KORE's PoO also admits that the Project will not be completed within one year: "KORE is requesting this EPO be approved for a period of 1 year from the approval date. Revegetation monitoring and reclamation maintenance will continue after the one-year period, as required." PoO at 27.

---

[1] PDF available from the USFS at https://www.fs.fed.us/rm/pubs_int/int_gtr035.pdf   (viewed October 7, 2021).

62.     Thus, whether or not drilling may finish in one year, Project operations "in connection with" and "reasonably incident" to the actual exploration (as defined in 36 C.F.R. §228.3(a)) will not be completed until up to three years or more after drilling is completed. As such, the Project operations, taken as a whole as mandated by the agency regulations, do not meet the "1 year or less" requirement of the CE-8 utilized by the agency here.

63.     This same USFS assertion was held illegal in Defenders of Wildlife v. U.S. Forest Service, Order, 4:14-cv-02446-RM (D. Ariz. 2015, Doc.# 39). On very similar facts, the federal court held that since monitoring of reclamation success would last three years, and that reclamation based on that monitoring "may be required during the three-year monitoring period" – the situation here – the agency could not use the "short-term" mineral exploration category for a proposed mineral exploration project.

64.     "Defendants argue that this three-year monitoring period should not be considered part of the project's duration because all ground-disturbing project activities will be completed before the monitoring period begins; however, the Decision Memorandum anticipates that additional ground disturbing reclamation activities may be required during the three-year monitoring period. USFS's determination that the project can be completed in one year or less is unsupported by the record." Defenders, Order at 8.

65.     "USFS argues that, if additional reclamation work is required during the three-year monitoring period, the additional reclamation work would be reviewed under NEPA. However, the reclamation work is already contemplated in and authorized by the Decision Memorandum, with no indication in the record that the already-approved reclamation design features would require a new Plan of Operations or further review and approval." Order at 8, n.5

66.     "Therefore, USFS's approval of the project using the categorical exclusion for short-term mineral explorations pursuant to 36 C.F.R. §220.6(e)(8) was arbitrary and capricious." Order at 8.

67.     Further, if it were true that this new "habitat restoration project" was completely independent of the mineral exploration project and falls within a timber stand improvement CE-6, the 1897 Organic Act and USFS regulations require that project to be done under a Special

Use Permit (SUP), subject to separate application, review, and approval requirements. As the Forest Service's regulations provide: "[a]ll uses of National Forest System lands, improvements, and resources, except those authorized by regulations governing … minerals (part 228) are designated 'special uses.' Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer, unless that requirement is waived by paragraphs (c) through (e)(3) of this section." 36 C.F.R. §251.50(a).[2]

68.     Issuance of a SUP is entirely discretionary with the agency. *See, e.g.,* 36 C.F.R. §251.53 (agency "**may** issue special use authorizations.")(emphasis added).

69.     Yet the Decision states that under the USFS' interpretation of the Mining Law, it treated all aspects of the Project, including the newly-created "habitat restoration project" as a mineral operation under the 1872 Mining, where the agency had **no discretion**: "The management of the mineral resource is guided according to Federal law and regulation rather than the management discretion of the Forest Service." Decision at 9. There is no mention of regulating the "habitat restoration project" under any other regulatory system but as a mineral operation under the mining regulations.

70.     The agency cannot have it both ways, approving both the exploration drilling/road project and the habitat restoration project (to avoid the 1-year limit) under asserted "rights" under the 1872 Mining Law (under which USFS believed it had "no discretion"), yet at the same time arguing that the required reclamation, now renamed a habitat restoration project, is not part of, and is completely independent of, the exploration project and any "rights" under the Mining Law.

---

[2] The only possible "waiver" of the requirement for a SUP for the habitat project is subsection (e)(1), where "The proposed use will have such nominal effects on National Forest System lands, resources, or programs that it is not necessary to establish terms and conditions in a special use authorization to protect National Forest System programs or operations." 36 C.F.R. §251.50(e)(1). That is inapplicable here because the challenged Decision establishes a number of terms and conditions requiring KORE to undertake various activities such as seeding, fencing, monitoring, and revegetation. Decision at 3.

