JEFFER MANGELS BUTLER & MITCHELL LLP
KERRY SHAPIRO (Bar No. 133912)
DANIEL QUINLEY (Bar No. 312579)
LENA STREISAND (Bar No. 339021)
Two Embarcadero Center, 5th Floor
San Francisco, California 94111-3813
Telephone:     (415) 398-8080
Facsimile:     (415) 398-5584

Attorneys for INTERVENOR-DEFENDANT
KORE Mining Limited

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| FRIENDS OF THE INYO; WESTERN WATERSHEDS PROJECT; CENTER FOR BIOLOGICAL DIVERSITY; and THE SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; LEANN MURPHY, Acting Mammoth District Ranger, <br><br> Defendants. <br><br> KORE MINING LIMITED, <br><br> Intervenor-Defendant. | Case No. 2:21-cv-01955-KJM-KJN <br><br> **INTERVENOR-DEFENDANT KORE MINING LIMITED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGEMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT** <br><br> Hearing on Motion <br> Judge: Chief Judge Kimberly J. Mueller <br><br> Date: June 23, 2022 <br> Time: 10:00 a.m. <br><br> Location:     United States Courthouse <br>                     501 I Street <br>                     Courtroom 3, 15th Floor, <br>                     Sacramento, CA 95814 |

69981073v17

KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................................1

II.  BACKGROUND ...............................................................................................................2

    A.  KORE's Exploration Project .................................................................................2

    B.  KORE's Project is the Result of Nearly Two Years of Preparatory Work ...............5

    C.  The Forest Service Determines that the Project Likely Falls Within a Categorical Exclusion .........................................................................................6

    D.  The Forest Service Initiates the Public Scoping Process ...........................................7

    E.  The Forest Service Considers Public Comments and Finalizes Resource Studies Prior to Approving KORE's Project................................................................8

    F.  The Forest Service Approves KORE's Plan of Operations .......................................8

III.  LEGAL STANDARDS ......................................................................................................9

    A.  National Forest Management ....................................................................................9

        1.  Statutory Management Regime ....................................................................9

        2.  The Forest Service Regulates Mining Activities in the National Forests Pursuant to Federal Law, Not by Special Use Permits ...................10

    B.  The National Environmental Policy Act ..................................................................11

        1.  NEPA is a Procedural Statute That Does Not Mandate Particular Results .....................................................................................................11

        2.  The Forest Service's Use of Categorical Exclusions ..................................11

IV.  STANDARD OF REVIEW ...............................................................................................12

    A.  The Administrative Procedure Act Governs The Court's Review of the Forest Service's Decision..................................................................................12

    B.  The Forest Service is Owed Substantial Deference ..................................................13

V.  ARGUMENT ....................................................................................................................14

    A.  Plaintiffs Fail to Demonstrate that the Forest Service's Use of Multiple Categorical Exclusions Was Arbitrary and Capricious............................................14

        1.  The Forest Service May Use Any and All Applicable Categorical Exclusions When Authorizing Mining Activities Under Part 228A............15

            a.  The Forest Service Properly Invoked CE-8 ....................................16

i

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

b.    The Forest Service Properly Invoked CE-6 ....................................17

c.    Part 228A Does Not Limit the Forest Service to CE-8 Only ...........18

d.    A SUP is Not Required Here..............................................................20

2.    The Forest Service's Decision Not to Seek Additional Public Comment Was Not Arbitrary or Capricious ...............................................21

a.    The Forest Service Was Not Obligated to Undertake Additional Public Scoping ...............................................................22

b.    The Forest Service's Decision to Utilize CE-6 Without Additional Public Comment Did Not Prejudice Plaintiffs ...............24

B.    Plaintiffs Fail to Demonstrate that Extraordinary Circumstances Preclude the Forest Service's Determination that KORE's Project is Categorically Excluded From NEPA.................................................................................24

1.    Speculative Harm to the Sage Grouse is Not an Extraordinary Circumstance ......................................................................................26

a.    The Forest Service's Determination on Extraordinary Circumstances is Entitled to the Highest Degree of Deference .......................................................................................26

b.    The Forest Service Thoroughly Analyzed Potential Harm to Sage-Grouse .......................................................................................27

i.    The Forest Service Diligently Collected and Evaluated Data Related to Potential Impacts to Sage-Grouse .......................................................................................27

ii.    The Forest Service Correctly Determined the Project Would Not Significantly Impact Sage-Grouse.....................28

c.    Plaintiffs' Allegations Ignore the Forest Service's Thoughtful Evaluation of Potential Impacts to Sage-Grouse...........31

d.    Plaintiffs Improperly Rely on Statements Reflecting Internal Agency Deliberations, Not Final Agency Action ...........................31

e.    Plaintiffs Ignore Project Changes.....................................................33

2.    Speculative Impacts to Groundwater, Including to Owens Tui Chub, Do Not Present an Extraordinary Circumstance .......................................34

C.    The Forest Service Properly Considered Cumulative Impacts When Evaluating the Project ...........................................................................36

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

D.      If the Court Grants Plaintiffs' Motion, It Should Remand Without Vacatur ...........37

VI.     CONCLUSION ................................................................................................................39

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
    189 F.3d 851 (9th Cir. 1999).................................................................................11, 12, 13, 24

*Alcoa, Inc. v. Bonneville Power Admin.*,
    698 F.3d 774 (9th Cir. 2012)...................................................................................................13

*All. for the Wild Rockies v. Savage*,
    375 F. Supp. 3d 1152 (D. Mont. 2016) ...................................................................................38

*All. for the Wild Rockies v. Weber*,
    979 F. Supp. 2d 1118 (D. Mont. 2013), *aff'd sub nom.*, 639 F. App'x 498 (9th
    Cir. 2016) ................................................................................................................................11

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146, 150-51 (D.C. Cir. 1993)....................................................................................37

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
    524 F.3d 938 (9th Cir. 2008)....................................................................................................11

*Bicycle Trails Council of Marin v. Babbitt*,
    82 F.3d 1445 (9th Cir. 1996)...............................................................................................11, 13

*Cal. Cmtys. Against Toxics v. Env't Prot. Agency*,
    688 F.3d 989 (9th Cir. 2012)...............................................................................................37, 38

*Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*,
    825 F. App'x 425 (9th Cir. 2020)...............................................................................................4

*Citizens Comm. to Save Our Canyons v. Krueger*,
    513 F.3d 1169 (10th Cir. 2008).................................................................................................10

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
    843 F. App'x 77 (9th Cir. 2021).................................................................................................37

*Conservation Cong. v. U.S. Forest Serv.*,
    2013 WL 2457481 (E.D. Cal. June 6, 2013)............................................................................26

*Cook Inletkeeper v. Raimondo*,
    541 F. Supp. 3d 987 (D. Alaska 2021)......................................................................................39

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
    833 F.3d 1136 (9th Cir. 2016)...................................................................................................13

69981073v17                KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page**

*Ctr. for Biological Diversity v. Salazar*,
  706 F.3d 1085 (9th Cir. 2013)..................................................................................11, 36, 37

*Defenders of Wildlife v. United States Forest Service*,
  No. CV-14-02446-TUC-RM (D. Ariz. Sept. 15, 2015) ......................................................19, 20

*Earth Island Inst. v. Elliott*,
  290 F. Supp. 3d 1102 (E.D. Cal. 2017)..............................................................................33, 36

*Earth Island Inst. v. Elliott*,
  318 F. Supp. 3d 1155 (E.D. Cal. 2018).............................................................................12, 15

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009)....................................................................................................10

*Humane Soc'y of U.S. v. Locke*,
  626 F.2d 1040 (9th Cir. 2010)..................................................................................................38

*In re Big Thorne Project*,
  857 F.3d 968 (9th Cir. 2017)....................................................................................................13

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002)..................................................................................................22

*Lands Council v. McNair*,
  537 F.3d 981, 987 (9th Cir. 2008)......................................................................................13, 14

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
  615 F.3d 1122 (9th Cir. 2010)..................................................................................................13

*Los Padres Forestwatch v. U.S. Forest Serv.*,
  No. 2:19-cv-05925-PJW, 2020 WL 4931892 (C.D. Cal., Aug. 20, 2020)................................15

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ...........................................................................................................12, 25

*Mont. Env't Ctr. v. U.S. Off. of Surface Mining*,
  274 F. Supp. 3d 1074 (D. Mont. 2017) ...................................................................................25

*Mountain Cmtys. for Fire Safety v. Elliott*,
  25 F.4th 667 (9th Cir. 2022)............................................................................................. passim

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999)....................................................................................................21

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page**

*Nat'l Mining Ass'n v. Zinke*,
  877 F.3d 845 (9th Cir. 2017)....................................................................................................12

*Nat'l Parks Conservation Ass'n v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) .........................................................................................24, 25

*Native Ecosys. Council v. Marten*,
  No. CV 17-77-M-DLC, 2018 WL 6480709 (D. Mont. Dec. 10, 2018), *aff'd*,
  800 F. App'x 543 (9th Cir. 2020).................................................................................12, 25, 26

*Native Ecosys. Council v. Tidwell*,
  371 Fed. App'x 718 (9th Cir. 2010).....................................................................................11, 16

*Native Ecosys. Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012)...................................................................................................25

*Nw. Coal. for Alt. Pesticides v. Lyng*,
  844 F.2d 588 (9th Cir. 1988).....................................................................................................24

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Ross*,
  2020 WL 1699980 (E.D. Cal. Apr. 4, 2020)..............................................................................23

*Pac. Rivers Council v. U.S. Forest Serv.*,
  942 F. Supp. 2d 1014 (E.D. Cal. 2013).....................................................................................39

*Pathfinders Mines Corp. v. Hodel*,
  811 F.2d 1288 (9th Cir. 1987)...................................................................................................10

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010)...................................................................................................13

*Sawooth Mountain Ranch LLC v. United States*,
  2022 WL 562612 (D. Idaho Feb. 24, 2022) .............................................................................37

*Short Haul Survival Comm. v. United States*,
  572 F.2d 240 (9th Cir. 1978).....................................................................................................13

*Sierra Club v. Bosworth*,
  510 F.3d 1016 (9th Cir. 2007)...................................................................................................13

*Sierra Club v. U.S. Forest Serv.*,
  828 F.3d 402 (6th Cir. 2016).....................................................................................................37

*Sierra Forest Legacy v. Sherman*,
  951 F. Supp. 2d 1100 (E.D. Cal. 2013)................................................................................37, 38

69981073v17

vi

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page**

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
  608 F.3d 592 (9th Cir. 2010)........................................................................................4

*U.S. Fish and Wildlife Service v. Sierra Club, Inc.*,
  141 S. Ct. 777 (2021) ...................................................................................................23

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) .........................................................................................................13

*United States v. Brunskill*,
  792 F.2d 938 (9th Cir. 1986)........................................................................................10

*United States v. Doremus*,
  888 F.2d 630 (D. Idaho 1989) ......................................................................................21

*United States v. Rizzinelli*,
  182 F. 675 (D. Idaho 1910) ..........................................................................................10

*Uranium Watch v. U.S. Forest Serv.*,
  2010 WL 3703807 (D. Utah Sept. 14, 2010) ...............................................................16

*Utah Env't Cong. v. Bosworth*,
  370 F. Supp. 2d 1157 (D. Utah 2005), *aff'd*, 443 F.3d 732 (10th Cir. 2006) .....................24, 37

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) .....................................................................................................11

*W. Watersheds Project v. Kraayenbrink*,
  620 F.3d 1187 (9th Cir. 2010).......................................................................................23

*Wilderness Soc'y v. Dombeck*,
  168 F.3d 367 (9th Cir. 1999).........................................................................................10

*Wildlaw v. U.S. Forest Serv.*,
  471 F. Supp. 2d 1221 (M.D. Ala. 2007).........................................................................21

*Wyoming v. U.S. Dep't of Agric.*,
  661 F.3d 1209 (10th Cir. 2011)......................................................................................9

*Yazzie v. U.S. Env't Prot. Agency*,
  851 F.3d 960 (9th Cir. 2017)..........................................................................................13

