1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Friends of the Inyo, et al.,                    No. 2:21-cv-01955-KJM-KJN

12                      Plaintiffs,                   ORDER

13          v.

14   U.S. Forest Service, et al.,

15                      Defendants,

16          and

17   KORE Mining, Limited,

18                      Intervenor-Defendant.

19

20

21          The United States Forest Service approved the proposed mining exploration project

22   submitted by KORE Mining, Limited for a site on public land near Mammoth Lakes, California.

23   The Forest Service determined the project will not cause any significant effects on the

24   environment.  Four advocacy organizations—Friends of the Inyo, Western Watersheds Project,

25   Center for Biological Diversity and the Sierra Club—disagree with the Forest Service's

26   assessment based on risks to a unique sage grouse population and to an endangered species of

27   fish.  They filed this action to challenge the Forest Service's decision under the Administrative

28   Procedure Act (APA), and KORE intervened as a defendant.

1

The Forest Service, the plaintiffs and KORE all have moved for summary judgment. As explained in this order, the Forest Service's decision was not "arbitrary" or "capricious" under the APA, so the court **grants** the motions for summary judgment brought by the Forest Service and KORE and **denies** plaintiffs' motion.

## I.      BACKGROUND

In 2019, KORE began investigating the project at the center of this litigation. *See* AR 5338–45. On the land in question—a wide and gently sloping expanse of 1,848 shrubby acres—other entities had bored hundreds of holes in the 1980s and 1990s. *See* AR 22, 14625–32. Technical limitations prevented these previous bore holes from reaching more than a few hundred feet deep. *See* AR 22, 33; see also KORE Mot. at 4–5, ECF No. 37. Based on surveys and investigations it conducted in 2019, KORE believed a deeper exploration could be fruitful today. *See* AR 22, 5344–45. In twelve locations, KORE proposed to clear vegetation, level a 50-foot-by-30-foot-surface, and drill downward at outwardly radiating angles to depths of more than 600 feet. *See* AR 1, 13, 35. This plan would allow it to explore a smaller but deeper cross-section of the same area others had explored in the past. *See* AR 35. KORE would then immediately refill and cap the bore holes with clay and cement grout. *Id.* It would not extract any resources; there would be no mining, at least not yet. AR 33, 35. To reach the twelve drill pads, KORE would construct about a third of a mile of temporary access roads. *See* AR 33. It would otherwise rely on the roads others had constructed many years before. *See* AR 22, 24. This project would be completed within a year and would, by KORE's estimate, disturb less than an acre of land. *See* AR 33, 35.

KORE submitted a notice required by Forest Service regulations in the summer of 2020. AR 5334. The Forest Service then requested a more detailed plan of operations, which KORE also prepared and submitted within about a month. *See* AR 5327, 5330, 5332. At first, the Forest Service believed KORE would likely need to prepare a detailed environmental assessment. *See* AR 5330. But in November and December 2020, several months after KORE submitted its plan, the Forest Service concluded preliminarily that the project was unlikely to have any significant effects on the environment: it would take less than a year, require less than a mile of new road,

and use existing roads.  AR 5321, 15232–38.  Over the next few months, the Forest Service

looked more carefully into whether that was so.  A consultant prepared a "Biological Impact

Analysis," *see* AR 150–267, 5310–20; the Forest Service required surveys of plants and wildlife,

*see* AR 268–314, 5303; and the Forest Service consulted with Tribal and state authorities and

solicited public comments, *see* AR 5277, 5280–82.

The agency received more than a thousand comments during the three-month "public

scoping" period.  AR 693–94.  Almost all commenters opposed mining in general, citing concerns

about water resources, wildlife and cultural resources, among others.  *See* AR 640–96, 694–95.

The plaintiffs and the City of Mammoth Lakes and Mono County detailed their concerns along

these lines in writing.  AR 698–736, 4972–78, 15239–42.  State and federal fish and wildlife

agencies also responded.  *See* AR 8058–63, 10091.

Many of those who submitted comments, including the government agencies, warned that

the project would disturb a particular population of sage grouse belonging to a species famous for

the extravagant displays male birds put on to attract a mate.  *See* AR 8058–63, 10091.  Picture a

spike-tailed, puff-chested small turkey in a brown tuxedo, shaking and strutting in the brush.

Specifically, sage grouse use the area where KORE would drill for both brooding and foraging.

AR 15160.  They nest on the ground and return to the same mating grounds, known as "leks,"

every year; they depend on large, continuous expanses of sagebrush for their survival.  AR 1111,

8059–60, 14060.  Whatever reduces or fragments this habitat threatens sage grouse, from fences

and roads to mining and grazing to wildfires and climate change.  AR 14059.

The sage grouse population at issue here lives in only a few counties in eastern California

and western Nevada.  AR 8059, 10091, 14059.  It is not listed as an endangered or threatened

species under the federal Endangered Species Act, but the Forest Service has recognized it as a

"species of conservation concern," a designation that reflects a "concern about the species'

capability to persist over the long-term" in the relevant area.  AR 10091, 14028.  California

agencies have also added the sage grouse to lists of "sensitive" species and species of "concern."

*See* AR 14059.  A recent federal study estimates the risk of "extirpation," i.e., a local extinction,

is 40 percent or greater within 20 years.  AR 1162.

1    Many who opposed the project, again including the state and federal fish and wildlife

2    agencies, also raised concerns about the project's potential effects on the local groundwater and

3    an endangered species of fish, the Owens Tui Chub. *See, e.g.*, AR 8061, 10090. KORE's drills

4    would reach deep enough into the ground to connect with both a cold-water surface aquifer and a

5    hot-water aquifer confined deeper and under pressure beneath the surface. *See* AR 5–6, 339,

6    8061. The confined aquifer could be under such pressure as to create an artesian well if

7    punctured: hot water would flow to the surface without pumping. AR 8061. If this hot water

8    were released from the confined aquifer, it could reduce both the quality and quantity of water

9    discharged from nearby springs. *Id.* Hot water from the confined aquifer might even deposit

10   poisonous geothermal chemicals into the shallower cold-water aquifer. *Id.* Two populations of

11   endangered chub live within about a mile of the project area, and they depend on groundwater

12   discharges. AR 8061, 10090. Other fish populations could suffer as well, including trout. AR

13   8061.

14    The Forest Service reviewed these comments and sent KORE a summary. *See* AR 693–

15   96. The Forest Service also began considering whether to approve the project in part as a sage

16   grouse habitat restoration effort, which could accelerate its environmental review. *See* AR 15064,

17   15067. In the following month, KORE altered the draft exploration plan based on the public

18   comments. *See* AR 19–60. Eventually, in September 2021, several months after public

19   comments had come in, and about two months after the Forest Service raised the possibility of a

20   partial restoration effort, it formally approved the project. As approved, the project has two parts.