71.     Either the reclamation/habitat restoration operations are part of the exploration project – and the "short term" CE-8 category cannot apply – or the new habitat/reclamation project is a separate project on federal lands requiring a separate permit approval process under the 36 C.F.R. Part 251 regulations (which were never applied). As noted, however, the agency cannot legally divorce the reclamation requirements mandated in its 36 C.F.R. Part 228A mining regulations from its review and approval of a mineral exploration operation to avoid the 1-year limit.

72.     If the agency desires to create a new and additional habitat restoration project separate from the exploration project, it must require KORE to submit a separate SUP application under 36 C.F.R. 251 Subpart B (which it never did). It cannot shoehorn the two projects together in an attempt to avoid the 1-year limit and also avoid the separate permitting requirements for the habitat project, which is essentially a request for a SUP under regulations wholly different from mining exploration projects and their required reclamation.

73.     Further, even if both CE categories could lawfully be applied to excuse USFS from preparing an EA or EIS prior to approving operations, the "extraordinary circumstances" in this case—significant impacts to the Forest Service Sensitive Bi-State sage-grouse and ESA-listed Owens tui chu—preclude use of any CE. By unlawfully approving the Project without first completing an EA or EIS, the USFS failed to fully consider impacts to these species and their habitats from the authorized activities.

74.     The USFS also overlooked the potentially significant environmental effects from the Project's operations, including by failing to consider where the 4,000 gallons of water per day needed for the exploration will come from and by arbitrarily limiting its consideration of the "project area" and "disturbed acres" to just the immediate drilling sites and road construction—thus ignoring impacts from the constant heavy equipment and truck traffic to and from the drill sites on wildlife, recreation, cultural resources, and other affected public resources.

75.     Finally, the USFS also failed to consider other possible significant cumulative effects flowing from the Project impacts combined with those of nearby current and reasonably

foreseeable mining/mineral, agriculture, water withdrawals/use, grazing, traffic, energy development, and all other activities in the area (including along/near access and truck routes).

76.      In sum, the Forest Service cannot use a categorical exclusion (CE) to approve the exploration project for at least four reasons: (1) the exploration and all related operations cannot be completed in "one year or less" as required to use CE-8; (2) the exploration will likely adversely affect a designated sensitive species (Bi-State sage-grouse) and the endangered Owens tui chub and thus "extraordinary circumstances" preclude the use of any CE; (3) the Forest Service failed to fully evaluate the direct, indirect, and cumulative impacts of the exploration and other activities prior to proposing to rely on a CE as required by its scoping regulations; and (4) the agency illegally bifurcated the exploration project by adding the new "habitat restoration project" in an attempt to avoid the 1-year limit of the mineral exploration CE-8.

## **STATUTORY AND REGULATORY BACKGROUND**

The National Environmental Policy Act

77.      "In NEPA, Congress recognized the 'profound impact' of human activities, including 'resource exploration,' on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.' 42 U.S.C. §4331(a)." Center for Biological Diversity v. U.S. Dept. of the Interior, 623 F.3d 633, 642 (9th Cir. 2010).

78.      NEPA has "twin aims." First, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." Kern v. BLM, 284 F.3d 1062, 1066 (9th Cir. 2002), *quoting* Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87, 97 (1983).

79.      NEPA requires federal agencies to fully analyze the "effects" or "impacts," "including those effects that occur at the same time and place as the proposed  action or alternatives and may include effects that are later in time or further removed in distance from the

proposed action or alternatives." 40 C.F.R. §1508.1(g).[3] NEPA requires federal agencies to take a "hard look" at the environmental effects of their proposed action. <u>Marsh v. Oregon Nat. Res. Council</u>, 490 U.S. 360, 374 (1989).

80.     NEPA and its implementing regulations promulgated by the Council on Environmental Quality (CEQ) require federal agencies to prepare an "environmental impact statement" (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §4332(2)(C).