**STATUTES**

30 U.S.C. § 22 ..................................................................................................................10

69981073v17

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page**

Administrative Procedure Act, 5 U.S.C. §§ 701-706 .................................................................12, 13

Endangered Species Act, 16 U.S.C. § 1531, *et seq.* .......................................................................34

Freedom of Information Act, 5 U.S.C. § 552 ...................................................................................23

General Mining Law of 1872 ....................................................................................10, 14, 18, 21

Geothermal Steam Act of 1970, 23 U.S.C. § 1001, *et seq.* ...........................................................36

Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 583, *et seq.*, and (3) ................................9

National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ............................................. passim

National Forest Management Act, 16 U.S.C. § 1600, *et seq.* .......................................................9, 10

The Organic Administration Act of 1897, 16 U.S.C §§ 473-482, 551 .................................9, 10, 21

Surface Resources Act of 1955, 30 U.S.C. § 612 ...........................................................................10

**OTHER AUTHORITIES**

36 C.F.R. Part 228, subpart A ....................................................................................... passim

36 C.F.R. Part 251 .............................................................................................2, 15, 20, 21

36 C.F.R. § 220.4 ..........................................................................................................21

36 C.F.R. § 220.6 ....................................................................................................... passim

36 C.F.R. § 228.4 .....................................................................................................10, 11

36 C.F.R. § 228.5 ..........................................................................................................21

36 C.F.R. § 228.8 ..........................................................................................................21

40 C.F.R. § 1501.7 .....................................................................................................21, 22

85 Fed. Reg. 18052 (Mar. 31, 2020) ..............................................................................7

85 Fed. Reg. 73629 (Nov. 19, 2020) ...........................................................................11, 15

## I.    **<u>INTRODUCTION</u>**

Defendant-Intervenor KORE Mining Limited ("KORE") submits this Memorandum of Points and Authorities ("Memorandum") in opposition to Plaintiffs' Motion for Summary Judgment ("MSJ"), Dkt. 34, and in support of its Cross-Motion for Summary Judgment ("Cross-MSJ"). KORE urges this court to uphold the United States Forest Service's ("Forest Service") decision to approve KORE's Long Valley Exploration Drilling Project ("Project"), a *de minimis* mineral exploration project proposing to construct 12 drill pads in an area previously subject to extensive prior mineral exploration activities, that included over 800 drill borings, hundreds of drill pads, and dozens of access roads, during the 1980s and 1990s. The small scale of KORE's activities and opportunity to improve wildlife habitat (specifically, for the bi-state distinct population segment of the greater sage grouse ("Sage-Grouse")) led the Forest Service to properly determine that the Project was subject to categorical exclusions under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*

Plaintiffs' case, a NEPA challenge to the Forest Service's decision to utilize categorical exclusions, fails because (1) the Project activities fall squarely within scope of activities covered by the two categorical exclusions at issue, and (2) the Forest Service properly determined that no "extraordinary circumstances" precluded the use of those categorical exclusions. At bottom, NEPA is a procedural statute and the Forest Service engaged faithfully and fully in the NEPA process by evaluating the Project; determining the Project is categorically excluded; undertaking public scoping; extensively investigating the potential for "extraordinary circumstances" based on scoping comments, and ultimately approving the Project. These actions, therefore, are owed deference by the Court, absent clear error by the agency.

Plaintiffs' case ultimately relies on two gravely flawed arguments: (1) a complex legal argument that improperly seeks to constrain the Forest Service's use of multiple categorical exclusions, despite controlling Ninth Circuit precedent, and (2) a factual argument that seeks to manufacture extraordinary circumstances to defeat use of categorical exclusions relying on out-of-context comments that actively ignore the Forest Service's diligent efforts to investigate resource conditions.

69981073v17

1

Plaintiffs' first argument rests on a series of faulty assumptions that the Forest Service: (i) cannot use multiple categorical exclusions for the Project; (ii) can only apply one categorical exclusion (36 C.F.R. § 220.6(e)(8) or "CE-8") for activities authorized under its mining regulations (36 C.F.R. § 228A or "Part 228A"), an artificial limitation of the Forest Service's ability to invoke any and all appropriate categorical exclusions for projects; and (iii) cannot authorize certain activities using a categorical exclusion unless it issues a special use permit, essentially requiring a "double" permitting process (*i.e.*, authorization under mining regulations and by special use permit regulations, 36 C.F.R. § 251 ). However, as discussed throughout this Memorandum, these faulty assumptions present the Court with a false dichotomy not supported by law. In fact, under Ninth Circuit precedent, the Forest Service **_can_** use multiple categorical exclusions and approve an activity authorized under its mining regulations using **_any_** categorical exclusion that is appropriate, not just CE-8. Once the flaws underpinning Plaintiffs' argument are exposed, and the correct precedent is applied, Plaintiffs' argument falls apart like a house of cards.

Plaintiffs' second argument is premised on the equally faulty assumption that public comments raising issues related to the Sage-Grouse and groundwater impacts presented during the Project's public scoping period are valid evidence sufficient to overturn the Forest Service's subsequent investigation of impacts to Sage-Grouse and groundwater in direct response to those public comments. This argument fails on two grounds: (i) Plaintiffs ignore the extensive investigations undertaken in response to scoping comments, and (ii) Plaintiffs fail to recognize the Forest Service's clear expertise, the deference to which the agency is entitled, and the fact that a disagreement with the Forest Service's conclusions does not evidence a failure to comply with NEPA.

Plaintiffs' arguments fail to demonstrate clear error and thus do not justify abrogating the Forest Service's approval of the Project. Accordingly, the Court should deny Plaintiffs' MSJ and grant KORE's Cross-MSJ.

## II.      BACKGROUND

### A.      KORE's Exploration Project

KORE's Long Valley Exploration Drilling Project ("Project") is a small-scale mineral

JMBM | Jeffer Mangels Butler & Mitchell LLP

exploration drilling[1] project designed "to evaluate the mineral potential within a claim block[2] controlled by KORE on a portion of a claim area that includes 95 contiguous unpatented mining claims on 1,848 acres." KORE's Exploratory Plan of Operations ("EPO") at AR 00022.[3] The Project is a less intense, smaller-scale continuation of extensive exploration of the Project area undertaken during the 1980s and 1990s. *See id.* This previous exploration program resulted in approximately 824 borings[4] across the claim block and extensive disturbance from historic drill pads and access roads.[5] *See id.* at AR 00022, 00024. The Figure above depicts the disturbed nature of the site, with numerous prior access roads (black), and the locations of



Figure 3. Project Area and Impact Area

---

[1] "Drilling" or "core drilling" is a method of mineral exploration that extracts a core from a rock formation for analysis to determine mineralization (*i.e.* gold content).

[2] A "claim block" refers to an aggregation of adjacent, individual lode and/or placer mining claims within an area.

[3] AR refers to the bates-stamped pages of the Administrative Record submitted by the Federal Defendants, as supplemented on February 4, 2022. Index to AR, Dkt. 31-2.

[4] A "bore" or "boring" is the actual hole produced in a rock formation by a drilling machine.

[5] A "drill pad" is the area where equipment necessary to conduct drilling is located. It is generally cleared of vegetation and graded for drilling before being re-graded to match local topography and revegetated upon reclamation.

69981073v17

3

KORE's Project (orange).[6] *See* Sensitive Species Report at AR 00291. The Project is not a "mining project," as it does not seek to actually develop a mine; rather, it is mineral exploration to determine whether commercial mining would be viable on KORE's unpatented mining claims. *See, e.g.*, *Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 825 F. App'x 425, 429 (9th Cir. 2020) (not all mineral exploration results in proposed or planned mine); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 600 (9th Cir. 2010) (exploration projects "inherently involve[] uncertainties; if mining companies knew the precise location of mineral deposits before drilling, exploration would not be required"). KORE's Project is a "mineral investigation" to be completed within twelve (12) months; requiring less than half a mile of construction of unpaved, access roads adjacent to prior, existing access roads constructed for the historic exploration program; and disturbing less than an acre of National Forest system land[7]— thus satisfying all criteria of the Forest Service's categorical exclusion for mineral exploration projects.

KORE's Project will construct twelve (12) new drill pads, located in previously disturbed areas and accessed using historic mining roads, pictured below. EPO at AR 00033; Sensitive Species Report at AR 00314. The Project is a continues previous exploration that focused on shallow (400 feet) mineralization and is designed to determine the mineralization characteristics of the lower ore body, which has not yet been evaluated due to technology limitations. *See id.*



Photo 4. Unmaintained access road. Facing east.

---

[6] Note that two (2) drill pads depicted on this figure were removed on Aug. 24, 2022 in order to avoid cultural resources concerns. *See* Drill Pad Change Mem. at AR 00328–30.

[7] "Land disturbance resulting from th[e] Project will total approximately 0.82 acres. Of that, roughly 0.43 acres would be from the drill pads and 0.39 from the use of temporary access roads." Decision Memo ("DM") at AR 00002.

Essentially, KORE is using far fewer of the same roads and exploring a much smaller section of the same areas but going deeper to fully evaluate its claims.

The Project totals approximately 0.43 acres of disturbance (approximately 0.035 acres for each drill pad). *See* EPO at AR 00033. At each drill pad, KORE will drill "up to 3 core, angle borings[8] at a drill length between 820 feet and 1,476 feet." *Id.* at AR 00035. Based on the angle of drilling, actual total depth of each boring will range from approximately 580 feet to 1,424 feet below the ground surface. *See id.* During the course of the Project, bores will be immediately abandoned[9] in accordance with all state- and county-required permits and standards, including placement of hydrated bentonite chips (*i.e.*, clay) from the bottom of each bore to within twenty (20) feet of the surface, and cement grout from there to the surface. *See id.* Additionally, KORE will construct approximately 1,676 feet of temporary access roads, resulting in an additional 0.39 acres of disturbance. *Id. at* AR 00033.

During the planning process, KORE responded to concerns and modified its Project to avoid and minimize impacts by utilizing previously disturbed roads, limiting drill pads to previously disturbed areas (to the extent possible), and ensuring that the Project's footprint is as small as feasible. *Id.* at AR 00043. Indeed, the existing EPO was modified to remove two (2) drill pads based on concerns regarding potential impacts to cultural resources. *See* Drilling Pad Changes Mem. at AR 00328. KORE's project is a thoughtfully designed, small-scale continuation of historic exploration activity in a significantly disturbed area.

**B.** **KORE's Project is the Result of Nearly Two Years of Preparatory Work**

KORE's Project culminates over two-years of site preparatory work, including several-small scale and nominal exploration activities to determine the appropriate scope and location for further mineral investigations. KORE's prior preparatory work included handheld mineral sampling, GPS mapping, and an induced polarization (electrical current) non-invasive mineral survey. *See* Prospecting and Sampling Activity Letter (Sept. 5, 2019) at AR 05344–45; NOI Resp.

---

[8] "Angle boring" is the core drilling at any angle ranging from 45-90 degrees, allowing multiple cores to be produced from a single pad, covering a large underground area, with minimal surface disturbance.

[9] Abandoned is a term of art specific to drilling and means the well will be sealed under all applicable well standards

Letter 2 (Sept. 19, 2019) at AR 05341–42 (authorizing hand sampling and mapping); NOI Resp. Letter 3 (Oct. 15, 2019) at AR 05338–40 (authorizing induced polarization surveying). Based on this initial work, KORE determined further mineral exploration was appropriate, which KORE initiated by submitting a notice of intent ("NOI") for the Project on June 8, 2020. *See* AR 005334. On June 19, 2020, the Forest Service requested that KORE submit a Plan of Operations for its exploration activities. *See* NOI Resp. Letter 4 (Jun. 19, 2020) at AR 05332. Although, based on the size and scale of the work, KORE was unclear on whether Forest Service regulations would mandate an EPO for its proposed mineral investigation, it nevertheless prepared and submitted an EPO on July 24, 2020. *See* EPO Resp. Letter (Jul. 28, 2020) at AR 05330; Timeline Concerns Letter (Aug. 13, 2020) at AR 05327.