21    First, as previously planned, KORE will clear and level twelve pads for its drilling

22   equipment, and from each of these pads, it can drill three core borings. AR 2. For the most part,

23   KORE will use existing public roads, but the Forest Service will allow it to construct about one-

24   third of a mile of new temporary access roads. *Id.* To reduce harms to the sage grouse during

25   their mating season, the Forest Service did not permit KORE to undertake any "disturbance

26   activity" between March 1 and June 30. AR 15. KORE will use fences and other devices to

27   prevent birds from perching on its equipment, and it will use acoustic screens and mufflers to

28   reduce noise. AR 15–16. The Forest Service imposed a fifteen mile-per-hour speed limit on

4

many roads to reduce the risk trucks will strike animals and birds, and to require workers to learn how to avoid harms to the wildlife and their habitats.  AR 15.  Drilling will finish within about six months, and any related work will finish within a year.  AR 2.

Second, after drilling is complete, KORE must take steps to return the land to its previous condition.  It will fill and cap the bore holes, regrade the drill pads to return the land to its original slope, and sow native seeds in the former drill pads and temporary access roads.  AR 2, 46.  For as many as three years after drilling is complete, a biologist will return and check on the land and vegetation.  AR 2.  The biologist can require more seeding, weeding and fence maintenance.  AR 2–4, 37.

In the Forest Service's assessment, this plan would avoid any significant effects to the environment.  Although drilling and trucks would disturb individual sage grouse while work is underway, the Forest Service believed these disturbances would not "affect their viability" within either the immediately surrounding area or the broader national forest.  AR 5.  The project is short-term, limited to a relatively small area, and the Forest Service would require the protective measures listed above—speed limits, time limits, seasonal limits, mufflers, and such—which would reduce the chances of harm to birds.  *See* AR 15–16.  The Forest Service also searched through records of the previous drilling operations and believed artesian flows were unlikely.  *See* AR 342–43.  A hydrogeological evaluation of historical records showed artesian flows are similarly unlikely in the KORE mining block.  AR 343.  The hydrological evaluation also showed that KORE's proposal was unlikely to mix the cold and hot aquifers.  *Id.*  But to reduce risks to groundwater, KORE will encase bore holes, use equipment designed to prevent blowouts, and fill and cap bore holes when the project is complete.  AR 6, 16–17.  The Forest Service was confident that neither the groundwater nor the endangered chub would be affected.  *See* AR 6, 8, 168.  As a result, the Forest Service decided not to investigate or consider the project's potential effects on the environment any further.  *See* AR 1–9.

The plaintiffs filed this lawsuit against the Forest Service soon after it approved the project.  *See generally* Complaint, ECF No. 1.  A few more details about federal mining and environmental laws are necessary to explain the plaintiffs' legal claims.

Under a law originally passed in the Nineteenth Century, people who discover mineral deposits on federal land can stake out a claim. *See United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1281 (9th Cir. 1980). Under a 1955 law known as the Multiple Use Act, the owner of an unpatented mining claim, which is a possessory interest limited to mining, may prospect and mine resources beneath the surface of federal lands, but the United States retains its rights to manage and dispose of the resources on the surface of that land. *See United States v. Buckland*, 689 F.3d 986, 991 (9th Cir. 2012). Under a third federal statute known as the Organic Administration Act, which also dates to the late Nineteenth Century, mining operations in the national forest system are regulated by the Secretary of Agriculture. 16 U.S.C. § 551. It recognizes "prospecting, locating, and developing the mineral resources" as "proper and lawful," but it demands compliance "with the rules and regulations covering [the] national forests." *Buckland*, 689 F.3d at 991 (alteration in original) (quoting 16 U.S.C. § 478).

The Forest Service regulates mining operations within the National Forest System. *See generally* 36 C.F.R. Part 228A.[1] If people wish to conduct mining operations that "might cause significant disturbance" to federal resources on the surface, then they must send the Forest Service notices of their intent and plans of their proposed operations for approval. *See* 36 C.F.R. § 228.4(a). For other uses of the forest system's "lands, improvements, and resources" unrelated to mining—operating a ski resort, for example, *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 336 (1989)—the Forest Service requires a "special use permit," 36 C.F.R. § 251.50(a).

Under the Forest Service's regulations, after an applicant submits the required notice or plan, the focus shifts to the environment and to the National Environmental Policy Act, more commonly known as "NEPA." *See* 36 C.F.R. § 228.4(f). NEPA, passed in the late 1960s, aspires to ensure each generation fulfills its responsibility "as trustee of the environment for succeeding generations" and attempts to strike "a balance between population and resource use," among other goals. 42 U.S.C. § 4331(b). It forces federal agencies to take action in pursuit of these

---

[1] Unless otherwise noted, regulations cited in this order were those in effect at the time of the Forest Service's decision.

1   goals, *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979), which are undeniably substantive, but

2   NEPA's "mandate" to federal agencies "is essentially procedural," *Vt. Yankee Nuclear Power*

3   *Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).  First, agencies must "have

4   available" and "carefully consider" the "significant environmental impacts" of any "major"

5   federal action.  *Robertson*, 490 U.S. at 349.  Second, NEPA ensures "detailed information" is

6   "made available to the larger audience" with a stake in the agency's decisions.  *Id.*

7            NEPA achieves these goals primarily by requiring agencies to prepare a "statement" on

8   "the environmental impact" of their actions—the "Environmental Impact Statement" or "EIS."

9   *See* 42 U.S.C. § 4332.  It does not demand an EIS for every decision an agency makes.  An EIS is

10  necessary only for "major Federal actions significantly affecting the quality of the human

11  environment."  42 U.S.C. § 4332(2)(C).  As a result, federal agencies must answer a crucial

12  question at the threshold: are any likely environmental effects of a particular action

13  "significant?"  That is the primary question in this case.

14           The Council on Environmental Quality, created by NEPA and housed within the

15  Executive Office of the President, has adopted NEPA regulations all federal agencies must follow

16  to fulfill their obligations under the law.  *See* 42 U.S.C. § 4342; *Mountain Communities for Fire*

17  *Safety v. Elliott*, 25 F.4th 667, 674 (9th Cir. 2022).  These regulations include rules for agencies to

18  follow when deciding whether the environmental effects of an action are "significant" and require

19  an EIS.  Under these regulations, when agencies are unsure whether environmental effects will be

20  significant, they prepare a more limited preliminary document: an "environmental assessment."