81.     If an agency is unsure whether a proposed action may have significant environmental effects, it may prepare a shorter document called an "environmental assessment" (EA) to determine if the proposed action will have significant environmental effects and whether an EIS is necessary. 40 C.F.R. §1501.4(c)(1978); 40 C.F.R. §1501.5(2000).

82.     In narrow situations, neither an EA nor an EIS is required and federal agencies may invoke a "categorical exclusion" (CE) from NEPA. 40 C.F.R. §1501.4 (2000, 1978).

83.     A "categorical exclusion" is defined as "a category of actions that the agency has determined, in its agency NEPA procedures (§1507.3 of this chapter), normally do not have a significant effect on the human environment." 40 C.F.R. §1508.1(d)(2000); *see also* 40 C.F.R. §1508.4(1978).

---

[3] On July 16, 2020, the Council on Environmental Quality issued new regulations at 40 C.F.R. Part 1500 implementing the National Environmental Policy Act, replacing previous regulations from 1978. *See* 85 Fed. Reg. 43304 (July 16, 2020) (available at https://www.federalregister.gov/documents/2020/07/16/2020-15179/update-to-the-regulations-implementing-the-procedural-provisions-of-the-national-environmental). The new NEPA regulations specifically provide that they "only apply to any NEPA processes *begun after* September 14, 2020." 40 C.F.R. §1506.13 (emphasis added). However, they also provide that "[a]n agency *may apply* the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." *Id.* (emphasis added). Because the NEPA process for this matter began before September 14, 2020 and the Forest Service did not formally apply the 2020 NEPA regulations, the 1978 regulations apply here. Nevertheless, Plaintiffs here cite to both the 1978 regulations and the 2020 regulations, should the Forest Service belatedly announce in litigation that the 2020 regulations apply.

84.     Each federal agency must develop "specific criteria for and identification of" actions that qualify for a categorical exclusion. 40 C.F.R. §1507.3(e)(2) (2000); 40 C.F.R. §1507.3(b)(2)(ii)(1978).

85.     Federal agencies are required to "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. §1507.3(e)(2)(ii)(2000); 40 C.F.R. §1508.4(1978).

86.     The USFS's categorical exclusion regulations require "scoping" prior to the use of a categorical exclusion. *See* 36 C.F.R. §220.6(c)(determination of potential for significant effects must be "based on scoping").

87.      NEPA's statutory framework, as well as USFS's own regulatory policies enumerated in the Forest Service Handbook (FSH), Section 1909.15 *et seq*., require the agency to consider potentially significant environmental effects, including cumulative impacts, before deciding to invoke a categorical exclusion and moving forward with a proposed action in the absence of an EA or EIS. If the proposed action may have a significant effect, USFS must prepare an EIS. *See* 36 C.F.R. §220.6(c). If, in contrast, USFS is uncertain whether the proposed action may have a significant effect, it must prepare an EA. Id.

88.     As required by the USFS's NEPA regulations "scoping" is required to solicit public input and ascertain the impacts and other aspects of the proposed project:

> (e)   Scoping (40 CFR 1501.7). (1) Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§ 220.6). (2) Scoping shall be carried out in accordance with the requirements of 40 CFR 1501.7.

36 C.F.R. §220.4(e).

89.     "Scoping is important to discover information that could point to the need for an EA or EIS versus a CE. Scoping is the means to identify the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS. Scoping should also reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects." FSH 1909.5, Section 31.3.

90.     Accordingly, only where the potential effects of a proposed action are certain to be insignificant, and scoping does not reveal otherwise or raise uncertainty, may USFS invoke a categorical exclusion. The determination of the significance of the potential effects requires USFS to consider the direct, indirect, and cumulative effects and impacts of past, present, and reasonably foreseeable future actions. *See* FSH 1909.5, Section 31.3.

91.     In addition, where "extraordinary circumstances" are present and may be affected, an agency may not invoke a categorical exclusion and USFS should prepare an EA or EIS instead. 36 C.F.R. §220.6(a) and (b).