**C.      The Forest Service Determines that the Project Likely Falls Within a Categorical Exclusion**

On December 1, 2020, Minerals and Geology Program Manager Colleen Garcia, District Ranger Gordon Martin and the Forest Service's NEPA Planner determined that KORE's Project should be categorically excluded from further NEPA review, based on CE-8. *See* Email from Colleen Garcia (Nov. 10, 2020) at AR 15234. CE-8 applies to mineral investigation projects of less than twelve (12) months that require less than one (1) mile of road construction. *See* 36 C.F.R. § 220.6(e)(8). After clarifying that the Project's necessary road repair and construction would include only 1,850 linear feet of new road construction and 1,400 feet of repair to existing access roads (*see* Email from Dennis Fransway (Nov. 6, 2020) at AR 15237 [providing GIS files of proposed access routes and Forest Service Roads] and Email from Dennis Fransway (Nov. 10, 2020) at AR 15235–36); the Forest Service declared that the Project "is in accordance with" CE-8, which permits "'[s]hort term [12 months or less] mineral, energy, or geophysical investigation and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than one mile of low standard road . . . or use and minor repair of existing roads." Email from Colleen Garcia (Dec. 1, 2020) at AR 05321.

Following this determination, initial resources analysis work began, including the completion, by a third-party biological resources consultant, of a Biological Impact Analysis for

the Project. *See* Biological Res. Work Plan at AR 05310–20; Biological Impact Analysis ("BIA") at AR 00150–267. Additionally, KORE and the Forest Service met multiple times in early 2021 to establish a Memorandum of Understanding ("MOU") relating to the necessary NEPA process for the Project. *See* Letter from Gordon Martin (Feb. 23, 2021) at AR 05303. During this process, the Forest Service required spring resource (*e.g.*, plant and wildlife) surveys "to make a decision about the protection measures needed for various resources, as well as to determine whether extraordinary circumstances exist that would preclude the use of Categorical Exclusions." *Id.* Further, to ensure NEPA-compliance, the Forest Service confirmed it would evaluate ***all*** necessary factors bearing on the use of categorical exclusions before starting the public scoping period. *Id.*

### D.   The Forest Service Initiates the Public Scoping Process

On March 24, 2021, the Forest Service initiated consultation with tribal interests and the California State Historic Preservation office ("SHPO"). *See* Scoping Summ. Report at AR 00693. On April 7, 2021, the Forest Service sent a stakeholder notification letter identifying a public scoping period originally scheduled to end on May 7, 2021. *Id.*; Scoping Notification at AR 05280–82. On May 4, 2021, the Forest Service published a news release informing the public that the comment period would be extended one (1) week to May 13, 2021. *See* AR 05277.

During the public scoping period, the Forest Service received over 1,500 comments. *See* Scoping Summ. Report at AR 00694; Forest Serv. Cmt. Analysis Resp./Cmt. List at AR 00640–92.[10] Approximately 22 comments requested the Project undergo full NEPA review (*i.e.*, preparation of an EIS). *See* Scoping Summ. Rep. at AR 00696; Cmt. Analysis Resp./Cmt. List at AR 00640–92. Comments also raised concerns as to impacts to wildlife, such as to the Sage-Grouse – often inaccurately identified as a Federally threatened or endangered species, it is actually a ***Forest Service "Species of Conservation Concern"***)[11] – and to groundwater quantity and quality, including potential impacts to the Federally-endangered Owens tui chub. *See* Scoping

---

[10] Regarding the submission of form comments, see Plaintiff Friends of the Inyo's website, https://friendsoftheinyo.org/mining-exploration-threatens-long-valley/, which solicits such comments.

[11] The United States Fish and Wildlife Service ("FWS") officially withdrew the Sage-Grouse listing petition on March 31, 2020, stating, "We find the best scientific and commercial data available indicate that the threats to the [Sage-Grouse] and its habitat . . . are reduced to the point that the DPS does not meet the [Endangered Species] Act's definition of an 'endangered species' or of a 'threatened species.'" 85 Fed. Reg. 18052 (Mar. 31, 2020).

69981073v17

7

Summ. Rep. at AR 00695.

The Forest Service received agency comments from (1) the California Department of Fish and Wildlife ("CDFW") regarding potential impacts on Sage-Grouse, groundwater quality and quantity, and groundwater dependent fish species, *see* AR 08058–63; (2) FWS, raising similar issues, *see* AR 10090–92; and (3) local municipalities opposed to KORE's mineral exploration work, which did not necessarily differentiate exploration from mine development, and raising similar issues, *see* AR 15239–52 (Mammoth Lakes); AR 04972–78 (Mono Cty.); AR 15147–52 (Mono Cty.). As discussed below, the Forest Service and KORE responded to these comments by, among other things, undertaking additional biological and hydrological impacts analyses.

Ultimately, the Forest Service took all procedural steps required under the regulations: it reviewed and evaluated the merits of public comments, pursued appropriate measures for reviewing additional data, and determined that it adequately evaluated the concerns of the commentators. *See* Scoping Summ. Rep. at AR 00696.

### E.    The Forest Service Considers Public Comments and Finalizes Resource Studies Prior to Approving KORE's Project

In evaluating the issues raised during scoping, the Forest Service utilized existing resource reports produced ***prior*** to the public scoping process (including a Sensitive Species Habitat Verification Report, produced in March 2021). *See* Sensitive Species Report at AR 00268–314. The Forest Service and KORE also produced (1) an updated BIA (modifying Project to minimize potential impacts to biological resources), AR 00150–267; (2) a Cultural Resources Summary Memorandum (modifying drilling pad locations and removing two drill pads), AR 00315–27; (3) a Hydrogeologic Evaluation (determining Project would not have anticipated impacts to groundwater resources and groundwater-dependent species), AR 00335–64; and (4) Noise Monitoring and Drilling Noise Analysis (modifying Project to reduce noise impacts to Sage-Grouse), AR 00365–406. KORE and the Forest Service's significant efforts addressed public concerns and ensured a NEPA-compliant decision.

### F.    The Forest Service Approves KORE's Plan of Operations

The Forest Service approved KORE's EPO in a Decision Memo dated September 27,

69981073v17

8

KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

2021. AR 00001, 00009. The Decision Memo states that KORE's Project, as provided for in the EPO, will be complete in approximately 50 to 170 days, to occur within 12 consecutive months. *Id.* at AR 00002. The Decision Memo invoked CE-8 (220.6(e)(8)), stating:

> All exploration activities and activities necessary to support the explorations itself fall under [CE-8]. These activities include those that are required to allow equipment access to the site (such as temporary road construction, grading and constructing drill pads) [*i.e.*, exploration preparation], implementing exploration (such as drilling exploration [*i.e.* bore] holes, driving [on] existing and temporary roads, having equipment on-site, transporting drilling muds to an approved off-forest site), and protecting natural and cultural resource during the exploration itself (such as installing erosion control measures, properly casing and abandoning drill [*i.e.* bore] holes, using noise and light controls, and regrading pads and replacing topsoil).

*Id.* at AR 00003. The Decision Memo also authorizes "post-project restoration . . . habitat improvement" activities, outside the scope of CE-8, which the District Ranger determined are "important to provide food and cover for native wildlife species" and "allow[] for native plant success." *Id.* These additional post-project activities "are not required to support mineral exploration activities" subject to CE-8, and instead fall under Categorical Exclusion 6 ("CE-6"), which allows "wildlife habitat improvement activities." *Id.*; 36 C.F.R. § 220.6(e)(6).

The Forest Service's Decision Memo approves one Project with discrete activities covered by different categorical exclusions: (1) mineral investigation occurring within a 12 month period, authorized under CE-8, and (2) reclamation success monitoring and habitat improvement evaluation, authorized under CE-6. *See* DM at AR 00003–04.

## III.    LEGAL STANDARDS

### A.    National Forest Management

#### 1.    Statutory Management Regime

The Forest Service administers land use within the National Forest system pursuant to multiple statutes, including (1) The Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C §§ 473-482, 551, (2) the Multiple-Use Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. § 583, *et seq.*, and (3) the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, *et seq.*, which require the Forest Service to manage Forest Service lands for multiple uses. *See Wyoming v.*

*U.S. Dep't of Agric.*, 661 F.3d 1209, 1221 (10th Cir. 2011) (citing 16 U.S.C. §§ 475, 528, 529); *Citizens Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). NFMA establishes substantive and procedural requirements for the development and implementation of forest management plans under the Act and mandates agency consistency with those plans. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citations omitted); 16 U.S.C. § 1604. Critically, these laws ***do not limit or qualify*** the applicability of the General Mining Law of 1872 or rights acquired thereunder (including KORE's mineral rights). *See Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 374 (9th Cir. 1999) ("The Organic Act ***reopened*** the forest to mineral entry.") (emphasis added).

### 2.  The Forest Service Regulates Mining Activities in the National Forests Pursuant to Federal Law, Not by Special Use Permits

Mining activities on National Forest System land is governed by the General Mining Law of 1872, which confers a statutory right to prospect, explore, and mine certain public lands. 30 U.S.C. § 22, *amended by* Surface Resources Act of 1955, 30 U.S.C. § 612. Congress affirmed the applicability of the General Mining Law to national forest land in the Organic Act, which explicitly makes national forests "subject to entry under the existing mining law of the United States and the rules and regulations applying thereto." 16 U.S.C. § 482; *Dombeck*, 168 F.3d at 374; *Pathfinders Mines Corp. v. Hodel*, 811 F.2d 1288, 1291 (9th Cir. 1987); *United States v. Rizzinelli*, 182 F. 675, 679–81 (D. Idaho 1910).

The Forest Service has established expansive regulations governing the use of national forest surface resources in connection with ***all*** mining activities, including exploration, mining, and reclamation. *See generally* 36 C.F.R. Part 228, subpart A ("Part 228A"); 16 U.S.C. § 482. Under Part 228A, any exploration or mining operations "which might cause disturbance of surface resources" must submit to the District Ranger a notice of intent to operate ("NOI"). *See* 36 C.F.R. § 228.4(a)(2). If the District Ranger determines that the proposed activity may "cause significant disturbance of surface resources," the operator must "submit a proposed plan of operations." *Id.*; *accord United States v. Brunskill*, 792 F.2d 938, 940 (9th Cir. 1986). Once a plan of operations is submitted, the Forest Service engages in the NEPA process to determine what level of

JMBM | Jeffer Mangels Butler & Mitchell LLP

environmental review, if any, is required. 36 C.F.R. § 228.4(f).

**B.     The National Environmental Policy Act**

**1.     NEPA is a Procedural Statute That Does Not Mandate Particular Results**

NEPA dictates required procedural compliance; it "does not contain substantive environmental standards" nor require "that agencies achieve particular substantive environmental results." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008). NEPA merely requires that federal agencies "perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)). Thus, NEPA's "mandate to the agencies is essentially procedural" and is designed only "to insure a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978).

**2.     The Forest Service's Use of Categorical Exclusions**

Federal agencies may comply with NEPA by relying on categorical exclusions for actions "which do not individually or cumulatively have a significant effect on the human environment" and therefore "generally do[] not mandate preparation of an EIS [Environmental Impact Statement] or an EA [Environmental Assessment]" absent the presence of "extraordinary circumstances." *All. for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1124 (D. Mont. 2013), *aff'd sub nom.*, 639 F. App'x 498 (9th Cir. 2016). The Forest Service has promulgated multiple categorical exclusions. 36 C.F.R. § 220.6. Using categorical exclusions is "a form of NEPA compliance" that "requires less than where an [EIS] or an [EA] is necessary," and exempts a project from further NEPA review. *See Salazar,* 706 F.3d at 1096 (internal citation omitted); *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir. 1999). The Forest Service has discretion in determining what categorical exclusions may apply to a project, including the ability to use *__multiple__* categorical exclusions for a project. *See Native Ecosys. Council v. Tidwell*, 371 Fed. App'x 718, 719 (9th Cir. 2010) (upholding Forest Service's use of two categorical exclusions); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 n.5 (9th Cir. 1996); 85

Fed. Reg. 73629 (Nov. 19, 2020) ("Integrated, multiple use management activities which are designed to accomplish management goals that often cross administrative program boundaries can fit within multiple [categorical exclusions].").