21  *Mountain Communities*, 25 F.4th at 674–75  Environmental assessments are "less demanding"

22  than full-scale impact statements.  *Id.* at 675.  In addition, the Council on Environmental Quality

23  recognizes some actions "normally do not have a significant effect on the human environment."

24  40 C.F.R. § 1501.4(a).  Agencies must identify categories of actions fitting this description, and

25  for actions in these categories, neither an environmental impact statement nor an environmental

26  assessment is required.  *Id.*  This kind of action is "categorically excluded."  *Id.* § 1501.3(a)(1).

27  But it is not enough for an agency to simply fit actions to categories.  If the agency believes a

28  categorical exclusion may cover a particular action, it must "evaluate the action for extraordinary

1   circumstances in which a normally excluded action may have a significant effect." *Id.*

2   § 1501.4(b).

3        The Forest Service has identified several categories of actions that do not normally have

4   significant effects and are thus categorically excluded from NEPA's requirement to prepare an

5   environmental impact statement or assessment.  Two are relevant.  First, "wildlife habitat

6   improvement activities that do not include the use of herbicides or do not require more than 1

7   mile of low standard road construction" are categorically excluded under 36 C.F.R. § 220.6(e)(6).

8   By way of example, the regulation lists brush control and prescribed burns, among other things.

9   *See id.*  This exclusion is commonly cited as "categorical exclusion 6" or "CE-6."  *See, e.g.*,

10  *Mountain Communities*, 25 F.4th at 672.  Second, mineral investigations "and their incidental

11  support activities" are categorically excluded if they will take less than one year to complete and

12  if they will require the construction of less than one mile of "low standard road" or will rely on

13  existing roads with only minor repairs.  *Id.* § 220.6(e)(8).  This exclusion also offers examples of

14  the investigations it covers, such as "geophysical investigations which use existing roads that may

15  require incidental repair to reach sites for drilling core holes, temperature gradient holes, or

16  seismic shot holes."  *Id.* § 220.6(e)(8)(i).  This exclusion is commonly cited as "categorical

17  exclusion 8" or "CE-8."  *See, e.g.*, *Uranium Watch v. U.S. Forest Serv.*, No. 10-0721, 2010 WL

18  3703807, at *6–7 (D. Utah Sept. 14, 2010).

19       In this case, the Forest Service concluded preliminarily that KORE's project would fall

20  entirely within the categorical exclusion for mineral investigations (CE-8), thus excluding the

21  project from NEPA's more rigorous review requirements.  *See* AR 5280–81, 5321.  Later, as

22  noted above, after receiving public comments and modifying the plan, the Forest Service began to

23  review KORE's plan partially as a habitat restoration project.  It thus began relying on both the

24  mineral exploration (CE-8) and habitat improvement exclusions (CE-6).  *See* AR 2–8.

25       The plaintiffs allege this decision violated NEPA and the Nineteenth Century law tasking

26  the Forest Service with regulating the National Forest System, namely the Organic Act.  *See*

27  Compl. ¶¶ 102–12 (NEPA); *id.* ¶¶ 113–15 (Organic Act).  First, they challenge the Forest

28  Service's decision to rely on the two categorical exclusions.  They contend the exclusion for

8

1  mineral investigations does not cover the project because more than a year will pass by the time

2  KORE regrades and reseeds the drill pads and temporary access roads. *See* Pls.' Mem. at 16–19,

3  ECF No. 34-1. As for the habitat improvement exclusion, the plaintiffs argue KORE is exploring

4  a mining claim, not restoring habitats, so the categorical exclusion is essentially an irrelevant end-

5  run around NEPA's more rigorous provisions. *See id.* at 19–22. In the alternative, the plaintiffs

6  argue the Forest Service's decision was arbitrary and capricious because KORE's project will

7  have significant effects on the unique sage grouse population and the endangered chub. *See id.* at

8  23–37. These effects, they argue, are extraordinary circumstances and require an EIS or

9  assessment even if the project would otherwise be categorically excluded. *See id.* Finally, the

10 plaintiffs argue the Forest Service's decision violated its Organic Act regulations because it did

11 not issue a special use permit required for all non-mining projects, such as the proposed habitat

12 rehabilitation. *See id.* at 22–23.

13      The parties agree the court can and should adjudicate these claims on their current cross-

14 motions for summary judgment. *See* Stip. & Order, ECF No. 33. Those motions are fully

15 briefed. *See* Pls.' Mem., ECF No. 34-1; Fed. Mot., ECF No. 40; KORE Mot., ECF No. 37; Pls.'

16 Reply, ECF No. 41; Fed. Reply, ECF No. 42; KORE Reply, ECF No. 43. The court submitted

17 the matter after hearing oral arguments by videoconference on July 7, 2022. Mins., ECF No. 50.

18 Roger Flynn, Talasi Brooks and Lisa Belenky appeared for the plaintiffs. Tyler Alexander

19 appeared for the United States. Kerry Shapiro appeared for KORE. The plaintiffs' claims rest on

20 the APA, so the court begins by reviewing the legal standards for APA claims at the summary

21 judgment phase.

22 **II.    LEGAL STANDARDS**

23      The APA creates a procedure for holding administrative agencies accountable to the

24 public and for challenging their actions in court. *Dep't of Homeland Sec. v. Regents of the Univ.*

25 *of Cal.*, 140 S. Ct. 1891, 1905 (2020). An agency's decisions can be set aside under the APA if

26 they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

27 5 U.S.C. § 706(2)(A). When a court is asked to decide whether an agency's decision was

28 arbitrary or capricious, it does not "substitute its judgment for that of the agency." *Motor Vehicle*

1  *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  The court

2  instead assesses whether the agency considered the relevant factors "and whether there has been a

3  clear error of judgment."  *Regents*, 140 S. Ct. at 1905 (quoting *Citizens to Preserve Overton Park,

4  Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

5        For decisions requiring a "high level of technical expertise," courts ordinarily defer to the

6  agency's "informed discretion."  *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *see also, e.g.*,

7  *Bahr v. Regan*, 6 F.4th 1059, 1075 (9th Cir. 2021) (reiterating this standard).  "[A]n agency must

8  have discretion to rely on the reasonable opinions of its own qualified experts even if, as an

9  original matter, a court might find contrary views more persuasive."  *San Luis & Delta-Mendota

10  Water Auth. v. Jewell*, 747 F.3d 581, 603–04 (9th Cir. 2014) (quoting *Marsh v. Ore. Nat. Res.

11  Council*, 490 U.S. 360, 378 (1989)).  In disputes about environmental impacts and categorical

12  exclusions, if the Forest Service has considered the "proper factors" and has made a "factual

13  determination on whether the impacts are significant or not," then its decision is "entitled to

14  deference."  *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

15        When an APA case comes to summary judgment, "the court does not employ the usual

16  summary judgment standard."  *See S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,

17  723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010).  It instead decides "whether or not as a matter of

18  law the evidence in the administrative record permitted the agency to make the decision it did."