92.     USFS has identified "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities" as a type of action potentially appropriate for a categorical exclusion from further NEPA analysis. 36 C.F.R. §220.6(e)(8).

93.     As noted above, the challenged Decision also utilized another CE category to approve the "habitat restoration project":

> (6) Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:
> (i) Girdling trees to create snags; (ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand; (iii) Prescribed burning to control understory hardwoods in stands of southern pine; and (iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.

36 C.F.R. §220.6(e)(6). This category CE-6 does not include reclamation of mineral exploration operations, which are considered part of mineral "operations," yet the agency utilized this category to approve the exploration project reclamation operations.

94.     USFS has developed criteria specifying resource conditions that must be considered in determining whether "extraordinary circumstances" related to a proposed action make the use of a categorical exclusion inappropriate and whether the proposed action warrants further analysis in an EA or EIS.  36 C.F.R. §220.6(a) and (b); Forest Service Handbook §1909.15, Chapter 31.2.

23

95.     The "extraordinary circumstances" that must be considered by USFS before using a categorical exclusion include, but are not limited to, consideration of whether "Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species" are in the project area and cultural sites.  36 C.F.R. §220.6(b)(1)(i), (b)(1)(vi); Forest Service Handbook §1909.15, Chapter 31.2(1).

The Forest Service Organic Act and Agency Permitting Requirements

96.     In addition to the procedural public review requirements under NEPA, the USFS must comply with the substantive permitting requirements for all activities on National Forest lands. These are governed by the Organic Act of 1897, 16 U.S.C. §§478, 551.

97.     The Organic Act directs the agency to "improve and protect" the National Forests. 16 U.S.C. §475. It further requires the Secretary of Agriculture (through the USFS) to "make provisions for the protection [of the lands] against destruction by fire and depredations." 16 U.S.C. §551. The Service "will insure the objects of such [forest] reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." Id.

98.     USFS permitting of mining exploration operations is governed by its regulations at 36 C.F.R. Part 228A.

99.     All other activities are considered "special uses" that require a permit under 36 C.F.R. Part 251, Subpart B (Special Uses). "All uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing … minerals (part 228) are designated 'special uses." Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer." 36 C.F.R. §251.50(a).

100.    Thus, if activities are considered part of a valid mineral operation with valid rights under the Mining Law, they are governed by the Part 228A regulations. All other activities on National Forest lands need a Special Use Permit authorization under Part 251B.

101.    Here, KORE submitted a PoO under 36 C.F.R. Part 228A for approval of its entire mineral exploration plan. See July 2020 PoO (revised in August 2021). Under the

definition of "operations" covered by the Part 228A regulations, all aspects of the exploration project, including monitoring and reclamation, are considered part of the authorized "operation," defined as: "All functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto." 36 C.F.R. §228.3.

## CLAIMS FOR RELIEF

### First Claim For Relief
### (Violation of NEPA and APA)

102. Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

103. In issuing the Decision and approving the exploration project, USFS inappropriately and illegally relied on a categorical exclusion applying to "short-term (1 year of less) mineral, energy, or geophysical investigations and their incidental support activities," 36 C.F.R. §220.6(e)(8), to exclude the exploration project from further NEPA review. The exploration project's exploration, reclamation, monitoring and mitigation, and all incidental support activities will take more than one year to complete, rendering the use of the "short term" mineral exploration CE inapplicable.

104. The agency's reliance on a new "habitat restoration project" cannot be used to circumvent the 1-year limit in CE-8.

105. In addition, USFS acted arbitrarily and capriciously when it reversed course from its own decision that an EA was required for the Project, in violation of NEPA and the APA.

106. USFS's actions, including its decision to invoke two categorical exclusions from NEPA instead of preparing at least an EA violates NEPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. USFS' violation of law prejudices and adversely affects Plaintiffs' rights and interests.