The presence of "extraordinary circumstances" may abrogate an agency's use of categorical exclusions and require the preparation an EA or EIS. *See Alaska Ctr.*, 189 F. 3d at 858. The Forest Service identifies "[r]esource conditions," including the presence of endangered or sensitive species, relevant to determining the presence of "extraordinary circumstances." 36 C.F.R. § 220.6(b). Yet the "mere presence" of a resource condition (*i.e.*, the presence or proximity of species to a project) "does not preclude use of a categorical exclusion." *Id.* § 220.6(b)(2); *Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1183 (E.D. Cal. 2018). There must be a cause-effect relationship between the proposed action and the resource condition. *See Earth Island Inst.*, 318 F. Supp. 3d at 1183. If there is a cause-effect relationship,  "the degree of the potential effect of a proposed action on these resource conditions . . . determines whether extraordinary circumstances exist." 36 C.F.R. § 220.6(b)(2); *Alaska Ctr.*, 189 F.3d at 858; *Native Ecosys. Council v. Marten*, No. CV 17-77-M-DLC, 2018 WL 6480709, at \*15 (D. Mont. Dec. 10, 2018), *aff'd*, 800 F. App'x 543 (9th Cir. 2020). A project's controversial nature does not constitute an extraordinary circumstance and does not preclude the use of a categorical exclusion. *See Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 680–81 (9th Cir. 2022) (rejecting analysis of so-called "intensity factors" such as likelihood of a project's public controversy in determining presence of extraordinary circumstances).

## IV.   STANDARD OF REVIEW

### A.   The Administrative Procedure Act Governs The Court's Review of the Forest Service's Decision

A reviewing court reviews agency compliance with the aforementioned statutes and regulations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Under the APA, agency action cannot be set aside unless such action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 868 (9th Cir.

2017). Accordingly, judicial review under the APA is "highly deferential," "extremely narrow," and "presumes agency action to be valid" so long as there exists a reasonable basis for the agency's decision. *Short Haul Survival Comm. v. United States*, 572 F.2d 240, 244 (9th Cir. 1978) (internal citation omitted); *see also U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 7 (2001) (internal citation omitted); *Yazzie v. U.S. Env't Prot. Agency*, 851 F.3d 960, 968 (9th Cir. 2017); *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

### B.    The Forest Service is Owed Substantial Deference

Whether a particular action falls within categorical exclusions or whether "extraordinary circumstances" exist are "reviewed under the arbitrary and capricious standard." *Alaska Ctr.*, 189 F.3d at 858 n.5. Such decisions are entitled to deference because they are "factual determination[s] that implicate[] substantial agency expertise." *Id.* (internal citation omitted); *accord Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 796 (9th Cir. 2012); *Bicycle Trails Council of Marin*, 82 F.3d at 1456 n.5. The Federal agency's decision "should be given controlling weight unless plainly" erroneous or inconsistent with the terms used in the regulation. *Alaska Ctr.*, 189 F.3d at 857; *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022–23 (9th Cir. 2007).

When reviewing agency action, a court does not reweigh the body of evidence in the record and cannot "substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *River Runners*, 593 F.3d at 1070 (internal citation omitted); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1150 (9th Cir. 2016). Consistent with these core principles, judicial review of a Forest Service decision pays the "highest deference . . . to the Forest Service's technical analyses and judgments within its area of expertise." *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010) (internal citation omitted). The Forest Service's judgments "often require trade-offs among worthy objectives" and such trade-offs are determined by the agency's "relevant expertise." *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017). Thus, "[t]he Forest Service acts arbitrarily and capriciously ***only*** when the record ***plainly*** demonstrates that the Forest Service made a clear error in judgment." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (emphasis added).

## V.    ARGUMENT

Pursuant to NEPA regulations, a project may be categorically excluded where (1) project activities fall within the scope of one or more of the relevant categories; and (2) no extraordinary circumstances exist. *See* 36 C.F.R. § 220.6(a). Both of these requirements are satisfied here, and, despite Plaintiffs' protestations, nothing further is required for KORE's small-scale, limited disturbance exploration project. The Forest Service's decision was not arbitrary and capricious and was supported by substantial evidence in the record. Plaintiffs do not meet their burden to demonstrate otherwise. Thus, the Court should decline Plaintiffs' request to upend the Forest Service's decision because it is "not free to impose on the agency [its] own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *McNair*, 537 F.3d at 993 (internal quotation marks omitted).

### A.    Plaintiffs Fail to Demonstrate that the Forest Service's Use of Multiple Categorical Exclusions Was Arbitrary and Capricious

Plaintiffs present the Court with a "gotcha" scenario: they assert that the Forest Service "cannot have it both ways" by approving KORE's Project ***and*** reclamation success monitoring and habitat enhancement activities using two categorical exclusions. Plaintiffs allege that either (1) using two categorical exclusions is not allowed and thus all aspects of the Project must be approved under CE-8 and conclude within 12 months pursuant to that categorical exclusion's limitations ***or*** (2) if allowed, the Forest Service failed to require KORE to obtain a Special Use Permit ("SUP") for the habitat restoration and enhancement activities, covered by CE-6, before approving the habitat restoration activities. *See* Dkt. 34-1 at 19, 22. Plaintiffs' argument presents a false dichotomy that is inconsistent with Forest Service regulations and authority and is unsupported by the record.

Both prongs of Plaintiffs' argument fail. First, Plaintiffs do not identify any legal authority suggesting that the Forest Service is prohibited from utilizing multiple categorical exclusions. Second, Plaintiffs provide no authority to support their assertion that all activities conducted under the General Mining Law of 1872 and authorized pursuant to Part 228A must be subject only to

CE-8, and that no other CE would or could apply. Plaintiffs thus present this court with a false premise to set-up a "straw man" argument that any Project activities not covered by CE-8 must fall outside the ambit of Part 228A and, having asserted that false premise, Plaintiffs claim a SUP was thus required under the Special Use Regulations, 36 C.F.R. Part 251 ("Part 251"). Yet Plaintiffs present no cause of action relating to *either* Part 228A or Part 251. Plaintiffs only assert a NEPA claim, thereby limiting the Court's review to whether the categorical exclusions invoked by the Forest Service cover the activities for which they were invoked. Plaintiffs cite no authority that limits the activities authorized under Part 228A only to the Project activities subject to CE-8, and thus the Forest Service's decision that the Project's CE-6 activities also fall within Part 228A is proper. Once Plaintiffs straw man argument is reduced to the hay it is, any argument proceeding from that premise to require a SUP collapses entirely. If the Project falls within a categorical exclusion and no extraordinary circumstances exist, the Forest Service has complied with NEPA.

### 1. The Forest Service May Use Any and All Applicable Categorical Exclusions When Authorizing Mining Activities Under Part 228A

Forest Service regulations and controlling Ninth Circuit law make clear that activities may fall within the scope of multiple categorical exclusions. Where those categorical exclusions control the approved activities, the activities are not subject to the limitations of any other categorical exclusion that otherwise could have been used. *See* 36 C.F.R. § 220.6(f) ("[I]f more than one category could have been used, [the Decision Memo must explain] why the specific category was chosen."); *Mountain Cmtys. for Fire Safety*, 25 F.4th at 679–80 ("in selecting a CE for a project, the Forest Service only needs to cite and rely on one CE, even if other CEs may apply"); *Los Padres Forestwatch v. U.S. Forest Serv.*, No. 2:19-cv-05925-PJW, 2020 WL 4931892, at *5 (C.D. Cal., Aug. 20, 2020) ("Forest Service is empowered to determine which [categorical exclusions] appl[y] and its decision is entitled to deference absent clear error"); *Earth Island Inst.*, 318 F. Supp. 3d at 1180–81; 85 Fed. Reg. 73629 ("[A]ctivities covered by, or limitations in, a particular CE do not constrain or limit the operation of any other CE . . . more than one CE may apply to an activity. Integrated, multiple-use management activities, which are designed to accomplish management goals that often cross administrative program boundaries, can

15
KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

fit within multiple CEs."). If the Forest Service determines that certain activities, even mining-related activities subject to Part 228A, are authorized under, and thus invokes CE-6, then CE-6 controls those activities, rather than CE-8. *See Mountain Cmtys. for Fire Safety*, 25 F.4th at 672 (commercial timber sale approved under CE-6 not subject to limitations in categorical exclusions relating to commercial timber sales).

Furthermore, courts recognize the Forest Service's authority to use multiple categorical exclusions for activities at a single site. *See Tidwell*, 371 Fed. App'x at 719. Indeed, the courts have upheld the Forest Service's use of multiple categorical exclusions for multiple activities connected to a single mining site. *See Uranium Watch v. U.S. Forest Serv.*, 2010 WL 3703807, at *5–*7 (D. Utah Sept. 14, 2010). In *Uranium Watch v. United States Forest Service*, plaintiffs challenged the Forest Service's approval of two activities at an existing mine site, authorized pursuant to Part 228A: (1) creation of two vent holes and (2) preparing and drilling 16 exploration holes. *Id.* at *1. In approving the activities, the Forest Service relied on two categorical exclusions: (1) CE-3 ("approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land") for construction of the vent holes and (2) CE-8. *Id.* at *2. The court upheld the use of the two categorical exclusions, finding that the Forest Service's use of each categorical exclusion was appropriate based on the exclusions' plain language. *Id.* at *5–*7. Here, the Forest Service also approved two mining activities as part of one EPO, pursuant to Part 228A, and utilized two categorical exclusions. If the Forest Service properly applies each of these categorical exclusions, the Forest Service's decision is entitled to deference

### a. The Forest Service Properly Invoked CE-8

The Forest Service properly determined that the mineral investigation portion of KORE's Project is subject to CE-8. Specifically, the Forest Service found that KORE's mineral investigation is a small-scale, limited-footprint mineral exploratory drilling plan that will construct, establish, use, and promptly and properly abandon, 12 drill pads, thereby ensuring that the mineral investigation will be complete within 50 to 170 days, significantly less time than the 12 months allotted by CE-8. DM at AR 00002. Once the investigation is complete (within 12 months) "all equipment will have been removed from the site and ***all activities in support of***

69981073v17

16

*exploration will be complete*," including reclamation of the drill pads (accomplished "by relieving compaction, grading to approximate the original land forms, and planting with a Forest Service approved native seed mix"). *Id.* at AR 00002–03 (emphasis added). The Project will require construction of 0.32 miles of new, low standard road—less than one-third of the one mile limit under CE-8—as well as the repair of existing roads within the already heavily disturbed claim block. *Id.* at AR 00002.

These activities fall both within the plain language of CE-8 and the non-exhaustive list of examples of the categorical exclusion. 36 C.F.R. § 220.6(e)(8)(vii). Indeed, Plaintiffs do not dispute that CE-8 applies to KORE's mineral investigation activities[12] and the record is unambiguous that KORE's mineral exploration will be complete within 12 months. *See* DM at AR 0002 (mineral investigation activities "including drilling, grading, and installation of erosion control features, *will be completed within [12 months]*"); EPO at AR 00049 ("KORE is requesting this EPO be approved for a period of *1 year from the start of onsite operation*"). Accordingly, KORE's mineral investigation fits within the plain language of CE-8 and the Forest Service's determination of such was not arbitrary or capricious

### b.   The Forest Service Properly Invoked CE-6

The Forest Service also determined that the reclamation monitoring and habitat enhancement portion of KORE's Project is subject to CE-6. The Forest Service made specific findings that these post-mineral exploration activities "*are not* required to support the mineral exploration activities [and] we are using an additional CE category to cover these activities." DM at AR 00003 (emphasis added); EPO at AR 00048; Email from Dennis Fransway (Jul. 20, 2021) at AR 15062–63 (reasoning that restoration monitoring activities will ensure "no net loss of habitat and no effect to the capability of Forest species of conservation concern to persist over the long term"). CE-6 authorizes "wildlife habitat improvement activities." 36 C.F.R§ 220.6(e)(6); *Mountain Cmtys. for Fire Safety*, 25 F.4th at 676 (finding CE-6 properly applies to activities

---

[12] Plaintiffs' only issue with the Forest Service's use of CE-8 is that they believe the Forest Service's mandated habitat restoration activities must also be complete within twelve (12) months. *See* Dkt. 34-1 at 18:15–16 (alleging KORE's proposed operations "do not meet the 'one year or less' requirement of CE-8"). This argument improperly applies CE-8 to all activities that could be authorized under Part 228A.