19  *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985); *see also, e.g.*, *S. Yuba River

20  Citizens League*, 723 F. Supp. 2d at 1256.

21  **III.   DISCUSSION**

22        **A.    Is the Project Within the Two Categorical Exclusions?**

23        The first question is whether KORE's drilling project fits the Forest Service's categorical

24  exclusions for short-term drilling and habitat restoration.  KORE and the Forest Service do not

25  dispute that when each exclusion is considered on its own, neither covers the entire project.  *See*

26  Fed. Mot. at 2–5, 12–15; KORE Mot. at 16–18.  Instead they argue the two exclusions together

27  cover the project.  *See id.*  The plaintiffs do not refute this point.  It is undisputed that all drilling,

28  grading and construction will finish within a year; KORE will regrade the pads and roads and cap

1    its wells within a year; revegetation is a non-herbicidal wildlife improvement for sage grouse; and

2    KORE will construct less than a mile of new access roads.  On this front, the dispute is purely

3    legal: has the Forest Service correctly interpreted the relevant regulations as permitting it to rely

4    on two different categorical exclusions for one project?  Or, equivalently, can a project be

5    approved in two or more parts, each covered by a different exclusion?

6          Answering this question requires interpreting the relevant regulations.  "Regulations are

7    interpreted according to the same rules as statutes, applying traditional rules of construction."

8    *Mountain Communities*, 25 F.4th at 676 (quoting *Minnick v. C.I.R.*, 796 F.3d 1156, 1159 (9th Cir.

9    2015)).  Courts employ "all the 'traditional tools' of construction."  *Kisor v. Wilkie*, 139 S. Ct.

10   2400, 2415 (2019) (quoting *Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S.

11   837 843 n.9 (1984)).  The "starting point" is "the language of the regulation."  *Mountain*

12   *Communities*, 25 F.4th at 676 (quoting *Wards Cove Packing Corp. v. Nat'l Marine Fisheries*

13   *Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002)).

14         The Forest Service's regulations on categorical exclusions use singular nouns in

15   addressing exclusions.  "A proposed action may be categorically excluded" if "there are no

16   extraordinary circumstances related to the proposed action" and if "the proposed action" is within

17   "a category" listed later in the same section.  36 C.F.R. § 220.6(a) (citing 36 C.F.R. § 220.6(d)

18   and (e)).  That is, "[a] proposed action" must fit within "a category"—one category—to be

19   excluded.  The Council on Environmental Quality uses the same singular nouns in its current

20   regulations: "If an agency determines that a categorical exclusion identified in its agency NEPA

21   procedures covers a proposed action, the agency shall evaluate the action for extraordinary

22   circumstances in which a normally excluded action may have a significant effect."  40 C.F.R.

23   § 1501.4(b) (2023).

24         This language does not necessarily mean that one action can never be matched with more

25   than one exclusion.  Categorical exclusions "may overlap."  *Earth Island Inst. v. Elliott*, 318

26   F. Supp. 3d 1155, 1180–81 (E.D. Cal. 2018).  The Ninth Circuit and another judge of this district

27   have held that the Forest Service may rely on any exclusion that covers an action, even if another

28   categorical exclusion would also work, and even if the exclusion the agency did not select is

11

narrower or perhaps a more natural fit.  *See Mountain Communities*, 25 F.4th at 679–80; *Earth Island Inst.*, 318 F. Supp. 3d at 1180–81; *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1109, 1114 (E.D. Cal. 2017); *see also Int'l Soc'y for Prot. of Mustangs & Burros v. United States Dep't of Agric.*, No. 22-08114, 2022 WL 3588223, at *10–12 (D. Ariz. July 28, 2022) (denying motion for preliminary injunction, finding agency's reliance on categorical exclusions likely reasonable), *reconsideration denied*, 2022 WL 3585831 (D. Ariz. Aug. 22, 2022).  In *Mountain Communities*, for example, the Forest Service had authorized a tree-thinning project.  *See* 25 F.4th at 673.  It relied on one of the same categorical exclusions it relied on in this case: CE-6, the exclusion for "timber stand" and "wildlife improvement activities."  *Id.* at 675.  The Ninth Circuit agreed the Forest Service's project fell within the terms of the categorical exclusion, so the Service was not required to prepare an environmental impact statement or environmental assessment.  *Id.* at 676–81.  The Circuit rejected the argument that other tree-harvesting exclusions with stricter limits were "the appropriate categories."  *Id.* at 679.  "[T]he Forest Service only needs to cite and rely on one [categorical exclusion], even if other[s] may apply."  *Id.* at 679–80.  In other words, the limits of one categorical exclusion do not apply to another.  *See id.*

Courts within this circuit have not decided, however, whether an agency may rely on multiple categorical exclusions for one "action" if no single exclusion would have sufficed.  In *Mountain Communities*, which the Forest Service and KORE cite to argue that agencies may rely on multiple exclusions in this way, the Forest Service had relied on just one categorical exclusion, and the Ninth Circuit agreed that exclusion sufficed.  *See id.*  In *Earth Island Institute*, also cited by both the Forest Service and KORE briefs, the "action" was "felling dead and dying trees along 50.2 miles of road along the east side of the Greenhorn Mountains, outside the Giant Sequoia National Monument."  318 F. Supp. 3d at 1162.  There, the Forest Service relied on three exclusions: "for road repair and maintenance (CE-4), timber stand and/or wildlife habitat improvement activities (CE-6), and post-fire rehabilitation activities (CE-11)."  *Id.* at 1163.  It did not argue, however, that different parts of the project were covered by different exclusions, and the district court did not reach that conclusion.  The district court was persuaded the project could proceed under only the one exclusion related to road maintenance.  *Id.* at 1172–83.

1    KORE and the Forest Service argue that despite the regulatory language and the decisions

2    above, a patchwork of individually-insufficient-but-collectively-sufficient exclusions can cover a

3    single project or action.  They point out that the regulations define many categorical exclusions in

4    terms of "activities" rather than "projects."  *See* Fed. Reply at 2–3; KORE Reply at 2.  Both of the

5    exclusions at issue in this case use that language.  CE-6 refers to "habitat improvement activities."