107.    In issuing the Decision and approving the exploration project and its required reclamation as two separate projects, and relying on categorical exclusions for both projects, the USFS inappropriately and illegally failed to adequately consider the direct, indirect and cumulative effects and impacts from all past, present, and reasonably foreseeable future actions in its consideration of the projects, including during the scoping process and categorical exclusion decision-making process.

108.    USFS has developed criteria specifying resource conditions that must be considered in determining whether extraordinary circumstances related to a proposed action make the use of a categorical exclusion inappropriate and whether the proposed action warrants further analysis in an EA or EIS. 36 C.F.R. §220.6(a) and (b); Forest Service Handbook §1909.15, Chapter 31.2.

109.    The "extraordinary circumstances" that must be considered by USFS before using a categorical exclusion include, but are not limited to, consideration of whether "Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species" are in the project area. 36 C.F.R. §220.6(b)(1)(i); Forest Service Handbook §1909.15, Chapter 31.2(1).

110.    "If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion." FSH §1909.15.

111.    The Project will have potentially-significant impacts on the Bi-State sage-grouse and Endangered Species Act-listed fish species that the Forest Service did not adequately consider.

112.    The USFS also violated NEPA by approving the Project under the CEs when extraordinary circumstances that would be significantly affected by the mining exploration and associated reclamation existed. The USFS' approval of the Project(s) despite the existence of extraordinary circumstances, including the agency's determination that there are no extraordinary circumstances that would preclude the use of a CE for the Project(s), is unsupported by the record and violates NEPA and its implementing regulations and policy and are arbitrary, capricious, not in accordance with law, and without observance of the procedures

required by law, within the meaning of the APA, 5 U.S.C. §706. USFS' violation of law prejudices and adversely affects Plaintiffs' rights and interests.

### Second Claim For Relief
### (Violation of NEPA, Organic Act, and APA)

113.    The USFS illegally utilized and approved the newly formulated "habitat restoration project" without subjecting the project to public review under NEPA and the 1897 Organic Act and without a discretionary Special Use Permit as required by the Organic Act, in violation of NEPA, the Organic Act, and their implementing regulations. The agency's Decision to approve the "habitat restoration project" under purported "rights to explore" under federal mining laws violates NEPA, the Organic Act, and their implementing regulations.

114.    In relying upon a separate CE for the required reclamation for the exploration Project, the FS unlawfully segmented its analysis and public review in violation of NEPA and the Organic Act.

115.    Reliance upon and use of the separate restoration project and CE-6 for required reclamation violate NEPA and the Organic Act and their implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706. USFS' violation of law prejudices and adversely affects Plaintiffs' rights and interests.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that USFS violated the APA, NEPA, the Organic Act, and their implementing regulations and policies in issuing its Decision Memo and project approvals.

B.    Reverse, set aside, and vacate USFS's Decision Memo and authorization of the projects.

C.    Enjoin Defendants, their agents, servants, employees, and all others acting in concert with them, or subject to their authority or control, from proceeding with any aspect of the projects, pending full compliance with the requirements of law.

1         D.      Award Plaintiffs their reasonable attorney's fees and costs incurred in this action

2   pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, or other provisions of law.

3         E.      Grant Plaintiffs such injunctive and additional relief as the Court deems just and

4   equitable or as Plaintiffs may hereinafter request.

5

6   Respectfully submitted this 21st day of October, 2021,

7                                           */s/ Lisa T. Belenky*
8                                           Lisa T Belenky (CA Bar # 203225)
Center for Biological Diversity
9   1212 Broadway, Suite 800
Oakland, CA 94612
10   (510) 844-7107
lbelenky@biologicaldiversity.org

11   Roger Flynn, (CO Bar #21078) *Pro Hac Vice*
12   *Application To Be Filed*
WESTERN MINING ACTION PROJECT
13   P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
14   (303) 823-5738
roger@wmaplaw.org
15

16   Talasi B. Brooks (Idaho Bar #9712), *Pro Hac Vice*
*Application To Be Filed*
17   Western Watersheds Project
P.O. Box 2863
18   Boise ID 83714
(208) 336-9077
19   tbrooks@westernwatersheds.org

20   *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

28