69981073v17

17

JMBM | Jeffer Mangels Butler & Mitchell LLP

resulting in habitat improvement). Here, the Decision Memo authorizes revegetation monitoring to ensure improved sagebrush habitat, as well as associated activities to improve revegetation success (*i.e.*, hand-weeding for invasive species and targeted reseeding to ensure thriving revegetation) under CE-6. *See* AR 00003–04. KORE's post-exploration activities thus fit within the plain language of CE-6.

### c.    Part 228A Does Not Limit the Forest Service to CE-8 Only

As discussed above, the Forest Service may utilize multiple categorical exclusions and thus its determination that both CE-8 and CE-6 are applicable to the Project was proper. Moreover, nothing precludes the Forest Service from using CE-6 for mining activities authorized under Part 228A if those activities also result in habitat improvement. *See Mountain Cmtys. for Fire Safety*, 25 F.4th at 672. Accordingly, invoking CE-6 did not prelude the Forest Service from approving all aspects of the Project pursuant to Part 228A.

In *Mountain Communities for Fire Safety v. Elliott*, the Ninth Circuit upheld the Forest Service's use of CE-6 for a timber harvesting project that included the commercial sale of timber because other categorical exclusions did "not adequately capture to the objectives" of the project. 25 F.4th at 680. There, plaintiffs' argument centered on the mistaken belief "that other categorical exceptions implicitly cabin CE-6's scope." *Id.* at 679. Plaintiffs argued the Forest Service's actions were constrained by CE-12—which limits commercial timber sales to 70 acres—or CE-14—which limits commercial timber harvests to 250 acres for control of insects and disease—to approve the project at issue (a habitat improvement project of over 1,000 acres, including timber harvest). *See id.* at 672–74, 679–80. The Ninth Circuit rejected plaintiffs' argument, finding that, while a project *may* fit into other categorical exclusions, only the categorical exclusion invoked governs the approved Project. *See id.* at 680.

Plaintiffs' argument here—that activity not covered by CE-8 cannot be approved under Part 228A—runs counter to this recent Ninth Circuit decision. This argument is based on a faulty premise and improperly conflates the limitations of CE-8 as applying to *all* mining activities that could be authorized under Part 228A, thereby "implicitly cabining" all activities conducted under the General Mining Law of 1872 that the Forest Service can authorize pursuant to Part 228A, and

69981073v17

18

ignores the full scope of the Project (both conducting mineral exploration and ensuring improved wildlife habitat post-Project). Plaintiffs did not, and cannot, cite to any authority that supports such a broad interpretation. Indeed, to support their argument, Plaintiffs' erroneously rely on a single, unpublished District of Arizona trial court opinion—*Defenders of Wildlife v. United States Forest Service*, No. CV-14-02446-TUC-RM (D. Ariz. Sept. 15, 2015) ("*Defenders*"). *See* Dkt. 34-1 at 18, 24, 24 n.7, 26–27, 35. Plaintiffs argue that this Court should categorically preclude the Forest Service from utilizing CE-8 to approve mineral exploration activities and other, applicable categorical exclusions (CE-6) to authorize habitat restoration activities because of the decision in *Defenders*. In *Defenders*, plaintiffs challenged a Forest Service decision approving a mining company's plan of operations to conduct exploratory activities on mining claims within the Coronado National Forest ("Sunnyside Project"). *Defenders*, No. CV-14-02446-TUC-RM, at 1–2. In *Defenders*, the Forest Service relied ***exclusively*** on CE-8 to approve the Sunnyside Project. *Id.* at 4. Plaintiffs challenged the Forest Service's decision, alleging that the Sunnyside Project could not be completed within 12 months. *Id.* at 4–5. The court accepted plaintiffs' arguments because the record indicated that mineral exploration portions of the Sunnyside Project could never have actually been completed within CE-8's 12 month limitation. Rather, mineral investigation activities for the Sunnyside Project alone would have taken at least 17 months. *Id.* at 7–8. Unlike here, the Forest Service in *Defenders* ***did not*** utilize CE-6 and ***did not*** specifically find that the Sunnyside Project's reclamation activities would further habitat improvement. *Id.*

The facts in *Defenders* are inapposite to the facts here. Plaintiffs' contention that *Defenders* presents "very similar facts" to the instant case does not withstand scrutiny. *See* Dkt. 34-1 at 19. Significant differences include: (1) the Forest Service's explicit use of multiple categorical exclusions in connection with KORE's Project to further agency goals; (2) KORE's exploration activities will be complete in 170 days, ***well within 12 consecutive months***, and associated reclamation will be complete within approximately six additional days;[13] and (3) the Forest

---

[13] The Decision Memo states, "[a]t the end of the one-year period, all equipment will have been removed from the site and all activities in support of exploration will be complete." AR 00002–03. KORE's EPO also states that equipment, "will return to the Project for use in reclamation grading which is also expected to be completed in ***4 days***. After

Service explicitly found that the requested post-reclamation monitoring activities for KORE's Project will be undertaken to ensure wildlife habitat improvement. These stark factual differences are illustrated in the chart below.

| Activity | Sunnyside Project | KORE Project |
|---|---|---|
| Mineral exploration and reclamation | 6-7 months, conducted over 18 consecutive months, based on lengthy non-operational period **Violates CE-8** | 50-170 days, within 12 consecutive months **Complies with CE-8** |
| Post-reclamation habitat monitoring | Not present **CE-6 not utilized** | Required by Forest Service and results in wildlife habitat improvement **Complies with CE-6** |
| Weed control | Required, potential herbicide use **CE-6 not utilized** | Hand pulled, no herbicides **Complies with CE-6** |
| Installation of structures and additional ground disturbing activities | Contemplated in Forest Service Decision to occur 1-3 years after mineral investigation **Violates CE-8** | None **Complies with CE-8** |

Therefore, Plaintiffs' reliance on *Defenders* is inappropriate and Plaintiffs' contention that CE-8 should control all mining activities is unsupported by case law.

### d.    A SUP is Not Required Here

Plaintiffs next attempt to manufacture a double-bind scenario for the Forest Service, arguing that ***even if*** the Forest Service could require habitat restoration activities pursuant to CE-6, KORE would have been required to apply for and obtain a SUP to conduct those activities. *See* Dkt. 34-1 at 22:5–10. Yet again, this contention is simply wrong.

First, the irony of this argument should not escape the Court: Plaintiffs brought this "environmental protection lawsuit" and their lead argument is that the Forest Service's decision should be invalidated because the agency included ***extra*** environmental monitoring protections ***to further National Forest System land management goals***. *See* Forest Plan Rev. at AR 00424 (finding Project consistent with Sage-Grouse revegetation and habitat restoration objectives); Inyo

---

reclamation grading and the removal of all equipment for the site, the site will be seed . . . using a hydro-seed truck and a materials (mulch) flat-bed truck . . . for completion of the hydroseeding operation which is expected to be completed within 2 days." AR 00036–37

20

KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

Forest Land Mgmt. Plan at AR 14347. Second, once Plaintiffs' faulty premise is exposed, it is clear that the Project activities authorized under CE-6 are still authorized under Part 228A; not, as Plaintiffs contend, Part 251. *See* EPO at AR 00048 (authorizing reclamation monitoring and habitat improvement activities as part of Part 228A plan of operations); 36 C.F.R. § 228.8(g)(5) (authorizing habitat restoration under Part 228A). Quite simply, the reclamation monitoring and habitat restoration activities are included in an EPO for activities pursuant to the General Mining Law of 1872 and do not need separate authorization. 36 C.F.R. §§ 251.50, 228.5, 228.8(g); *United States v. Doremus*, 888 F.2d 630, 635–36 (D. Idaho 1989) (Forest Service's approval for activities requires SUP only if such activity would independently require a SUP). Here, the only authorization KORE was required to obtain was under Part 228A for work undertaken pursuant to the Mining Laws of 1872.

Finally, although the Forest Service did not need to reach this issue for the reasons discussed above, even if Part 251 were to apply, the activities authorized here would be considered "nominal," such that the Forest Service could have determined that its regulations would not require a use permit. *See* 36 C.F.R. § 251.50(e) (not SUP required where "proposed use will have such nominal effects . . . that it is not necessary to establish terms and conditions . . . to protect National Forest System lands and resources or to avoid conflict with National Forest system programs or operations"). Accordingly, Plaintiffs' argument that the Organic Act mandates the Forest Service separately authorize habitat restoration activities, irrespective of other approval processes (*i.e.* Part 228A ) that may govern those activities, is without merit.

### 2.    The Forest Service's Decision Not to Seek Additional Public Comment Was Not Arbitrary or Capricious

Plaintiffs also argue that the Forest Service erred by failing to reopen the Project to additional public comment once the agency added the additional habitat restoration monitoring and determined that those activities were subject to CE-6. *See* Dkt. 34-1 at 19:23–26. However, Plaintiffs' argument misapplies the Forest Service's obligations to undertake additional public comment for categorically excluded projects.

NEPA only mandates public scoping if the Federal agency is required to prepare an EIS;

69981073v17

21

KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

however, the Forest Service has extended public scoping to other agency actions. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 811 (9th Cir. 1999); 36 C.F.R. § 220.4(e); 40 C.F.R. § 1501.7(c). Scoping is a flexible process and the responsible official may modify it accordingly. *Wildlaw v. U.S. Forest Serv.*, 471 F. Supp. 2d 1221, 1247 (M.D. Ala. 2007). Undertaking additional public comment is necessary only where "substantial changes are made later in the proposed action." 40 C.F.R. § 1501.7(c).

Here, Plaintiffs urge this Court to abrogate the Forest Service's Decision Memo, arguing that the Forest Service substantially changed the Project in an "eleventh hour" bifurcation of the Project and improperly "carve[d]-off mining reclamation." *See* Dkt. 34-1 at 25–26. Plaintiffs fail to assert any "substantial change." Therefore, Plaintiffs fail to meet their burden to demonstrate the Forest Service's decision was arbitrary and capricious.

### a.   The Forest Service Was Not Obligated to Undertake Additional Public Scoping

The Forest Service is only obligated to undertake additional public scoping where there is a "substantial change in the proposed ***action*** that is relevant to environmental concerns." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1118 (9th Cir. 2002) (emphasis added). Here, the Forest Service's decision to approve KORE's reclamation monitoring and habitat enhancement activities under CE-6 was not a "substantial change" sufficient to require additional public comment. First, the monitoring and enhancement activities were previously described in both KORE's July 2020 draft EPO and April 2021 draft EPO, on which all interested parties had opportunity to comment during the original scoping period. *See* 2d Draft EPO at AR 00098; 1st Draft EPO at AR 00137. Second, and critically, the Forest Service's only change was applying additional legal support for portions of the Project using CE-6, not changing the proposed action itself. Accordingly, Plaintiffs' argument that there existed a substantial change in the ***action*** necessitating additional public scoping is without merit.