6    36 C.F.R. § 220.6(e)(6).  CE-8 refers to "mineral, energy, or geophysical investigations and their

7    incidental support activities."  *Id.* § 220.6(e)(8).  From this language, the Forest Service reasons it

8    "may satisfy NEPA for a given project by relying on different CEs for different activities."  Fed.

9    Reply at 3.  Or as KORE argues, "each of the multiple activities . . . were subject to different CEs,

10   and therefore did not require further NEPA review."  KORE Reply at 2 (emphasis omitted).

11       Although the Forest Service's NEPA regulations do indeed refer to "activities," they

12   cannot be stretched as far as the Forest Service and KORE propose.  When the regulations use the

13   words "activities" and "actions," they appear to use those words as synonyms.  At the beginning

14   of the list of categorical exclusions, including CE-6 and CE-8, the regulation defines the listed

15   exclusions as "[c]ategories of *actions* for which a project or case file and decision memo are

16   required."  36 C.F.R. § 220.6(e) (emphasis added).  Then, in the list of categories, the regulation

17   refers to "activities."  *See, e.g.*, *id.* §§ 220.6(e)(6), (8).  As a result, the more natural way to read

18   the regulations' reference to plural "activities" is as a reference to the various "actions" that may

19   be excluded categorically, one by one, if the action is "within a category."  *Id.* § 220.6(a)(2), as

20   explained above.

21       In addition, when the same regulation mentions multiple categorical exclusions, it

22   assumes the agency will select just one.  It requires the Forest Service to prepare "a decision

23   memo" if the Service excludes an action under CE-6, CE-8 and other listed categorical

24   exclusions.  *Id.* § 220.6(e).  The decision memo must include "[t]he rationale for using the

25   category and, if more than one category could have been used, why the specific category was

26   chosen."  *Id.* § 220.6(f)(2)(ii).  So "if more than one category" could cover an action, the Forest

27   Service must select a single category and explain "why the specific category was chosen."  *Id.*  As

28   another district court concluded, when "more than one categorical exclusion comes into play," the

13

Forest Service may "determine which one applies." *ForestWatch v. U.S. Forest Serv.*, No. 19-5925, 2020 WL 4931892, at *5 (C.D. Cal. Aug. 20, 2020), *vacated and remanded but aff'd in relevant part*, 25 F.4th 649 (9th Cir. 2022).  The District of Arizona's decision in *Defenders of Wildlife v. U.S. Forest Service*, which the plaintiffs cite, fits this same mold.  *See* Order at 5–8, No. 14-cv-02446 (D. Ariz. Sept. 15, 2015), ECF No. 39 (considering Forest Service's decision to rely on CE-8 only).

At the same time, although this regulatory language might seem to establish unambiguously that one action can be matched with only one exclusion, that is not the case.  Following the thread further into the regulations leads to a tangled knot.  Under the regulations in force at the time of the Forest Service's decision here, a categorical exclusion was by definition "an action which a federal agency has found 'do[es] not individually or cumulatively have a significant effect on the human environment.'"  *ForestWatch*, 25 F.4th at 661 (quoting 40 C.F.R. § 1508.4 (2019)).  This meant that if an action fell within a categorical exclusion, an agency was not obligated to consider whether that action was "connected" to other actions or whether it had any "indirect" and "cumulative" impacts on the environment.  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096–97 (9th Cir. 2013) (quoting 40 C.F.R. § 1508.25 (2013)).  By this reasoning, an action within one categorical exclusion has no significant effect on the environment, and two separate actions within two separate exclusions, respectively, have no significant effect on the environment, so if the Forest Service identifies two actions and a separate categorical exclusion for each, the combined effects of those actions would also remain insignificant by definition.  Zero plus zero is zero.  Or, alternatively, if the Forest Service cannot rely on a patchwork of exclusions to cover one action, it could potentially achieve the same result by splitting an action into pieces and relying on a single exclusion for each piece.  That strategy might be consistent with the regulations and NEPA's purposes.

A Utah federal district court relied on reasoning like this in *Uranium Watch v. U.S. Forest Service*, 2010 WL 3703807.  A mining company had proposed two related projects.  First, it would drill two holes to ventilate an existing mine.  *Id.* at *1.  Second, it proposed sixteen smaller exploratory bore holes near the same mine.  *Id.*  The Forest Service approved the projects and

relied on two exclusions.  For the vent holes it relied on an exclusion for the "approval,

modification, or continuation of minor special uses . . . that require less than five contiguous acres

of land."  *Id.* at *2 (quoting 36 C.F.R. § 220.6(e)(3) (2009)).  For the exploratory holes it relied on

CE-8, the same exclusion for a short-term exploratory project it relied on in this case.  *See id.*  In

the ensuing APA challenge, the district court rejected the challengers' argument that the Forest

Service had wrongly disregarded the project's cumulative effects, citing the Tenth Circuit's

decision in *Utah Environmental Congress v. Bosworth*, *see id.* at *4 (citing 443 F.3d 732 (10th

Cir. 2006)), a decision the Ninth Circuit has cited with approval, *see Salazar*, 706 F.3d at 1097.

In *Utah Environmental Congress*, the Tenth Circuit held that by definition, categorically excluded

actions do not "create a significant environmental effect."  443 F.3d at 741.  The Utah district

court's decision could thus be interpreted as endorsing the conclusion that a single project can be

approved in two parts, each covered by a different exclusion.

        In some extreme cases, this divide-and-conquer strategy might lead to absurd results.

Consider a six-month mining exploration project.  On its own, the project may very well have no

"significant effect on the human environment," 40 C.F.R. 1501.4(a), and so it might be excluded

categorically under CE-8, but if the Forest Service also planned to relocate administrative and

recreational buildings under CE-21 and 22, *see id.* § 220.6(e)(21)–(22), to realign two miles of the

surrounding roads under CE-24 , *see id.* § 220.6(e)(24), to widen other parts of the surrounding

roads and replace a bridge under CE-23, *see id.* § 220.6(e)(23), to fell and sell the surrounding

trees under CE-12, *see id.* § 220.6(e)(12), to construct telephone and utility lines under CE-2, *see

id.* § 220.6(e)(2), and to modify the course of a nearby stream under CE-7, *see id.* § 220.6(e)(7),

could the Forest Service reasonably claim no significant effects were expected?  Or could the

Forest Service indefinitely extend a supposedly "short-term" exploratory project under CE-8 by

approving a new six-month project every six months?