Plaintiffs further seek to improperly color the Forest Service's inclusion of wildlife habitat restoration measures and subsequent invocation of CE-6 as an abrupt about-face of the agency's decision-making, relying entirely on internal agency edits to a draft of the Decision Memo. *See*

Dkt. 34-1 at 21:13–18. Yet, internal changes during a pre-decisional process do not constitute a "change" for purposes of re-opening the public comment period. Plaintiffs' argument conflates changes in ***internal*** agency deliberations (necessary for a robust debate allowing the agency to reach the proper decision) with changes in direction from an agency's ***external, final decisions***. To support their argument that Federal Defendants improperly "bifurcated" reclamation and exploratory drilling, Plaintiffs rely on *Pacific Coast Federation of Fishermen's Associations v. Ross*, 2020 WL 1699980 (E.D. Cal. Apr. 4, 2020) and *Western Watersheds Project v. Kraayenbrink*, 620 F.3d 1187 (9th Cir. 2010), both of which are inapposite here. *See* Dkt. 34-1 at 22:1–2. Both cases are inapplicable here because they deal with ***final*** agency actions. See *Pac. Coast Fed'n Fishermen's Ass'ns*, 2020 WL 1699990, at \*1 (requiring federal wildlife agency to "examine its own prior factual findings [and] conclusion" when replacing ***final*** agency opinions with contradictory biological opinions issued a decade later); *W. Watersheds Project*, 620 F.3d at 1208 (requiring "reasonable explanation" for change in grazing regulation change, ***final*** agency action, that differed significantly from prior regulations).

Unlike the situations in these cases, the situation facing the Forest Service here is one of ***internal decision-making***, not reversal of a ***final agency decision***. Critically, there were no "factual findings" or "previous findings" issued by the Forest Service as a ***final agency action***, regarding the Project that would require re-examination. Plaintiffs' argument rests on a fundamental obfuscation that the Forest Service, after receiving public comment, underwent a single decision-making process. Indeed, if the court were to accept Plaintiffs' reasoning, Federal agencies would be required to obtain new or additional public comment every time internal deliberations occur. Furthermore, Plaintiffs' argument is undermined by the Supreme Court's recent decision in *United States Fish and Wildlife Service v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021). In that decision, the Supreme Court found that internal agency ***draft*** biological opinions were exempt from disclosure under the Freedom of Information Act, 5 U.S.C. § 552, based on deliberative process privilege because the documents "reflect[ed] a preliminary view—***not a final decision***." *Id.* at 786. The Supreme Court reasoned that disclosure and subsequent use of such documents risks a "chilling effect," hobbling agency decision-making and candor. *Id.* at 785–86.

Plaintiffs ask this Court to use the Forest Service's internal dialogue to overturn its final decision. The Court should reject Plaintiffs' arguments.

**b.      The Forest Service's Decision to Utilize CE-6 Without Additional Public Comment Did Not Prejudice Plaintiffs**

Even if the Forest Service was required to obtain additional public comment, Plaintiffs' argument would fail because they were not prejudiced by the Forest Service's decision to (i) require additional habitat restoration activities and (ii) authorize those activities under CE-6. An agency's decision not to re-scope an action can be overturned only if it actually prejudiced the challenging party. A party is prejudiced if it does not have adequate opportunity to participate and communicate its views. *Nw. Coal. for Alt. Pesticides v. Lyng*, 844 F.2d 588, 595–96 (9th Cir. 1988); *Utah Env't Cong. v. Bosworth*, 370 F. Supp. 2d 1157, 1168 (D. Utah 2005), *aff'd*, 443 F.3d 732 (10th Cir. 2006) (rejecting claim that scoping process was inadequate due to failure to allow opportunity to comment before application of categorical exclusion because plaintiffs had adequate opportunity to comment in previous round of scoping). During the initial public scoping process, Plaintiffs, and many members of the public, commented that they believed the Project was not covered by **_any_** categorical exclusion and an EIS was mandatory to approve any project. Plaintiffs' comments during initial scoping were sufficiently expressed Plaintiffs' opposition to the Project and the Forest Service's use of any categorical exclusion. As much as Plaintiffs here may want another opportunity to oppose **_any and all_** mining activities, no law mandates such an opportunity and lack thereof in no way prejudices Plaintiffs. The Forest Service followed all necessary steps under the law and its decision to invoke a categorical exclusion **_after_** receiving Plaintiffs' comments did not prejudice Plaintiffs.

**B.      Plaintiffs Fail to Demonstrate that Extraordinary Circumstances Preclude the Forest Service's Determination that KORE's Project is Categorically Excluded From NEPA**

In deciding that Project activities fell within the scope of both CE-6 and CE-8, the Forest Service rationally determined that no "extraordinary circumstances" otherwise precluded application of either categorical exclusion. Where a proposed action fits within a categorical exclusion, NEPA review is unnecessary unless there are "extraordinary circumstances" related to

the proposed action "in which a normally excluded action may have a significant environmental effect." *Alaska Ctr.*, 189 F.3d at 858 (internal quotations omitted). Courts defer to the agency's expertise and factual conclusions in determining whether extraordinary circumstances are present. *Id.* at 859.

During the NEPA process, the Federal agency "must consult agencies with special expertise with respect to any environmental impact involved." *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (internal quotations and citations omitted). However, the Federal agency "bears the ultimate statutory responsibility for the [p]roject [and] ***does not have to follow other agencies' comments slavishly***—it just has to take them seriously." *Id.* (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991)).

Ultimately, the Forest Service's determination regarding the nonexistence of "extraordinary circumstances" is entitled to the highest level of deference, including deference to "rely on the reasonable opinions of its own qualified experts." *See Marsh*, 490 U.S.at 376; *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012); *Marten*, 2018 WL 6480709, at *17. Courts should not engage in a "battle of the experts," or substitute its judgment for that of the agency, but must consider whether the record demonstrates that the Federal agency considered expert opinion and reasonably and fully informed itself of the appropriate facts. *Mont. Env't Ctr. v. U.S. Off. of Surface Mining*, 274 F. Supp. 3d 1074, 1102 (D. Mont. 2017). Vigorous public opposition is not a substitute for expert opinion or facts, and is insufficient to overcome agency deference. *Id.* at 1102–03.

Plaintiffs' "extraordinary circumstances" argument rests largely on the premise that non-Forest Service agencies' comments (which the Forest Service seriously considered), and vigorous public opposition, are sufficient to overcome the Forest Service's thorough, rational, and well-supported analysis. As discussed below Plaintiffs also ignore extensive forest Service analysis prepared subsequent to public comment. The Court should reject Plaintiffs' attempts to abrogate agency deference.

///

////

## 1.   Speculative Harm to the Sage Grouse is Not an Extraordinary Circumstance

Plaintiffs argument that the Project is subject to "extraordinary circumstances," based on purported harms to the Sage-Grouse, is premised on the wrong standard of review, speculative, unsupported allegations of harm; and purported evidence largely taken from public comments submitted *__before__* the Forest Service received and evaluated multiple resource studies that directly addressed concerns raised during the public comment period.

### a.   The Forest Service's Determination on Extraordinary Circumstances is Entitled to the Highest Degree of Deference

Plaintiffs argue the wrong standard, *i.e.*, that Forest Service cannot use a categorical exclusion if it cannot demonstrate that there will be no impacts to resource conditions (essentially requiring the agency to prove a negative). *See* Dkt. 34-1, at 14:14–21, 31:10–14 ("Only where evidence shows that the project '*will not* impact negatively on the species' might use of a CE be appropriate"). The correct standard instead requires the Forest Service to disclose, analyze, and determine whether potential impacts are immaterial or insignificant to resource conditions when determining whether extraordinary circumstances are present (not, as Plaintiffs argue, find "no impacts"). *See Marten*, 2018 WL 6480709, at *16. Plaintiffs' argument seeks to hold the Forest Service to a higher standard than required by law. In fact, this District *__has already rejected__* Plaintiffs' argument and their reliance on *Conservation Congress v. United States Forest Service*, 2013 WL 2457481 (E.D. Cal. June 6, 2013) is thus misplaced. *See Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1118 (E.D. Cal. 2017) (applying correct legal standard and finding *Conservation Congress* not applicable where Forest Service adequately explained why project's effects would be insignificant).[14]

///

///

---

[14] It is also worth noting that in further proceedings, the court upheld the Forest Service's determination that no extraordinary circumstances precluded the use of a categorical exclusion. *See Conservation Cong. v. U.S. Forest Serv*, 2016 WL 1162676, at *4 (E.D. Cal. Mar. 24, 2016) ("the court must find that the Forest Service provided a reasoned explanation for why the presence of northern spotted owl habitat . . . does not constitute an extraordinary circumstance."

69981073v17

26

KORE's MPA ISO Cross-MSJ and Opp. to Plaintiffs' MSJ

**b.      The Forest Service Thoroughly Analyzed Potential Harm to Sage-Grouse**

Here, the Forest Service's thorough and detailed evaluation of the Project's potential impacts to Sage-Grouse is well documented. As stated in the Decision Memo, the Forest Service determined that "implementation of . . .  avoidance and minimization measures" would ensure that "impacts to species of conservation concern [*i.e.*, Sage-Grouse], should they be present, would be ***minor and temporary***." DM at AR 00004. This conclusion is the summation of substantial research, evaluation, and decision-making, which is demonstrated throughout the administrative record.

**i.      The Forest Service Diligently Collected and Evaluated Data Related to Potential Impacts to Sage-Grouse**

The Forest Service and KORE thoroughly collected data and evaluated the Project's potential impacts to Sage-Grouse. Even prior to the public comment period, the Forest Service confirmed that multiple resource surveys would have to be completed before it would make any final decision. In a February 2021 letter, the Forest Service wrote: "The Inyo National Forest's position is that a Decision Memo ***cannot be completed*** for the Long Valley Mineral Exploration Project until field surveys have been completed . . . in order to make a decision about the protection measures needed for various resources, ***as well as determine whether extraordinary circumstances exist that would preclude use of Categorical Exclusion[s]***." Letter from Gordon Martin (Feb. 23, 2021) at AR 05303. The Forest Service's refusal to move forward with the Project without spring survey information further confirms that the Agency understood its review obligations and sufficiently evaluated potential impacts to Sage-Grouse. Throughout the resource study process, the Forest Service ensured that its designated experts were provided with the Forest Service's best understanding of potential interactions with Sage-Grouse, including (1) GIS data for Sage-Grouse leks,[15] at-risk and invasive plants, and archeological data. Emails between Colleen

---

[15] In providing this information, the Forest Service's biologist identified the two leks closest to the Project site and acknowledged that one lek was "considered historical and hasn't had any [Sage-Grouse] detections since 2015." *See* Email from Colleen Garcia (May 25, 2021) at AR 15129–30.

Garcia and Travis McGill (Jan. 8, 2021) at AR 15219–27.

The Forest Service continued to diligently address concerns raised during the public comment period. For example, public scoping raised concern regarding noise impact on Sage-Grouse at lek sites and within the general project vicinity. In response, the Forest Service and KORE prepared the 2021 Noise Analysis. *See* AR 00365–406. This led the Forest Service to request additional impact minimization measures (the use of sound blankets during lekking, brooding and nesting season, now included in the Project) because, "Lek 07A [the lek closest to the Project site] isn't the only area near the [P]roject where [Sage-Grouse] are occupying the land—it is assumed they are nesting and brooding nearby as well." *See* Email from Thomas Torres (Jul. 2, 2021) at AR 15082. The Forest Service's engagement was substantial while evaluating resource conditions, and the agency investigated the concerns raised during the public scoping period.

### ii.    The Forest Service Correctly Determined the Project Would Not Significantly Impact Sage-Grouse

The Forest Service relied on multiple reports when evaluating potential impacts to Sage-Grouse, including the BIA (prepared subsequent and in response to public comments), AR 00150–267; the Sensitive Species Report, AR 00268–314; and an August Noise Monitoring and Drilling Noise Analysis, AR 00365–406. These reports, coupled with significant discussion among Forest Service expert staff, consultants, and KORE to evaluate potential impacts to Sage-Grouse, informed Project design to avoid and minimize those potential impacts, and provide ample evidence in the administrative record to substantiate the Forest Service's determination that potential impacts to Sage-Grouse do not rise to a level of significance that would constitute an "extraordinary circumstance."