        This is not such an extreme case.  If anything, this case illustrates how a patchwork theory

of categorical exclusions might be reasonable in some circumstances.  Under the plan the Forest

Service approved, "[a]ll activities incidental to mining, including drilling, grading, and

installation of erosion control features, will be completed within one year of the beginning of

15

1    operations."  AR 2.  "At the end of the one-year period, all equipment will have been removed

2    from the site and all activities in support of exploration will be complete."  AR 2–3.  "[T]here

3    would be no more than 0.32 miles of temporary road construction."  AR 3.  "All exploration

4    activities and activities necessary to support the explorations itself fall under [CE-8]."  *Id.*  The

5    Forest Service was concerned, however, about the project's possible effects on "wildlife habitat

6    (including sage grouse and mule deer)."  AR 3.  So it has also required "post-project restoration

7    for habitat improvement," including "seeding, installing (sage-grouse friendly) fences around the

8    pads to protect seedlings from livestock or wildlife grazing, monitoring revegetation activities on

9    foot, and pulling weeds if needed."  *Id.*  It believes "[t]hese restoration activities are important to

10   provide food and cover for native wildlife species, as well as allowing for native plant success."

11   *Id.*  It wants "to be certain that adequate rehabilitation occurs," so it does not "want to limit any

12   activities needed for rehabilitation to a time frame of one year or less."  AR 3.  The Forest Service

13   has accordingly relied in this respect on CE-6, which has no one-year limit.  *See id.*  And it is

14   undisputed that the seeding, fencing, monitoring, and weed-pulling fall within the limits of CE-6.

15        The plaintiffs offer only one reason why the categorical exclusion for short-term mining

16   investigations does not cover the entire project: it will last longer than one year.  *See* Pls.' Mem.

17   at 16–19.  They do not dispute that all "drilling, grading, and installation of erosion control

18   features, will be completed within one year of the beginning of operations."  AR 2.  So if the

19   Forest Service had approved KORE's proposal without requiring any rehabilitation beyond the

20   first year, the project would have fit a single categorical exclusion.  In that situation, however, by

21   the Forest Service's reasoning, the project's "effects to natural resources" would have been

22   greater.  *See* AR 3.  The plaintiffs do not dispute the Forest Service's conclusion that the

23   restoration efforts will reduce effects on the environment.  As KORE argues bluntly, the

24   plaintiffs' "lead argument is that the Forest Service's decision should be invalidated because the

25   agency included extra environmental monitoring protections."  KORE Mot. at 20 (emphasis

26   omitted).

27        The APA requires "reasoned decision making," not perfection.  *Regents*, 140 S. Ct. at

28   1905 (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015)).  It permits a federal court to set

aside an agency's actions if they were "arbitrary" or "capricious," not if the court would have thought about the problem differently or would have reached a different conclusion. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  If an agency has examined the relevant data and provided a "satisfactory explanation for its action," *id.* (quoting *Motor Vehicles Ass'n*, 463 U.S. at 43), if it has considered the relevant factors and has not made a "clear error of judgment," *Regents*, 140 S. Ct. at 1905 (quoting *Overton Park*, 401 U.S. at 416), then a court may not set its decision aside.  Under this standard, the Forest Service's "decision to invoke a categorical exclusion" does not violate the APA if it "'reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion.'"  *Mountain Communities*, 25 F.4th at 680 (quoting *Earth Island Inst.*, 290 F. Supp. 3d at 1114).

Applying the law to the record of this case, this court finds the Forest Service reasonably concluded KORE's project fits within the categorical exclusions for short-term mining exploration and for wildlife habitat improvement activities.  The Forest Service also was reasonable in relying on two categorical exclusions.  Perhaps its decision to do so rested on an incorrect understanding of what the relevant regulations permit.  But by definition, categorically excluded activities have no significant environmental effects, so it would be pointless to set aside the Forest Service's decision in this case if its sole error was a failure to process KORE's proposal as two "actions" rather than one.

The court understands this reading is not without drawbacks.  For example, it could have the effect of preventing the public from commenting on whether the habitat restoration exclusion is a good fit for KORE's project.  *See* Pls.' Mem. at 19.  Although the plaintiffs and the broader public had an opportunity to respond to the Forest Service's decision to rely on the exclusion for short-term drilling projects during the public "scoping" period, they did not have an opportunity to respond to the Forest Service's decision to rely in addition on the exclusion for habitat restoration projects.

If the court were to send the matter back to the agency it could permit further public comments, but the plaintiffs cite no authority to show an agency must give notice again and receive comments if it ultimately relies on a different or additional categorical exclusion than the

one it originally proposed.  The court is aware of no such authority.  Rather, the most analogous authorities suggest the Forest Service here had no obligation to engage in further public consultation.  *See, e.g.*, *Lands Council v. Packard*, No. 05-210, 2005 WL 1353899, at *5 (D. Idaho June 3, 2005) ("[B]ecause categorical exclusions are so limited, agencies need not provide for public comment for projects meeting the requirements for categorical exclusion."); *see also* 40 C.F.R. § 1501.9(g) (requiring revisions to scoping determinations "if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts").  The Forest Service requested and received more than a thousand comments over three months about the project and its environmental effects, including effects on sage grouse, groundwater and the endangered chub.  In the worst case scenario, if an agency were required to solicit and review public comments every time a comment led to any change in its thinking about categorical exclusions, the agency could be forced into a vicious cycle of renotice and revision.  Applying the regulations as the plaintiffs' propose would thus be "inconsistent with the efficiencies that the abbreviated categorical exclusion process provides." *Salazar*, 706 F.3d at 1097.

In summary, an agency's decision to rely on multiple exclusions for the same project might in some cases expand categorical exclusions beyond their intended purposes.  But not in this case.  Nothing suggests the Forest Service ignored the project's environmental effects. Nothing suggests it attempted to obscure the project's environmental effects behind multiple categorical exclusions.  It imposed additional habitat restoration requirements in an effort "to minimize effects to natural resources."  AR 3.  The court is not in a position to second-guess the Forest Service's judgment about such a specialized and technical subject matter.  *See Kleppe*, 427 U.S. at 412.  "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference."  *Alaska Ctr. For Env't*, 189 F.3d at 859.  KORE's project fits within the categorical exclusions for short-term mining exploration (CE-8) and for habitat restoration (CE-6).