The BIA thoroughly analyzes the possible impacts to Sage-Grouse, acknowledging: (1) that "[t]he Project Area and vicinity are known to provide year-round habitat" for the Sage-Grouse, (2) the presence of several known leks in the area, and (3) that "big sagebrush scrub

28

provides suitable habitat within the Project Area."[16] BIA at AR 00166. The Report disclosed that the closest lek to the Project was approximately a quarter-mile away, with the next closest 0.59 miles away. *Id.* at AR 00167. Furthermore, the BIA determined that potential impacts from the Project would be limited to "***minimal loss of vegetation***" of Big sagebrush scrubland within the Project's drill pads and temporary access roads, "due to the use of existing dirt roads, trails, and disturbed areas, and small size of the drill pads" and the "greatly disturbed" nature of existing access routes. *Id.* at AR 00169. The Report concluded that while "[t]here will be a temporary reduction in Big sagebrush brushland," that reduction would be limited ***only*** to the duration of KORE's mineral investigation activities (approximately 170 days), would constitute less than one acre, and would be sufficiently revegetated such that "there will be no net loss of sage habitat." *Id.*

The BIA also indicates that Sage-Grouse may face "potential indirect impacts" from "raised ambient noise levels." *Id.* However, these indirect impacts to Sage-Grouse would be limited and temporary, confined to KORE's drilling schedule. DM at AR 00004. In fact, in evaluating the potential for noise impacts on Sage-Grouse, a worst-case-scenario was modelled, based on continuous (24-hour) drilling. It indicated that "[n]oise levels produced by exploration activities are predicted to result in a maximum noise level increase of 8.7 dBA" at the lek closest to KORE's Project, an "increase . . . less than the 10 dBA increase criterion established for [Sage-Grouse] leks." BIA at AR 000169–70.

Based on the anticipated potential impacts to Sage-Grouse, KORE modified the Project to implement avoidance and minimization measures, as discussed in the table below. *See* Emails between Dennis Fransway and Colleen Garcia (Jul. 29, 2021) at AR 15059–61 (ensuring mitigation measures properly documented based on Forest Service changes); 1st Draft EPO at AR 00133 (identifying only one measure to avoid potential impacts to Sage-Grouse); *cf.* EPO at AR 00042–43 (listing six additional measures to avoid potential impacts to Sage-Grouse). The following chart summarizes efforts to minimize impacts to Sage-Grouse.

---

[16] Leks are "large patches of bare ground" used "during breeding season where large numbers of both males and females congregate and males perform elaborate courtship rituals that involved strutting displays." BIA at AR 00166.

| Potential Impact to Sage Grouse | Project Modification or Minimization Measure | Result |
|---|---|---|
| Disturbance to mating and breeding rituals | Limiting operating period outside of mating and breeding season, adjustable "based on current nesting conditions or risk assessment" | No risk of disturbance to mating or breeding rituals |
| Loss of Big sagebrush scrub | Limitation of project disturbances to pre-existing, heavily disturbed areas | Less than one-acre of Big sagebrush scrub disturbed |
| Permanent loss of Big sagebrush scrub | Reseeding and prohibition on subsequent soil-disturbing activities "until desired habitat conditions have been met" | No permanent loss of Big sagebrush scrub |
| Noise Impacts | Use of noise dampening materials (*i.e.*, barriers, mufflers, etc.); standards regarding use, idling, and placement of equipment | Noise impacts on nearby leks below acceptable threshold |
| Impacts to individual Sage-Grouse | Maximum speed limits of 15-miles per hour; implementation of a Worker Environmental Awareness Program | Reduced risk of impacts to individual Sage-Grouse, if present |

BIA at AR 00170.

The Forest Service's efforts to understand and analyze potential impacts to Sage-Grouse are significant and supported by substantial evidence in the administrative record. Indeed, that evidence indicates that (1) KORE's Project will not have any significant impacts on sage grouse leks or Sage-Grouse mating and breeding; (2) KORE's Project will have no more than a minor, temporary impact on Big sagebrush scrub (particularly because majority of vegetation in Project area is described as poor); (3) KORE's Project will not result in any significant noise impacts to Sage Grouse; and (4) KORE's Project will not result in any significant impacts to the Sage-Grouse's "capability to persist over the long term in [the] area." DM at AR 00003–04; Forest Plan Rev. at AR 00421, 424; *see also* Emails Between Dennis Fransway and Colleen Garcia (Jul. 20, 2021) at AR 15062–63 (describing impacts to Sage-Grouse as not affecting species' capability to persist over the long-term in the plan area, even if "little effect to individuals" may occur). Accordingly, the administrative record is brimming with evidence that supports the Forest Service's determination that no extraordinary circumstances related to Sage-Grouse exist and that

the Project is categorically excluded from NEPA.

**c.     Plaintiffs' Allegations Ignore the Forest Service's Thoughtful Evaluation of Potential Impacts to Sage-Grouse**

Despite the Forest Service's extensive analysis conducted *__after__* the public comment period, Plaintiffs merely regurgitate the same concerns they raised during the public comment period (before extensive analysis), which were subsequently evaluated by the Forest Service. Plaintiffs thus request that this Court essentially ignore the Forest Service's expert determination regarding the nonexistence of "extraordinary circumstance," in favor of comments made *__before__* the Forest Service completed preparation and review of resource reports and evaluated the Project's potential impacts *__in light of those reports__*. The Court should reject Plaintiffs' contentions because they rely on non-expert opinions not subject to *__any__* deference by this Court and actively ignore the Forest Service's thorough evaluation of environmental impacts. *See* Dkt. 34-1 at 27:17–22.

**d.     Plaintiffs Improperly Rely on Statements Reflecting Internal Agency Deliberations, Not Final Agency Action**

Furthermore, Plaintiffs' attempt to undermine the Forest Service's determination using out-of-context Forest Service employees' communications is also unavailing. Plaintiffs rely on several email communications from Forest Service Biologist Thomas Torres, including: (1) a January 8, 2021 email (predating public scoping, Project modifications, and additional resource studies) and (2) an April 21, 2021 email (during public scoping, prior to Project modifications and completion of additional resource studies). Simply put, an out-of-context statement that "[t]his [P]roject is going to disturb sage-grouse," made before the Forest Service finished its evaluation and subsequent modification of the Project to address concerns, is not a smoking gun that indicates the Project will impact Sage-Grouse to the extent required to constitute "extraordinary circumstances." Putting aside the fact that "disturb" *__is not a synonym__* for "significantly impact," Plaintiffs leave out of their argument that, subsequent to each of these emails, the Forest Service substantively evaluated the issues brought to the Forest Service's attention. For example, Thomas Torres reviewed the BIA before it was finalized, and provided the following comments relating to the Project's purported impacts on Sage-Grouse: "Aside from a few edits to bi-state sage grouse

mitigations (mentioned above) [requiring the Project's non-operational period to increase from an original May 15th end to July 1st and imposing a 15 mph "near sage grouse leks"] ***I see no more issues with this report—it is very thorough***." Email from Colleen Garcia (Jul. 29, 2021) at AR 15060.

At bottom, Plaintiffs ignore the thorough review that the Forest Service undertook, and instead rely on a single email from the Forest Service's biologist, sent in April 2021. The Court should defer to the Forest Service's diligence, as demonstrated by that same Forest Service biologist, who (1) reviewed resource studies prepared in response to public comments received after the April 2021 email, and (2) found that, once appropriate Sage-Grouse minimization efforts were implemented, the resource report was "very thorough." If the above events did not convince Plaintiffs that the Project's potential impacts to Sage-Grouse were properly evaluated, it is unlikely that ***any*** review would be sufficient. Indeed, given Plaintiffs' public comments opposing ***any*** mining or mineral exploration activities in this area, it is more than likely the parties would be filing fairly similar briefs to this Court even if an EA (or an EIS) had been prepared.

Plaintiffs' failure to recognize the Forest Service's significant post-comment analysis of potential impacts to Sage-Grouse is also reflected in their reliance on internal Forest Service debate. *See* Dkt. 34-1 at 29:13 (describing internal debate on draft BIA between the Forest Service experts and third-party consultants regarding necessary changes to BIA). However, Plaintiffs' argument ignores that (1) the draft indicates the Forest Service sought to include a discussion of direct impacts to Sage-Grouse in a separate section of the report;[17] (2) the Forest Service, ***in the draft***, articulated its conclusions that impacts to Sage-Grouse would be "minor" and "temporary," or not significant; and (3) the final (and thus operative) BIA ***accurately reflects*** the Forest Service's position. *See* Biological Analysis Cmts. at AR 15030, 15035 (regarding discussion of impacts in draft report); BIA at AR 00166–67 (final report reflecting Forest Service's comments). ///

---

[17] Plaintiffs' argument also truncates the Forest Service's comment, which is provided in full here, with the previously omitted section ***emphasized***: "I agree with Kary that there really are direct impacts. Bids will likely be flushed, ***minor, temporary impact, but it is a direct impact. But that can be covered below, not here. I commented in the sage grouse section.***" *See* Biological Analysis Cmts. at AR 15030; *cf.* Dkt. 31-4 at 29:11–17.

### e. **Plaintiffs Ignore Project Changes**

Finally, Plaintiffs ignore the Project changes and the Forest Service's required minimization measures, which are designed to reduce potential impacts to Sage-Grouse. *See* Dkt. 34-1 at 28:5–30:3 (dismissing minimization measures that reduce impacts to Sage-Grouse). For example, Plaintiffs argue that the Project's timing restrictions to avoid lekking season are non-existent because the Forest Service can "eliminate[] [them] with prior written approval . . . with no public review." *See* Dkt. 34-1 at 28:15–17. In actuality, KORE cannot undertake ground disturbing activities between March 1 and June 30 "unless prior written approval from the Forest Wildlife Biologist is obtained." DM at AR 00015. Far from the *carte blanche* alleged by Plaintiffs, this timing restriction avoids Sage-Grouse lekking season and allows timing to "be adjusted based on [a] risk assessment." BIA at AR 00170.

Similarly, Plaintiffs falsely allege that minimization and mitigation measures do nothing to address either impacts to individual Sage-Grouse or habitat displacement and degradation based on Project construction. *See* Dkt. 34-1 at 28:25–29:10. In fact, the Project includes significant minimization measures to reduce the risk of impacts to individual Sage-Grouse, including "pre-disturbance surveys" for Sage-Grouse; implementation of worker awareness training; and measures to ensure no net loss of Big sagebrush scrub, including revegetation requirements. *See* EPO at AR 00042 (describing pre-disturbance surveys), 00046 (describing revegetation); BIA at AR 00170 (describing all minimization measures). The administrative record includes substantial evidence that the Forest Service evaluated potential risks to Sage-Grouse and the Project will include significant measures that the Forest Service has determined, based on thorough evaluation, will result in no significant impacts to Sage-Grouse.

Accordingly, Plaintiffs fail to carry their burden in demonstrating that the Forest Service's determination of no extraordinary circumstances relating to the Sage-Grouse was "arbitrary and capricious" and the Court should afford the Forest Service substantial deference related to its expert agency opinion that this Project does not present any extraordinary circumstances.

///

///

## 2. Speculative Impacts to Groundwater, Including to Owens Tui Chub, Do Not Present an Extraordinary Circumstance

Plaintiffs also attempt to demonstrate the presence of extraordinary circumstances based on the presence of the federally-listed Owens tui chub within one mile of the Project Area. This argument is equally unavailing. Plaintiffs fail to articulate any "cause-effect relationship" between the Project and groundwater impacts and cannot point to *any* evidence within the administrative record that the Project could result in significant impacts to the Owens tui chub. *See Earth Island Inst.*, 290 F. Supp. 3d at 1118. Rather, Plaintiffs rely on speculative harms raised prior to completion of a groundwater resources study. Rather than acknowledge the Forest Service evaluated possible impacts and found that no extraordinary circumstances exist, Plaintiffs ignore this fact, perhaps hoping the Court will overlook the evidence in the record and the Decision Memo. Plaintiffs' unsupported allegations fail to demonstrate that the Forest Service acted in an "arbitrary and capricious" manner and instead demonstrate that it is Plaintiffs who fail to carry their burden.

First, Plaintiffs argue that, because KORE's exploratory bore holes "will puncture the regional aquifer" such drilling "could result in severe impacts to both water quality and quantity." Dkt. 34-1 at 33:18–19. This argument *fails to articulate any causal relationship* between KORE's exploratory drilling and any actual impacts to either water quality or water quantity, and it there fails to satisfy the standard in *Earth Island Institute*, *supra*. Such a conclusory argument is insufficient to overcome the voluminous data in the administrative record demonstrating that the Forest Service not only thoroughly evaluated potential groundwater impacts, but also determined such impacts were nonexistent.