**B.      Is this a case of "extraordinary circumstances"?**

When a project is categorically excluded, the agency then must consider whether there are "extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. § 1501.4(b).  To that end, the Forest Service's regulations identify several "resource conditions" to evaluate.  *See* 36 C.F.R. § 220.6(b)(1).  These "conditions" include the presence of "Forest Service sensitive species," such as the sage grouse.  *Id.* § 220.6(b)(1)(i).  They also include the presence of a habitat of a species on the federal endangered species list, such as the Owens Tui Chub.  *See id.*  But "[t]he mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion."  *Id.* § 220.6(b)(2).  To determine whether there are extraordinary circumstances, the Forest Service checks whether there is "a cause–effect relationship between a proposed action and the potential effect on these resource conditions" and if so, it considers "the degree of the potential effect of a proposed action on these resource conditions."  *Id.*  In this case, the Forest Service determined "there are no extraordinary circumstances that would warrant further analysis and documentation."  AR 4.

As a threshold matter, the parties disagree what legal standard this court must apply under the APA.  The plaintiffs argue the Forest Service must determine that the project will not affect the "resource" in question.  *See* Pls.' Mem. at 24 (citing *Conservation Cong. v. U.S. Forrest Serv.*, No. 12-02416, 2013 WL 2457481, at *8 (E.D. Cal. June 6, 2013)).  In the case of an endangered species or species of concern, this would mean the Forest Service could not rely on a categorical exclusion unless it determined the project "*will not* impact negatively on the species." *Id.* (emphasis in original) (quoting *Conservation Cong.*, 2013 WL 2457481, at *8).  In the plaintiffs' view, any "uncertainty" forecloses this conclusion.  *See id.*  In other words, the Forest Service cannot rely on its belief that a project "is not likely to adversely affect" the species.  *Conservation Cong.*, 2013 WL 2457481, at *8.

The Forest Service disagrees that certainty is necessary.  It emphasizes the language of its regulation.  To decide whether there are extraordinary circumstances, it considers "*the degree of the potential effect* of a proposed action" on a specific resource.  Fed. Mot. at 22 (emphasis in original) (quoting 36 C.F.R. § 220.6(b)(2)).  This language suggests that to some "degree,"

adverse effects might not foreclose an exclusion.  Or as the Forest Service argues, it is not

necessary to exclude every possible "negative impact."  *See id.*  "Impacts to protected species—

even negative impacts—are not an extraordinary circumstance" if a project "'is not likely to result

in a trend toward federal listing or a loss of viability for the species as a whole.'"  *Id.* (quoting

*Ctr. for Biological Diversity v. Illano*, 928 F.3d 774, 782 (9th Cir. 2019)).

The Forest Service has the better argument on this point.  If the plaintiffs' position were

correct, then the Ninth Circuit could not have affirmed the district court's decision in *Illano*.  In

that case, the Forest Service had approved a tree-thinning project in the Tahoe National Forest.

*See* 928 F.3d at 779.  Biologists had evaluated the project's potential effects on the California

spotted owl.  *Id.*  They concluded the project "may affect individuals, but [was] not likely to

result in a trend toward federal listing or loss of viability" for the species as a whole.  *Id.*  The

Forest Service determined there were no extraordinary circumstances and relied on a categorical

exclusion.  *Id.*  The plaintiffs sued, arguing the Forest Service should have prepared an

environmental assessment or impact statement, and the district court granted summary judgment

to the Forest Service.  *Id.*  The Ninth Circuit affirmed:

> In finding that individual owls may be negatively impacted in the
> short-term but the species would benefit in the long-run, the Forest
> Service relied upon scientific studies and its own expert judgment, to
> which we must defer. . . . [T]he Forest Service considered relevant
> scientific data, engaged in a careful analysis, and reached its
> conclusion based on evidence supported by the record. Therefore, its
> decision was not arbitrary or capricious.

*Id.* at 782–83.  In sum, even though individual owls might have suffered negative consequences,

even though the Forest Service's experts could not say with certainty the species as a whole

would maintain its numbers and viability, and even though the plaintiffs had cited competing

evidence, the Forest Service's decision withstood an APA challenge.

A number of other federal district courts within this circuit have refused to adopt the more

stringent standard the plaintiffs propose, some relying on *Illano*.  *See, e.g.*, *Wildlands Def. v.

Bolling*, No. 19-00245, 2020 WL 5042770, at *11 (D. Idaho Aug. 25, 2020); *Greater Hells

Canyon Council v. Stein*, No. 17-00843, 2018 WL 7254696, at *3 (D. Or. Dec. 18, 2018); *Earth

1   *Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1118–20 (E.D. Cal. 2017).  Even in *Conservation*

2   *Congress*, the case the plaintiffs rely on most heavily, the court later upheld the Forest Service's

3   decision even though it could not exclude the possibility the challenged project would negatively

4   affect the northern spotted owl.  *See* 2016 WL 1162676, at *3 (E.D. Cal. Mar. 24, 2016).

5        In this case, as in *Illano*, the Forest Service has considered the relevant evidence and

6   explained its decision that there are no "extraordinary circumstances."  First, it concluded that

7   effects on the sage grouse would be "minor and temporary."  AR 4.  Individual birds "in the area

8   would avoid the immediate vicinity of the drill sites during the exploration activities and

9   associated disturbance."  AR 4.  Drilling might cause "physiological stress," reduce foraging, and

10  could increase predation, but "these impacts will be short-term and spatially limited, so [they]

11  will not result in any impacts to the species that would affect their viability within the project area

12  or the Inyo National Forest."  AR 4–5.  The Forest Service relied on the analysis of subject matter

13  experts.  *See* AR 167 (reproducing biological report; concluding "[p]roject implementation is not

14  expected to affect greater sage grouse's . . . capabilities to persist over the long term in the Project

15  Area."); AR 380 ("Noise levels produced by exploration activities are predicted to result in

16  maximum noise level increases of 8.7 dBA at the LV07A sage-grouse lek.  This increase is less

17  than the 10 dBA increase criterion established for sage-grouse leks.").  After receiving public

18  comments, the Forest Service imposed limits and put protective measures in place: KORE would

19  not drill during the most sensitive season, it would install anti-perching devices and acoustic

20  screening devices, it would impose speed limits on most roads, and it would educate workers

21  about avoiding harms to wildlife.  *See* AR 15–16.  The Forest Service's decision was reasonable.

22       Second, the Forest Service concluded that any negative effects on groundwater were

23  unlikely and minimal.  Its decision speaks for itself:

24            Groundwater will not be extracted by the project. Previous
25            exploration drilling in the area did not encounter any artesian
26            groundwater conditions. It is not expected that this exploration effort
27            will encounter these conditions either, and therefore there should not
28            be any inadvertent groundwater loss. A groundwater analysis has
29            been completed that analyzes potential for intermixing of shallow
30            cool and deep warm aquifers in the area (Barlett, 2021). In summary,
31            there does not appear to be a significant upper, cool water aquifer in

the claim block. Therefore, it is not likely that drilling will cause intermixing of the two aquifers in this area. . . . [T]o further minimize any risk of groundwater intermixing, drill holes will be cased during drilling, open for a short time and abandoned (closed) immediately after completion by backfilling with a bentonite slurry and cement grout from the bottom of the hole to the surface. Therefore, there should be no effects to groundwater.