Furthermore, Plaintiffs' argument both inappropriately relies on statements that pre-date the Forest Service's actual evaluation of groundwater impacts, and dramatically overstates concerns of the Forest Service's sister agencies. Plaintiffs reiterate the claim that FWS "rais[ed] serious concerns about the Project's potential impacts to the endangered Owens tui chub." Dkt. 31 at 8:20–22, 10:4–5, 33:22–24. This hyperbole mischaracterizes FWS's actual concerns that local Owens tui chub populations "may be impacted by loss of water quantity, impacts to water quality

and alterations to water chemistry," and that after reviewing the Project's "scoping materials, [FWS was] unclear if these concerns were considered or evaluated" by the Forest Service. FWS Cmt. Letter at AR 10090. FWS then recommends that the Forest Service consider the "potential impacts to groundwater resources due to exploratory drilling; followed by discussions with [FWS] pursuant to the [Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*] ***should*** potential impact to [Owens tui chub] habitat be anticipated." *Id.* (emphasis added). Far from "serious concerns," FWS simply commented that the Forest Service should evaluate potential effects to the listed species and initiate further consultation with FWS under the provisions of the ESA ***if, and only if,*** the Forest Service actually anticipated impacts to the species.

In response to comment letters, the Forest Service, its designated consultant, and KORE researched the extent of any potential groundwater impacts, including (1) reviewing nearly 900 bore logs from the previous owner of the claim block (Royal Gold) and at least 27 technical reports on the geology and hydrogeologic conditions in the area; and (2) communicating with USGS geologists, past-and-present Forest Service personnel, and a former geothermal company geologist who were all exceptionally familiar with the geology, hydrogeology, and groundwater in the Project Area. *See* Email from James Howle (May 21, 2021) at AR 15145 (USGS "not aware of any USGS drilling in Long Valley where 'an artesian situation was encountered'"); Emails Between Dennis Fransway and James Howle (May 21-24, 2021) at AR 15133–44 (evaluating all potential wells in Project area and historical data and finding no evidence of "artesian conditions"); Email from Colleen Garcia (May 24, 2021) at AR 15131–32 (inquiring and receiving no information about artesian conditions); Email from Colleen Garcia (May 25, 2021) at AR 15129–30 (describing only known artesian conditions in Little Antelope Valley, not Long Valley or within KORE's Project area).

This investigation, in direct response to both the CDFW and FWS comments, yielded no actual evidence of artesian conditions, but did result in the thorough Hydrogeologic Evaluation of the Kore Long Valley Project ("Hydro Report"). AR 00335–65. In that report, Doug Bartlett, a Professional Geologist and Certified Hydrogeologist, specifically addressed the concerns raised by CDFW and FWS. *Id.* The Hydro Report evaluates the potential for artesian conditions, which, if

35

present, could potentially impact groundwater-dependent species like the Owens tui chub. *Id.* The Hydro Report found that KORE's "claim block is underlain by a groundwater system geothermally heated (average of 130° F) but ***without artesian pressure that would result in flow form borings at ground surface***." *Id.* at AR 00343. Absent the presence of artesian conditions, KORE's bore holes ***will not*** result in aquifer mixing and attendant potential impacts to water quality, quantity, or subsequent potential impacts to the Owens tui chub. The report further concluded that, based on observed temperatures actually measured in historic wells and bore holes on the claim block, CDFW's concern that the underlying groundwater was separated into an "upper, cool water aquifer" and a "deeper geothermal aquifer," was completely unfounded. These conclusions were based on data collection from the over 800 bore holes drilled on the claim block between 1994 and 1997, none of which indicated artesian conditions or the presence of a cool water aquifer. *Id.* at AR 00342–43. The Hydro Report concluded that the Project would "not result in any impacts to regional spring flow or groundwater or surface water quality." *Id.* at AR 00343.

In sum, rather than ignore the concerns raised by CDFW and FWS, as Plaintiffs argue, the Forest Service actually found no extraordinary circumstances based on significant data in the administrative record developed ***in response to those comments***. Plaintiffs' statements that the Forest Service's determination is conclusory neither grapples nor engages with the extensive record of evidence demonstrating the opposite—that the Forest Service heeded scoping comments and acted appropriately in conducting further inquiries to determine whether the Project would actually impact federally-listed species.

Accordingly, Plaintiffs fail to carry their burden in demonstrating that the Forest Service's determination of no extraordinary circumstances relating to the Owens tui chub was "arbitrary and capricious" and the Court should afford the Forest Service substantial deference related to its expert agency opinion that this Project does not present any extraordinary circumstances.

### C.   The Forest Service Properly Considered Cumulative Impacts When Evaluating the Project

Plaintiffs contend that the Forest Service failed to consider cumulative impacts of (1) purported "mining/mineral, agriculture, water withdrawals/use, grazing, traffic, energy

development, and all other activities in the area (including along/near access and truck routes). *See* Dkt. 34-1 at 35:3–7.[18] However, the Forest Service's application of a categorical exclusion to authorize KORE's mineral exploration activities renders these allegations moot.

Where the Forest Service's use of categorical exclusions are reasonable and there are "no extraordinary circumstances that would exempt the project from coverage under the [categorical exclusions]," the Forest Service is not required to analyze cumulative impacts. *Earth Island Inst.*, 290 F. Supp. 3d at 1123. Independent evaluation of cumulative impacts is inappropriate because the categorical exclusion process **_already_** takes cumulative impacts into account. *See Salazar*, 706 F.3d at 1097; *Utah Env't Cong.*, 443 F.3d at 741–42; *Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 411 (6th Cir. 2016). Plaintiffs point to no binding authority requiring otherwise, and Plaintiffs' argument here "undercut[s] the purpose of categorical exclusions generally." *Sawooth Mountain Ranch LLC v. United States*, 2022 WL 562612, at *32 (D. Idaho Feb. 24, 2022).

Here, because the Forest Service reasonably determined that no extraordinary circumstances precluded the application of a categorical exclusion, no further analysis of cumulative or connected actions is required under NEPA. Unless there is a clear requirement that the Forest Service evaluate cumulative impacts during its analysis, this Court should decline to require the consideration of cumulative or connected actions against the direction of the Sixth, Ninth, and Tenth Circuits. *See Sawooth Mountain Ranch*, 2022 WL 57261, at *33; *Salazar*, 706 F.3d 1097; *Utah Env't Cong.*, 443 F.3d at 741–42; *Sierra Club*, 828 F.3d at 411.

### D.    If the Court Grants Plaintiffs' Motion, It Should Remand Without Vacatur

Notwithstanding Plaintiffs assertion that, if they prevail, the Court should vacate the Forest Service's approval of the Project, *see* Dkt. 34-1 at 37, if the Court does find Plaintiffs' argument

---

[18] Plaintiffs' argument includes the assertion that because KORE raised concerns about the impacts of proposed geothermal leasing that overlap with KORE's claim block, including the possibility of multiple developments in a single, confined area, KORE's Project must be analyzed in conjunction with the NEPA review of the geothermal leasing and considered inextricably linked. *See* Dkt. 34-1 at 35:22–36:22. This argument is disingenuous. KORE's letter regarding proposed geothermal leasing in overlapping KORE's claim block simply states KORE's opposition to such leasing, given the potential for geothermal leasing to materially interfere with KORE's property rights. *See* AR 15164 (arguing that the issuance of any geothermal lease must not (and cannot, pursuant to the Geothermal Steam Act of 1970, 23 U.S.C. § 1001, *et seq.*) interfere with KORE's mining claims). Regardless, KORE's exploration project has independent utility from any speculative geothermal leasing, and thus the Forest Service is not required to analyze cumulative impacts during the categorical exclusion process. *See Earth Island Inst.*, 290 F. Supp. 3d at 1123.

persuasive, it should instead remand the matter for further consideration without vacating the Forest Service's Decision Memo and approval of the Project.

"[A] [c]ourt is not mechanically obligated to vacate an agency decision that it finds invalid" and may utilize the full range of equitable remedies available to it. *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1105 (E.D. Cal. 2013). Where "equity demands," a court should remand an agency decision without vacatur. *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 843 F. App'x 77, 80 (9th Cir. 2021). When determining whether vacatur is appropriate, courts consider several factors, including: (1) deficiencies in the agency's decision (reflecting the extent of doubt regarding the agency's choice); and (2) "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012). Where the agency can "readily cure a defect in its explanation of a decision" or where vacatur "would at least temporarily defeat the enhanced protection of the environmental values covered by [the agency] decision at issue," the court will not vacate an agency decision. *Humane Soc'y of U.S. v. Locke*, 626 F.2d 1040, 1053 n.7 (9th Cir. 2010); *Cal. Cmtys. Against Toxics*, 688 F.3d at 992.

The Forest Service's Decision Memo contains no serious deficiencies that warrant vacatur. A serious deficiency ***does not exist*** where, as is the case here, an agency evaluates and discloses the environmental consequences of its action and acts in a manner such that NEPA's procedural goals are met. *See Sierra Forest Legacy*, 951 F. Supp. at 1109; *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2016) (vacating without remanding despite limited analysis by agency). Here, the administrative record demonstrates that the Forest Service and KORE, in approving and developing the Project respectively, thoroughly reviewed the potential environmental impacts, reviewed the implications and veracity of potential issues raised during the public comment period, conducted further investigation where necessary, and changed the project to alleviate the risk of potential impacts. *See e.g.* 1st Draft EPO at AR 00133 (identifying only one measure to avoid potential impacts to Sage-Grouse); Hydrogeologic Eval. at AR 00335–65; *cf.* EPO at AR 00042–43 (listing six additional measures to avoid potential impacts to Sage-Grouse).

The Forest service was "fully informed as to the [minimal] environmental consequences" of KORE's Project and approved that Project in compliance with NEPA's procedural requirements.

Additionally, a broad remand and vacatur of the entirety of the Forest Service's Decision Memo would be inappropriate in this case. The primary issue here is whether it was appropriate for the Forest Service to utilize CE-6 when requiring additional habitat improvement monitoring and possible activities for the three years following reclamation. If the Court finds that the Forest Service's use of CE-6 was inappropriate, then it should limit vacatur to that issue only; and allow KORE's mineral investigation to move forward under CE-8. Again, this scenario demonstrates the irony of Plaintiffs' argument: where vacatur "would at least temporarily defeat the enhanced protection of the environmental values covered by [the agency's action]," vacatur is inappropriate. *Humane Soc'y of U.S.*, 626 F.2d at 1053 n.7. Here, vacatur could eliminate the habitat improvement monitoring specifically requested by the Forest Service, thwarting the Forest Service's multiple use management goals.

Finally, vacatur is inappropriate here because disruption must account for ___**all**___ consequences of planned projects, including economic and practical impacts. *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1018 (E.D. Cal. 2013). Here, KORE's Project is the culmination of over two years of diligent exploration activities and KORE has expended significant amounts of money, labor, and time to plan and implement the Project. *See* Decl. of Marc Leduc, Dkt. 15-2. Courts recognize the expense and nature of drilling projects, and have previously denied vacatur where disruption resulting from delays outweighs significant procedural and substantive deficiencies. *See Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 992 (D. Alaska 2021). Here, any deficiencies are minimal, and are consequently outweighed by the disruptive nature of vacatur. The Court should therefore deny Plaintiffs' request for vacatur.

## VI.    CONCLUSION

For the reasons stated above, Plaintiffs fail to demonstrate that the Forest Service's approval of the Project was "arbitrary and capricious." KORE respectfully requests that this Court

//

//

deny Plaintiffs' Motion for Summary Judgment and grant Summary Judgment in favor of Federal Defendants and KORE.

DATED:  March 28, 2022

JEFFER MANGELS BUTLER & MITCHELL LLP
KERRY SHAPIRO
DANIEL QUINLEY
LENA STREISAND

By: _____
KERRY SHAPIRO

Attorneys for INTERVENOR-DEFENDANT
KORE Mining Limited