Project design features for the protection of water resources have been included in Appendix A and approval of the Plan of Operations will be conditioned upon acceptance of these design features. All drill holes will be cased, blowout prevention equipment will be in use, bore holes will be abandoned immediately upon completion, and spill kits will be on site. These preventative measures are an extra precaution to ensure that in the unlikely case that artesian groundwater flow is encountered, there will be minimal potential impacts to groundwater, soil, or surface water resources

AR 6.  The record supports these conclusions.  *See, e.g.*, AR 335–64 (reproducing hydrological technical memorandum).  With the evidence before it, the Forest Service reasonably decided any negative effects on the wildlife that depend on groundwater were unlikely and minimal.  *See* AR 168 (biological report).

The plaintiffs cite competing evidence and draw different conclusions about possible harms to the sage grouse and endangered chub.  This evidence does not nullify the evidence the Forest Service relied on; nor does it show the Forest Service's conclusions were arbitrary.  At most, the evidence might show experts could reasonably disagree about the effects of KORE's project.  *See, e.g.*, Pls.' Mem. at 25–26 (citing internal discussions about sage grouse brooding and foraging in the area and how to characterize likely effects on sage grouse).  It is not for the court to decide whether the plaintiffs' conclusions are more persuasively reasoned.  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *Marsh*, 490 U.S. at 378.  Here, considering the record as a whole, the Forest Service's conclusions are reasonable.

In addition to citing potential harms to the sage grouse and chub, the plaintiffs argue the Forest Service wrongly disregarded the cumulative effects of KORE's project.  Pls.' Mem. at 34–

22

37.  Some district courts have held that agencies must consider an action's indirect and cumulative effects when deciding whether an action is categorically excluded.  *See* Order at 13–14, *Defs. of Wildlife v. U.S. Forest Serv.*, No. 14-2446 (D. Ariz. Sept. 15, 2015), ECF No. 39; *All. for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1129 (D. Mont. 2013), *aff'd*, 639 F. App'x 498 (9th Cir. 2016) (unpublished); *Sierra Club v. United States*, 255 F. Supp. 2d 1177, 1182 (D. Colo. 2002).  These decisions cite regulations issued by the Council for Environmental Quality in force at the time of the Forest Service's decision, which required agencies to consider cumulative effects and the effects of other similar actions when determining "the scope of environmental impact statements."  40 C.F.R. § 1508.25.  The same regulations also included a list of considerations that help an agency evaluate the intensity of an environmental impact.  *See id.* § 1508.27(b).

These regulations did not require the Forest Service to investigate the cumulative effects of KORE's drilling project.  By its terms, § 1508.25 applies to environmental impact statements, so is not relevant until an agency must prepare an impact statement.  *Salazar*, 706 F.3d at 1097–98; *Earth Island Inst.*, 290 F. Supp. 3d at 1122–23.  Nor do the "intensity factors" in § 1508.27(b) come into play in this case.  The Forest Service weighed those factors when it defined the categorical exclusions and the "resources conditions" it uses to decide whether extraordinary circumstances are present; it was not necessary to repeat that exercise in response to KORE's proposal.  *See Mountain Communities*, 25 F.4th at 680–81 (citing *Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 411 (6th Cir. 2016)).  Finally, at the relevant time, a categorical exclusion was, by definition, an action that "do[es] not individually or cumulatively have a significant effect on the human environment," as explained above.  *ForestWatch*, 25 F.4th at 661 (alteration in original) (quoting 40 C.F.R. § 1508.4 (2019)).  That is, the Forest Service decided that actions within the categories listed in 36 C.F.R. § 220.6(e) have no cumulatively significant effects absent the extraordinary circumstances defined in § 220.6(b).

The plaintiffs argue the Forest Service should still have considered the cumulative effects of KORE's project because the Service's Handbook requires it to do so.  *See, e.g.*, Pls.' Reply at 16–17.  They argue the Handbook is analogous to the Bureau of Land Management's regulations,

which the Ninth Circuit and District of Arizona analyzed in *Salazar*.  *See id.* (citing 706 F.3d at 1096–98 and 791 F. Supp. 2d 687, 703 (D. Ariz. 2011)).  The Ninth Circuit, however, has held that the Forest Service's Manual and Handbook "do not have the independent force and effect of law."  *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996).  For that reason, this court need not "review [the plaintiffs'] contention that the [Forest] Service failed to comply with the guidelines contained in either."  *Id.*; *see also, e.g.*, *United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982) (refusing to enforce provisions in the U.S. Customs Manual that did not have "the force and effect of law").

In sum, because "the Forest Service considered relevant scientific data, engaged in a careful analysis, and reached its conclusion based on evidence supported by the record," its decision to rely on categorical exclusions "was not arbitrary or capricious."  *Illano*, 928 F.3d at 783.

**C.     The Organic Act**

Finally, the plaintiffs argue the Forest Service was wrong to approve the project without a separate "special use" permit required by regulations adopted under the Organic Act.  *See* Pls.' Mem. at 22–23.  The Forest Service's regulations divide mining projects from other projects:

> All uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing . . . minerals (part 228) are designated "special uses." Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer . . . .

36 C.F.R. § 251.50(a).  In other words, if a use is not authorized by the regulations governing minerals in Part 228, then a special use permit is required.

Part 228 includes regulations protecting the environment.  It requires "[a]ll operations" to "be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources."  36 C.F.R. § 228.8.  More specifically, it requires operators to "reclaim the surface disturbed in operations," including "[r]eshaping and revegetation of disturbed areas" and "[r]ehabilitation of fisheries and wildlife habitat."  *Id.* § 228.8(g)(4)–(5).  This language

1   authorizes the habitat rehabilitation efforts the Forest Service imposed on KORE, so no "special

2   use authorization" was required.

3   **IV.   CONCLUSION**

4       The court **grants** the Forest Service's and KORE's motions for summary judgment, and

5   **denies** the plaintiffs' motion.  This order resolves ECF Nos. 34, 37 and 40 and so the court **closes**

6   **this case**.

7       IT IS SO ORDERED.

8   DATED:  March 8, 2023.

                                                               CHIEF UNITED STATES DISTRICT JUDGE