**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRIENDS OF THE INYO; WESTERN WATERSHEDS PROJECT; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB, | No. 23-15492 D.C. No. 2:21-cv-01955- KJM-KJN |
| *Plaintiffs-Appellants*, v. | OPINION |
| UNITED STATES FOREST SERVICE; LEEANN MURPHY, | |
| *Defendants-Appellees*, | |
| KORE MINING, LTD., | |
| *Intervenor-Defendant-Appellee*. | |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted August 24, 2023
San Francisco, California

Filed May 21, 2024

Before:  Patrick J. Bumatay, Lucy H. Koh, and Roopali H.
Desai, Circuit Judges.

Opinion by Judge Desai;
Dissent by Judge Bumatay

## SUMMARY[*]

### Environmental Law

The panel reversed the district court's summary judgment in favor of the U.S. Forest Service and KORE Mining Ltd. in an action brought by environmental groups challenging the Forest Service's approval of the Long Valley Exploration Drilling Project, a mineral exploration project on land in the Inyo National Forest in California.

An agency can comply with the National Environmental Policy Act's environmental requirements by invoking a Categorical Exclusion ("CE") to avoid preparing an Environmental Impact Statement or an Environmental Assessment, two of which are at issue here:  CE-6, which allows timber stand or wildlife habitat improvement activities that do not use herbicides or require more than 1 mile of low standard road construction; and CE-8, which allows certain short-term mineral, energy, or geophysical investigations and their incidental support activities.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The parties disputed whether the Forest Service regulation enumerating CEs, 36 C.F.R. § 220.6, allowed the Forest Service to combine two CEs to approve a proposed action, where no single CE could cover the proposed action alone.

The panel held that the two-phase Project was a single proposed action. The Forest Service properly analyzed the Project as one proposed action because Forest Service regulations prohibit artificially bifurcating reclamation from a proposed plan of operations, and all parties treated KORE's mineral exploration and reclamation as one proposal.

Neither CE-6 nor CE-8 alone could cover the proposed action. The plain language of the regulation, and its history, structure, and purpose, supported finding that § 220.6 prohibited combining CEs, where no single CE could cover a proposed action alone. The panel held that the Forest Service's error in combining CE-6 and CE-8 was not harmless, and remanded for district court to enter summary judgment on behalf of plaintiffs, vacating the agency's decision.

Dissenting, Judger Bumatay would hold that any error in applying the CEs here was harmless because the Project would disturb less than an acre of land and no one has identified any significant impact on the environment.

## COUNSEL

Roger Flynn (argued), Western Mining Action Project, Lyons, Colorado; Talasi B. Brooks, Western Watersheds Project, Boise, Idaho; for Plaintiffs-Appellants.

Ezekiel Peterson (argued), Tyler M. Alexander, and Robert P. Stockman, Assistant United States Attorneys; Todd Kim, Assistant Attorney General; United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Jamie Rosen, Attorney, United States Department of Agriculture, Office of General Counsel, Washington, D.C.; for Defendants-Appellees United States Forestry Service and Leeann Murphy.

Kerry Shapiro (argued), Daniel Quinley, and Lena Streisand, Jeffer Mangels Butler & Mitchel LLP, San Francisco, California, for Intervenor-Defendant-Appellee Kore Mining LTD.

**OPINION**

DESAI, Circuit Judge:

In 2021, the United States Forest Service approved the Long Valley Exploration Drilling Project (the "Project"), a mineral exploration project on land in the Inyo National Forest. Plaintiffs Friends of the Inyo, Western Watersheds Project, Center for Biological Diversity, and Sierra Club (collectively, "Friends") sued under the National Environmental Policy Act ("NEPA"), arguing that it was unlawful for the United States Forest Service ("Forest Service") to approve the Project by combining two categorical exclusions, when neither one alone could justify approval of the Project. KORE Mining Ltd. ("KORE"), the entity that proposed the Project, intervened as a defendant. The district court granted summary judgment in favor of the Forest Service and KORE and denied Friends' motion for summary judgment. For the reasons discussed below, we reverse the decision of the district court.

**BACKGROUND**

**I.   National Environmental Policy Act**

"Congress enacted NEPA to establish a national policy for the environment." *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 674 (9th Cir. 2022). NEPA requires federal agencies to perform environmental analysis before taking any "major Federal actions significantly affecting the quality of the human environment." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 987–88 (9th Cir. 2020) (quoting *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013)). NEPA "does not mandate particular results," but "imposes only procedural requirements to ensure that the

agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* at 988 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008)). An agency can comply with NEPA in three ways: (1) it can prepare an Environmental Impact Statement ("EIS"); (2) it can prepare an Environmental Assessment ("EA"); or (3) it can invoke a Categorical Exclusion ("CE") to avoid preparing an EIS or EA. *Id.* This case involves the invocation of CEs.

CEs represent a "more expedited track available for a limited set of agency actions . . . 'that normally do not have a significant effect on the human environment.'" *Earth Island Inst. v. Muldoon*, 82 F. 4th 624, 632 (9th Cir. 2023) (quoting 40 C.F.R. § 1501.4(a)). Invoking an exclusion allows an agency to avoid preparing an EIS or EA so long as no "extraordinary circumstances" indicate that the action will nonetheless have a significant environmental effect. *Id*. To approve a project using a CE, the Forest Service must issue a "decision memo" supported by a project record or case file. § 220.6(e).

The Forest Service promulgated 25 categories of CEs in 36 C.F.R. § 220.6(e). Two CEs are at issue here: (1) CE-6 allows "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction," 36 C.F.R. § 220.6(e)(6) ("CE-6 (habitat improvement)"); and (2) CE-8 allows "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads,"

*Id*. § 220.6(e)(8) ("CE-8 (mineral operations less than 1 year)").

## II. Mining Activities on Forest Service Administered Land

The General Mining Law of 1872 confers a statutory right to prospect, explore, and mine minerals on certain public lands, including National Forests. 30 U.S.C. § 22, amended by Surface Resources Act of 1955, 30 U.S.C. § 612; 16 U.S.C. § 482. Such activities, known as "operations," must be "conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 U.S.C. § 228.1. "Operations" are defined as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto . . . ." § 228.3(a).

Under the Forest Service's mineral regulations, any person proposing "operations which might cause significant disturbance of surface resources" must file "a notice of intent to operate" with the Forest Service District Ranger with jurisdiction over the operations area. 36 C.F.R. § 228.4. If the District Ranger finds that any operation will likely cause "significant disturbance of surface resources," the operator must submit a "proposed plan of operations" to the Forest Service for approval. 36 C.F.R. § 228.4. No operations can be conducted until a plan of operations is approved. 36 C.F.R. § 228.4.

A plan of operations must provide, among other things, a description of how the operations will be conducted and the "measures to be taken to meet the requirements for environmental protection in § 228.8." 36 C.F.R. § 228.4. In turn, § 228.8, titled "[r]equirements for environmental

protection," requires an operator to "reclaim the surface disturbed in operations by such measures as will prevent or control . . . damage to the environment and forest services including . . . reshaping and revegetation of disturbed areas" and "rehabilitation of fisheries and wildlife habitat." 228.8(g), (g)(4)–(5). Once the Forest Service receives an operator's proposed plan of operations, the agency must complete "an environmental analysis in connection with [the] proposed operating plan" to "determine whether an environmental statement is required." § 228.4(f), (a)(4), (b); § 228.5(a)–(b).

## III.  The Long Valley Exploration Drilling Project

East of Mammoth Lakes, California, there is a wide expanse of public land covered by shrubs and small trees within the Inyo National Forest. The Long Valley Exploration Drilling Project is a proposed mineral exploration project on this Forest Service-managed land. The Project would proceed in two phases. The approved Plan of Operations would first allow KORE to build 12 temporary drilling pads in the Project area, which would be used for one year or less. Then, for up to three years after drilling, experts would monitor and tend to the Project area to ensure environmental rehabilitation is successful.

Each drilling pad would include up to 3 core, angle borings, which will reach depths from about 580 to 1,424 feet. KORE would use existing public roads and build up to .32 miles of temporary access roads for the Project. Between the temporary roads and drilling pads, KORE estimates the Project would directly disturb about .82 acres within the Project area. Friends allege that the Project's impact will be much larger because construction will be scattered throughout the Project area and will disrupt the region with

loud noises and visual intrusions. The parties also dispute whether the Project's drill depths will reach or disrupt the regional ground water aquifer.

## IV.  Procedural Background

KORE began investigating the Project in 2019. The proposed site was 1,848 acres in Mono County, where other entities bored hundreds of holes in previous explorations in the 1980s and 1990s. Although the previous holes only reached a few hundred feet, KORE believed that deeper exploration, which had previously not been technically possible, could be fruitful. KORE proposed drilling fewer, deeper holes in the periphery of the same area. KORE would then refill the holes without extracting any resources.

KORE submitted a required notice of intent to the Forest Service in the summer of 2020. The Forest Service requested a more detailed plan of operations because KORE's "proposed mining activities" were "likely to cause significant disturbance of surface resources." KORE prepared and submitted a plan of operations that summer. Initially, the Forest Service determined that KORE needed to prepare an EA to assess the Project's environmental impact. In a July 2020 letter to KORE, the Forest Service concluded: "Our initial review of the Plan of Operation indicates that an Environmental Assessment will need to be completed for this project."

In August 2020, KORE sent a letter to the Forest Service objecting to the need for NEPA review. KORE wrote that it was "hopeful that [the Forest Service] can help [KORE] get through this initial exploration stage on a quicker timeline." In an email to KORE in November 2020, the Forest Service informed KORE that the agency was "trying to fit the project into a Categorical Exclusion for the NEPA process . . . ."

The same day, the Forest Service reversed course, informing KORE that NEPA review was unnecessary because the Project could be approved via CE-8 (mineral operations less than 1 year).

On January 2, 2021, the Forest Service listed the Project "as a proposal on the Inyo National Forest Schedule of Proposed Actions (SOPA)." The Forest Service solicited public comment on the proposed Project and received over 1,500 comments. Commenters raised "potential impacts to tourism, wildlife, cultural resources, water quality and recreation." Many comments warned that the Project could disrupt several species in and around the Project area. Among these were objections to the Project based on potential disruption to the Bi-State sage-grouse and the Owens Tui Chub. The Bi-State sage grouse is a ground nesting bird recognized by the Forest Service as a Species of Conservation Concern. Commentors expressed concerns that the Project would allow destruction of the sage grouse's habitat and lead to disruption of mating and nesting. The Owens Tui Chub is an endangered species of fish. Although the Project area does not contain surface water, two populations of endangered chub live near the Project area and depend on groundwater. The Forest Service received many comments expressing concern that the Project would impact ground and surface waters. Commentors also objected to the Forest Service's reliance on CE-8 (mineral operations less than 1 year) because the Project's reclamation period would take up to three years, and thus the Project could not be completed within one year.

After receiving public comments, in July 2021, the Forest Service altered its analysis of the Project. In the agency's draft Public Involvement Scoping Summary Report, the Forest Service acknowledged that commentors

were concerned that the Project could not be approved using CE-8 (mineral operations less than 1 year) because "some activities would continue beyond one year, particularly monitoring and re-seeding as necessary, and other habitat restoration activities." The Forest Service stated that "[t]hese concerns were considered" and, ultimately, the agency "add[ed] another CE category to cover the minor activities that may occur to support rehabilitation, which may include additional seeding or planting vegetation, and leaving fences in place around revegetated areas."

Internally, Forest Service Environmental Coordinator Erin Noesser shared an updated version of a draft decision memo approving the Project. The updated memo relied on a combination of CE-6 and CE-8 to approve the Project without an EA or EIS. She explained in an internal email: "I added the new CE category and an explanation, so see if you think it's logical. I'm sending it to our attorneys and NEPA people today to look at that section, so they may ask for some changes if they don't like it." The updated memo relied on a combination of CE-6 and CE-8 to approve the Project without an EA or EIS. It concluded that "[r]eclamation activities that do not involve grading, or major ground disturbance may continue past one year as needed for satisfactory reclamation" and "fall under support activities necessary for mineral exploration." A redlined note in the draft explained that the Forest Service District Ranger was approving the project under an additional CE, CE-6 (habitat improvement), because "I want to be sure that I explicitly acknowledge that these restoration activities may take more than one year and that we have analyzed both the positive and negative impacts of the restoration activities."

After these drafts, the Forest Service formally approved the Project in a final decision memo. The decision memo

continued to rely on the combination of two CEs, but it reversed its description of the Project's reclamation plan, finding that post-one-year reclamation efforts "are not support activities necessary for mineral exploration." As approved, the Project was divided into two phases. In phase one, covered by CE-8 (mineral operations less than 1 year), KORE will complete its mineral exploration and initial site reclamation. Phase one will last one year, and at the end of the one-year period, all equipment will be removed, and exploration activities will be complete. In phase two, covered by CE-6 (habitat improvement), for up to three years after phase one, experts will monitor and tend to the Project area to ensure revegetation is successful.

The Forest Service found that the Project's plan of operations would avoid any significant effects on the environment. The final decision memo concluded that "impacts to the [sage grouse], should they be present, would be minor and temporary," and "will not result in any impacts to the species that would affect their viability within the Project area or the Inyo National Forest." It found that drilling may cause "physiological stress, reduced foraging success, and exposure to higher predation rates," but that, with the implementation of avoidance and minimization measures, any impact would be "short-term and spatially limited." The decision memo also evaluated risks to groundwater and concluded based on a historical groundwater analysis that "there is a very low potential for any effect to surface or groundwater quality or quantity from this exploration project."

Friends sued the Forest Service after it approved the Project, alleging that the Forest Service violated NEPA by approving the Project using a combination of two CEs where neither CE alone could be invoked to avoid an EIS or EA.

Both sides moved for summary judgment. The district court granted the Forest Service and KORE's motions for summary judgment and denied Friends' motion for summary judgment. Friends appealed to this court.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *350 Mont. v. Haaland*, 50 F.4th 1254, 1263 (9th Cir. 2022). We review NEPA claims under the standards set forth in the Administrative Procedure Act and must set aside agency action if we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citing 5 U.S.C. § 706). Arbitrary and capricious review is "highly deferential" and presumes that the agency action is valid if "a reasonable basis exists" for the agency's decision. *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007). But we defer to an agency's decision only if it is "fully informed and well-considered," *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (quoting *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986)), and our review is limited to "the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015).

## ANALYSIS

The parties dispute whether the Forest Service regulation enumerating CEs, 36 C.F.R. § 220.6, allows the Forest Service to combine two CEs to approve a proposed action, where no single CE could cover the proposed action alone. To answer this question, we must define the scope of the proposed action here, then decide whether the Forest Service properly combined CE-6 and CE-8. Based on the plain

language of § 220.6, we hold that the two-phase Project was a single proposed action, and that § 220.6 prohibits combining two CEs, when neither CE would cover a proposed action alone.

## I.  The Project is a single proposed action.

We first define the scope of the proposed action considered by the Forest Service. Under § 220.6, "A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if . . . [t]he proposed action is within a category listed in § 220.6(d) and (e)." Section 220.6 thus requires NEPA compliance for each "proposed action" considered by the agency. Here, the agency evaluated the two-phase Project as a single proposed action. The Forest Service properly analyzed the Project as one proposed action because Forest Service regulations prohibit artificially bifurcating reclamation from a proposed plan of operations.

Forest Service NEPA regulations do not define "proposed action." 36 C.F.R. § 220.6. However, the term "proposed action" must be read alongside the Forest Service's mineral regulations, which establish that reclamation cannot be bifurcated from other mineral exploration efforts. Specifically, the mineral regulations govern mineral exploration "operations." 36 C.F.R. pt. 228.3(a). Operations encompass "[a]ll functions, work, and activities in connection with" mineral exploration. § 228.3(a). This definition necessarily includes reclamation because mineral operations are required under § 228.8 to meet certain environmental protection procedures, including revegetation and wildlife habitat rehabilitation. § 228.8(g). In fact, operators must submit a "proposed plan of

operations" to the Forest Service that describes "measures to be taken to meet the requirements for environmental protection in § 228.8," § 228.4(c)(3), and the Forest Service must then review the plan's environmental impact, §§ 228.4(a)(4), (b), 228.5(a)–(b). The Forest Service thus necessarily reviews mineral exploration and reclamation as a single proposed project. Under this framework, in the mineral exploration context, the "proposed action" is the proposed plan of operations as a whole—not its component parts. The entire Project is thus subject to NEPA review, and KORE's proposed plan of operations must fit within "a category" of CE under § 220.6.

That KORE's plan of operations was a single proposed action is further evidenced by the fact that all parties treated KORE's mineral exploration and reclamation as one proposal, not piecemeal proposals. For example, KORE described the Project in its plan of operations as comprising both exploration and remedial activities. And throughout the approval process, the Forest Service and KORE presented one Project to the public for comment and referred to the Project as the proposed action in letters, announcements, reports, internal documents, and the plan of operations itself. The Forest Service's final decision memo then ultimately approved KORE's plan of operations as a single proposal. The record thus shows that the Forest Service and KORE understood the Project to be a single action. Indeed, at oral argument, the Forest Service agreed that it had approved a single proposed action to be completed in two phases.

Although the agency's final decision memo divided the Project into two phases, the Forest Service considered the entire Project as the proposed action by conducting a single analysis of the potential extraordinary circumstances related to the Project. Because the agency considered only the

combined effect of the action, we must accept the agency's treatment of the entire Project as the proposed action in our analysis. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 33 F.4th 1202, 1223 (9th Cir. 2022) ("It is black-letter law 'that an agency's action may not be upheld on grounds other than those relied on by the agency.'" (quoting *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 420 (1992))).[1]

We thus hold that the Project was a single proposed action.

## II. Neither CE-6 nor CE-8 alone could cover the proposed action.

The parties agree that neither CE applied by the Forest Service covers the Project alone. CE-8 applies to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities." 36 C.F.R. § 220.6(e)(8). But the proposed action, which includes two phases, exceeds one year. The decision memo found that after reclamation activities occur for "up to one year," the "minimum monitoring time" for the rehabilitation

---

[1] To hold otherwise would require us to define the proposed action differently at different points in the regulation. The proposed action evaluated for a categorical exclusion must be the same proposed action evaluated for extraordinary circumstances. *See* 36 C.F.R. § 220.6 ("A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if . . . [t]he proposed action is within a category listed in § 220.6(d) and (e)." (emphasis added)); *Prieto-Romero v. Clark*, 534 F.3d 1053, 1061 n.7 (9th Cir. 2008) ("[W]ords or phrases are presumed to have the same meaning when used in different parts of a statute." (internal quotation marks omitted)). Not even the Forest Service asks us to reach this inconsistent result.

phase is three years. For its part, CE-6 applies to "[t]imber stand and/or wildlife habitat improvement activities." 36 C.F.R. § 220.6(e)(6). It cannot cover the full Project because phase one includes drilling and exploratory activities that are not remedial in nature. Both the Forest Service and KORE thus argue only that each phase of the Project could be covered by a different CE, not that one of the CEs applied by the Forest Service was sufficient alone.

## III.  Section 220.6 prohibits combining CEs to approve a proposed action.

Because both phases of the Project are a single proposed action and the parties do not dispute the scope of either exclusion, we must decide whether the agency properly combined CE-6 (habitat improvement) and CE-8 (mineral operations less than 1 year) to approve the proposed action. We hold that 36 C.F.R. § 220.6 unambiguously prohibits combining CEs to approve a proposed action, where no single CE could cover the proposed action alone.

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Mountain Cmtys. for Fire Safety*, 25 F.4th at 676 (quoting *Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir. 2015)). "Our 'legal toolkit' includes careful examination of 'the text, structure, history, and purpose of a regulation.'" *Amazon.com, Inc. v. Comm'r of Internal Revenue*, 934 F.3d 976, 984 (9th Cir. 2019) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)). "But, of course, 'the starting point of our analysis must begin with the language of the regulation.'" *Mountain Cmtys. for Fire Safety*, 25 F.4th at 676 (quoting *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002)). Both the plain language of the regulation, and its

history, structure, and purpose, support finding that § 220.6 prohibits combining CEs, where no single CE could cover a proposed action alone.[2]

### A. The text of § 220.6 prohibits the Forest Service from combining CEs to approve a proposed action when no CE alone is sufficient.

The plain text of § 220.6 prohibits the Forest Service from combining CEs to approve a proposed action when no CE alone is sufficient. That regulation provides:

> A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if: (1) The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or (2) The proposed action is within a category listed in § 220.6(d) and (e).

36 C.F.R. § 220.6(a). This language uses singular nouns: "*a* proposed action" may be categorically excluded if "*the* proposed action" is "within *a* category." *Id.* (emphasis added). In other words, the regulation's language indicates

---

[2] The Forest Service concedes that *Auer* deference does not apply here. Under *Auer*, if a regulation is genuinely ambiguous, we defer to the agency's reasonable interpretation of its own regulation. *Auer v. Robbins*, 519 U.S. 452, 461 (1997). But we only defer to interpretations that are "the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views." *Kisor*, 139 S. Ct. at 2416 (quoting *United States v. Mead*, 533 U.S. 218, 237–38 & n.6 (2001)). The Forest Service agrees it made no such authoritative statement here.

that a single "proposed action" must fall within a single "category" for it to be categorically excluded. As explained in *Niz-Chavez v. Garland*, the "decision to use the indefinite article 'a'" is evidence of intent to use a term "as a discrete, countable thing." 141 S. Ct. 1474, 1480 (2021) (considering the ordinary meaning of a statute governing the stop-time rule, and reasoning: "To an ordinary reader . . . 'a' notice would seem to suggest just that: 'a' single document containing the required information, not a mishmash of pieces with some assembly required"); *see also United States v. Randall*, 34 F.4th 867, 876 (9th Cir. 2022) (finding that the "phrasing '*an* offense'" is a "singular construction" that "tells us that *each* 'offense' requires a separate assessment" (emphasis in original)), *cert. denied*, 143 S. Ct. 1061 (2023). There, like here, if the statute had "meant to endow the government with the flexibility it supposes" it could have indicated so. *Niz Chavez*, 141 S. Ct. at 1480. We thus credit the singular construction of § 220.6.

The canon of statutory construction that "singulars normally include plurals," codified by Congress in the Dictionary Act, does not render this singular construction plural. *Schott v. Comm'r*, 319 F.3d 1203, 1206 (9th Cir. 2003). Although the Act tells us to assume "words importing the singular include and apply to several persons, parties, or things" unless the statutory context indicates otherwise, 1 U.S.C. § 1, it "does not transform every use of the singular 'a' into the plural 'several.' Instead, it tells us only that a statute using the singular 'a' can apply to multiple persons, parties, or things." *Niz-Chavez*, 141 S. Ct. at 1482.[3]

---

[3] Moreover, "[o]n the rare occasions when we have relied on this rule, doing so was 'necessary to carry out the evident intent of the statute,'"

Section 220.6(a)'s singular language is also consistent with the rest of the Section. When the Forest Service applies a CE enumerated in Subsection 220.6(e), it must prepare a decision memo that includes the "rationale for using the category." 36 C.F.R. § 220.6(f)(2)(ii). And when "more than one category could have been used," the decision memo must explain "why the specific category was chosen." *Id.* Thus, though § 220.6 lists multiple exclusions, it explicitly directs the agency to explain why it picked the chosen category.

Although § 220.6(a)(2)'s "within a category" language is different from § 220.6(a)(1)'s directive that the proposed action must be "within one of the categories established" by 7 C.F.R. 1b.3, 36 C.F.R. § 220.6(a), neither subsection permits the agency to combine CEs when no CE alone could cover a proposed action. The "a category" language is instead consistent with this court's finding that CEs "may overlap" and more than one CE may apply to one set of facts. *See Mountain Cmtys. for Fire Safety*, 25 F.4th at 680 & n.9 ("[I]n selecting a CE for a project, the Forest Service only needs to cite and rely on one CE, even if other CEs may apply."). But the proposed action must be covered by the chosen exclusion. In short, even if the dissent were correct that "one" and "a" have different meanings, neither allows the agency to combine CEs. Section 220.6(a)'s language thus establishes that exclusions cannot be combined to

---

*United States v. Hayes*, 555 U.S. 415, 422 n.5 (2009) (quoting *First Nat. Bank in St. Louis v. Missouri*, 263 U.S. 640, 657 (1924)). Reading § 220.6(a)'s singular language to include plurals is not necessary to carry out the regulation's intent—in fact, as discussed below, it would serve only to circumvent NEPA's procedural requirements and would thus contradict NEPA's intent.

approve a proposed action, where no single CE could cover the project alone.

### B. The history, structure, and purpose of § 220.6 lead to the same result.

Although the plain language of § 220.6 alone prohibits the Forest Service from combining CEs, the structure, history, and purpose of the Section further reinforce our conclusion.

First, the history of § 220.6 shows that its CE categories were intentionally enumerated independently, rather than as a grab bag of combinable exclusions. In 1991, when the Forest Service first proposed CE-6 (habitat improvement), it stated that the previously existing CE, a broad "category of low impact silvicultural activities," would be separated into "precise, clearly understood categories of proposed actions." National Environmental Policy Act Revised Policy and Procedures, 56 Fed. Reg. 19720–21 (Apr. 29, 1991). Accordingly, the Forest Service established four new "categories of proposed actions" eligible for exclusion:

> (1) Proposals to harvest or salvage timber which remove one million board feet or less of merchantable wood products; require one mile or less of new road construction; assure regeneration of harvested or salvaged areas, where required; (2) Proposals to thin merchantable timber from over-stocked stands which require one mile or less of new road construction; (3) Proposals to artificially regenerate areas to native tree species, including needed site preparation not involving the use of pesticides; and

> (4) Proposals to improve vegetation or timber conditions using approved silvicultural or habitat management techniques, not including the use of herbicides.

*Id*. at 19721. The Forest Service did not list these categories of proposed actions as subcategories under a single CE. Instead, it divided the prior exclusion into four new CEs, one for each category of action. In doing so, the drafters clearly intended for the Forest Service to consider each CE independently. *See id.*; 36 C.F.R. § 220.6(e). Allowing the Forest Service to combine CEs after the fact would undermine this effort.

Second, the structure of § 220.6 shows that CEs cannot be combined, where one CE alone cannot cover a proposed action. Each CE is separately defined by the Section, and many include time and space limitations that would be futile if they could be duplicated or combined. *E.g.*, 36 C.F.R. § 220.6(e)(3) ("Approval, modification, or continuation of special uses that require less than 20 acres of NFS lands."); § 220.6(e)(6) ("Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction"); § 220.6(e)(8) ("Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities"); § 220.6(e)(11) ("Post-fire rehabilitation activities, not to exceed 4,200 acres"). Some enumerated CEs also directly conflict with one another and could not meaningfully be applied together. CE-23, for example, permits "[r]oad management activities" on National Forest Service roads, but "cannot include construction or realignment." 36 C.F.R. § 220.6(e)(23). But CE-24 permits "[c]onstruction and realignment of up to 2 miles of NFS roads and associated parking areas."

§ 220.6(24). Combining these exclusions would undermine their limits and violate the basic principle that "[a] statute or regulation should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Nacarino v. Kashi Co.*, 77 F.4th 1201, 1210 (9th Cir. 2023) (quoting *United States v. Grandberry*, 730 F.3d 968, 981–82 (9th Cir. 2013)).

Finally, the purpose of NEPA and § 220.6 also support our holding that CEs may not be combined, where no one CE could cover a proposed action alone. NEPA is a procedural statute, but its mandates are a "basic national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215–16 (9th Cir. 1998)). Under the regulations implementing NEPA, an agency must "prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement." 40 C.F.R. § 1501.5(a). This requirement ensures that agencies consider "detailed information concerning significant environmental impacts." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

CEs are designed to streamline this process when a class of proposed actions has been found to have little to no effect on the environment. *See Env't Prot. Info. Ctr.*, 968 F.3d at 988. But when an agency applies CEs in a way that circumvents NEPA's procedural requirements and renders the environmental impact of a proposed action unknown, the purpose of the exclusions is undermined. That is the case

here. The district court acknowledged the potentially "absurd results" that might flow from allowing a patchwork application of CEs to a single proposed action:

> Consider a six-month mining exploration project. On its own, the project may very well have no "significant effect on the human environment," 40 C.F.R. 1501.4(a), and so it might be excluded categorically under CE-8, but if the Forest Service also planned to relocate administrative and recreational buildings under CE-21 and 22, *see id.* § 220.6(e)(21)–(22), to realign two miles of the surrounding roads under CE-24, *see id.* § 220.6(e)(24), to widen other parts of the surrounding roads and replace a bridge under CE-23, *see id.* § 220.6(e)(23), to fell and sell the surrounding trees under CE-12*, see id.* § 220.6(e)(12), to construct telephone and utility lines under CE-2, *see id.* § 220.6(e)(2), and to modify the course of a nearby stream under CE-7, *see id.* § 220.6(e)(7), could the Forest Service reasonably claim no significant effects were expected? Or could the Forest Service indefinitely extend a supposedly "short-term" exploratory project under CE-8 by approving a new six-month project every six months?

That this is not such an extreme case does not nullify the potential consequences of the rule moving forward. Any project can be broken down into seemingly innocuous independent acts. The fact that the Forest Service has found CEs "normally do not have a *significant* effect on the human

environment," 40 C.F.R. 1508.1(d) (emphasis added), does not mean they have *no* effect, and combining carefully defined exclusions renders these calculated risks unknown. The Forest Service asks us to adopt a view of categorical exclusions that will swallow the protections of NEPA. We decline to do such violence to NEPA's procedural safeguards. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

\*     \*     \*

Based on the text, history, structure, and purpose of § 220.6, we thus conclude that the Forest Service cannot combine categorical exclusions to approve a proposed action, when no single CE would cover a proposed action alone.

## IV.  The Forest Service's error was not harmless.

Finally, the Forest Service and KORE suggest that, even if we find that the agency erred by combining CE-6 and CE-8, its failures were, at most, harmless error. Here, even cursory review of the Forest Service's actions demonstrates the agency's error was not harmless. "The harmless-error analysis asks whether the failure to consult materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016). We have found harmless error when an agency's decision contains clerical or insubstantial

errors. *See, e.g.*, *Cal. ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 794 (9th Cir. 2014) (declining to remand when an error was a "scrivener's error" and the necessary documents were "plainly incorporated by reference"); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994) *as amended on denial of reh'g* (Dec. 20, 1994) (finding a "technical non-disclosure does not require reversal" because "we must look to the ultimate harm NEPA seeks to prevent: the risk of damage to the environment that results if the agency fails to properly and thoroughly evaluate the environmental impacts of a proposed project"). But errors are not harmless if "they prevented a proper, thorough, and public evaluation of the environmental impact of [a] Project." *Lands Council v. Powell*, 395 F.3d 1019, 1037 n.25 (9th Cir. 2005). In *California Wilderness Coalition v. U.S. Department of Energy*, for example, an agency failed to prepare an EIS or an EA, and we found its proffered reasons for doing so were "not persuasive as a matter of law and [were] not supported by the record." 631 F.3d 1072, 1106 (9th Cir. 2011). Because the agency had not "taken the requisite 'hard look' at the environmental consequences" of the project, the error could not be harmless. *Id.*

So too here. The Forest Service failed to prepare either an EIS or an EA for the Project. And its proffered reason for doing so—that it could combine two CEs to approve a project that no single exclusion could cover—is unpersuasive as a matter of law. The agency thus failed to take the requisite "hard look" at the proposed action that NEPA requires. *Id*. Because NEPA is a procedural regime promulgated to ensure that federal agencies "carefully consider . . . detailed information concerning significant

environmental impacts," *Robertson*, 490 U.S. at 349, we find no support for the agency's position that it is harmless to wholly circumvent this process.

Where, as here, the agency completely fails to undertake the required environmental analysis, conclusions about the environmental impact of the under-evaluated project are speculation. The fact that each CE represents a category of actions that "normally do[es] not have a significant effect on the human environment," 40 C.F.R. § 1508.1(d), does not undermine this conclusion. While the dissent quips that "zero plus zero is zero," this circular math assumes that because the agency has found each category of risk acceptable, their impact will not change when combined. As set forth above, the sometimes-conflicting time and space limitations in 220.6's enumerated CEs undercut this assumption. *E.g.*, 36 C.F.R. § 220.6(e)(23) (allowing "[r]oad management activities" on National Forest Service roads, but not "construction or realignment"); § 220.6(24) (allowing "[c]onstruction and realignment of up to 2 miles of NFS roads and associated parking areas."). The dissent's back-of-the-envelope math thus cannot replace the "hard look" NEPA requires.

The dissent also attempts to cast the Forest Service's lack of analysis as a clerical error by concluding that the Forest Service could have successfully proceeded with the same project had it been formally divided into two proposed actions. But as explained above, remediation cannot be artificially bifurcated from mineral exploration. *See* 36 C.F.R. §§ 228.3(a), 228.8(g). Nor can this court speculate on how experts may have evaluated each phase of the Project independently. *Michigan*, 576 U.S. at 758 (explaining that this court's review is limited to "the grounds that the agency invoked when it took the action."). Given the decision memo

itself suggests that the Forest Service believed that post one-year reclamation activities may be needed for satisfactory reclamation,[4] the agency's misapplication of CEs was not harmless.

## CONCLUSION

In an earlier order, we reversed the district court's order denying Plaintiffs' motion for summary judgment and granting Defendants' and Defendant-Intervenors' motions for summary judgment. We now remand for the district court to enter summary judgment on behalf of Plaintiffs, vacating the agency's decision.

**REVERSED    and    REMANDED    with INSTRUCTIONS.** Defendants shall bear costs on appeal.

---

BUMATAY, Circuit Judge, dissenting:

Straddling California and Nevada, the Inyo National Forest covers around two million acres of forest. Most of it lies on the eastern slope of the Sierra Nevada Mountains, offering spectacular views. The Inyo National Forest also teems with wildlife. Among other species, it is home to the Bi-State sage-grouse. The sage-grouse is a ground-nesting bird famous for its mating dance. This sage-grouse subpopulation exists in only five counties in Nevada and three counties in California. Given its limited geographic spread, the Bi-State sage-grouse is considered a "species of

---

[4] In fact, an internal draft of the Forest Service's decision memo acknowledged that "restoration activities do fall under support activities necessary for mineral exploration" and "would not be limited to one year" under CE-8 (mineral operations less than 1 year).

conservation concern," though it is not classified as an endangered or threatened species under federal law.

The Inyo National Forest is also potentially rich in minerals. Under federal law, citizens have a right to explore for mineral resources on public lands. *See* General Mining Law of 1872, ch. 152, 17 Stat. 91 (codified as amended at 30 U.S.C. §§ 21–54). In the 1980s and 1990s, parts of the Forest were explored, which included constructing roads and drilling hundreds of cores. In 2020, KORE Mining Limited sought to conduct additional mineral investigation at the periphery of the prior mineral exploration site. This new project would involve building twelve temporary drilling pads. Each drill pad would be active for only three to twelve days. Because roads already exist in the area, only 0.32 miles of new temporary access roads would need to be constructed. The whole project would only impact about 0.82 acres out of the 2 million acres of the Forest. And to mitigate concerns for the sage-grouse, the exploration will begin after the sage-grouse breeding and nesting season ends and will be prohibited in sage-grouse breeding grounds.

After completing the exploration, KORE would immediately refill any bore holes and revegetate the drill pads and temporary access roads with native seed mix. All mineral exploration, from installing to removing the drilling equipment, would be completed within one year. No actual mining would be involved. This project would solely permit mineral exploration. As shown below, the total disturbed area would be minimal.



LONG VALLEY EXPLORATION PROJECT
BIOLOGICAL IMPACT ANALYSIS
**Project Site**
Exhibit 2

After considering KORE's proposal, the Forest Service, which manages Inyo, added several requirements.   To minimize any environmental effects, the Forest Service will require KORE to conduct a post-project restoration for habitat improvement.  The reclamation will require KORE to re-seed, install sage-grouse friendly fences, monitor revegetation, and pull weeds.  If monitoring were to show that revegetation was inadequate, the Forest Service would mandate that KORE renew its reclamation efforts.  And to ensure adequate rehabilitation, the Forest Service will not limit the reclamation phase to one year—it would take up to three years.

After KORE agreed to these requirements, the Forest Service approved the project.   It did not conduct an environmental impact statement or an environmental assessment.  Instead, after notifying the public and receiving thousands of comments about the project, the Forest Service issued an 18-page decision memo.  This memo assessed that the project fell within the regulatory definition of two

categorical exclusions, thus alleviating the need for a more extensive environmental analysis.

Friends of the Inyo and other environmental advocacy groups challenge the Forest Service's decision to allow KORE to explore the park without an environmental impact statement or assessment.  While the district court affirmed the Forest Service's decision, the majority reverses.  Given that this project would disturb less than an acre of land and no one has identified any significant impact on the environment, any error made by the Forest Service was harmless.

For this reason, I respectfully dissent.

## I.

### A.

The National Environmental Policy Act ("NEPA") requires agencies to conduct an environmental analysis before taking any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Agencies have three ways to meet NEPA's requirements: (1) develop an environmental impact statement, (2) prepare an environmental assessment, or (3) invoke a categorical exclusion.  *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 988 (9th Cir. 2020).  The first two methods require an agency to analyze a project's impact on the environment—with varying levels of detail.  *Compare* 40 C.F.R. § 1508.1(h) (2020) (an "environmental assessment" is a "concise public document") *with id*. § 1508.1(j) (an "environmental impact statement" is a "detailed written statement").

Of the three, a categorical exclusion is the least onerous because it is limited to agency action that "normally do[es]

not have a significant effect on the human environment." *Id.*
§ 1508.1(d).  This results in a "more expedited track" since
"an agency need not prepare an environmental assessment or
environmental impact statement for an action that it
concludes fits within the exclusion, so long as no
'extraordinary circumstances' indicate that the action will
nonetheless have a significant effect." *Earth Island Inst. v.
Muldoon*, 82 F.4th 624, 632 (9th Cir. 2023) (quoting 40
C.F.R. § 1501.4(b)).  Categorical exclusions free agencies to
focus on major projects that may result in a significant
environmental impact.  *See* 48 Fed. Reg. 34263–66 (July 28,
1983); *see also* 40 C.F.R. § 1500.4(a) (2020) (requiring
agencies to use categorical exclusions when possible to
reduce excessive paperwork).  We uphold an agency's use
of a categorical exclusion whenever "the application of the
exclusions to the facts of the particular action is not arbitrary
or capricious." *Safari Club Int'l v. Haaland*, 31 F.4th 1157,
1178–79 (9th Cir. 2022) (simplified).

Like other agencies, the Forest Service has promulgated
regulations governing its use of categorical exclusions.
Under its regulations, absent "extraordinary circumstances,"
"[a] proposed action may be categorically excluded from
further analysis and documentation in an [environmental
impact statement] or [environmental assessment] . . . if . . .
[t]he proposed action is within a category listed in § 220.6(d)
and (e)." 36 C.F.R. § 220.6(a)(2) (2020).  The Forest Service
then promulgated 37 different categorical exclusions in
paragraphs (d) and (e).  *See id*. § 220.6(d)–(e).

In this case, the Forest Service invoked two exclusions—

- **Categorical Exclusion-8**:    The   mining
  exploration phase fell within the exclusion
  for "[s]hort-term (1 year or less) mineral,

energy, or geophysical investigations and their incidental support activities." *Id*. § 220.6(e)(8). The exclusion includes projects that "require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads." *Id*.

- **Categorical Exclusion-6**: The revegetation phase came within the exception for "wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." *Id*. § 220.6(e)(6).

The issue here is whether the Forest Service may invoke *two* categorical exclusions for *one* project to avoid preparing an environmental impact statement or assessment. Friends of the Inyo and the other groups argue that it cannot and that the Forest Service artificially bifurcated the project into two to get around NEPA. The Forest Service and KORE counter that the regulations do not preclude using two categorical exclusions when a project has two distinct phases, as here.

As a textual matter, this question is a challenging one. Recall that, under the regulation, a categorical exclusion is appropriate if "[t]he proposed action is within a category listed in § 220.6(d) and (e)." *Id.* § 220.6(a)(2). So we focus on the meaning of "within a category."

**i.**

Several reasons support reading the regulation as permitting only one categorical exclusion.

First, as the majority holds, § 220.6(a)(2) refers to "a category" in the singular. Sometimes, a statute's "singular construction" is "significant" of meaning. *United States v. Randall*, 34 F.4th 867, 876 (9th Cir. 2022). But, of course, this isn't dispositive.

Second, the term "within" gives us another clue. Normally, when we say something is "within" another thing, it is "inside" it. *See Within*, American Heritage Dictionary (3d ed. 1996). Take a car. We wouldn't say a car is "within" a garage if half of it is sticking out onto the driveway. So an action falling "within a category" naturally means that the action falls wholly inside the category.

Third, construing § 220.6(a)(2) to require one category offers a nice parallel with § 220.6(a)(1). Section 220.6(a)(1) establishes another group of categorical exclusions for the Forest Service, but expressly limits the agency to only "one" exclusion. It permits a categorical exclusion if "[t]he proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3." 36 C.F.R. § 220.6(a)(1) (2020). The Secretary then established seven categories of activities, ranging from policy planning to criminal law enforcement, that don't require an environmental assessment or impact statement. *See* 7 C.F.R. § 1b.3(a)(1)–(7). So reading both subparagraphs to allow only one category would give them a parallel structure.

Fourth, the provision governing the Forest Service's "decision memos" on categorical exclusions contemplates that the agency should explain "why *the* specific category was chosen." 36 C.F.R. § 220.6(f)(2)(ii) (emphasis added). This is required even if "more than one category could have been used." *Id*. Again, this suggests only one category could be used.

And finally, the Forest Service did not appear to believe it could use multiple categorical exclusions for one project given its attempt to change § 220.6(a)'s language. *See* 84 Fed. Reg. 27544, 27546 (June 13, 2019). In 2019, the Forest Service proposed an amendment to its NEPA regulations to "clarify . . . that a proposed action may be categorically excluded if it is within one or more of the categories" listed in the regulations. *Id*. The proposed change sought to ensure that "[w]here a proposed action consists of multiple activities, and all of the activities that comprise the proposed action fall within one or more [categorical exclusions], the responsible official may rely on multiple categories for a single proposed action." *Id*. This proposed rule change was not implemented, but it shows that the Forest Service did not think it had the authority to bifurcate actions under the existing regulation.

So the requirement that a "proposed action" fall "within *a* category" may mean that the Forest Service can select only *one* categorical exclusion for a proposed action.

### ii.

But some persuasive arguments exist on the other side too.

First, there's the long-established rule of interpretation that "singulars normally include plurals." *Schott v. Comm'r of Internal Revenue*, 319 F.3d 1203, 1206 (9th Cir. 2003). This "rule is simply a matter of common sense and everyday linguistic experience[.]" Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 130 (2012). After all, it would hang so much on the mere use of the singular article "a" in § 220.6(a)(2). So we could read the regulation's text to mean that a "proposed action" is excluded if it is "within categories listed."

Second, the adjacent § 220.6(a)(1) uses different language.  As stated above, it refers to "one of the categories."  This more expressly limits the Forest Service to picking one and only one category.  That § 220.6(a)(2) uses different language from § 220.6(a)(1) may signify a different meaning.  *See SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words.") (simplified); Scalia & Garner, Reading Law, at 156 ("[A] material variation in terms suggests a variation in meaning.").  For whatever reason, the regulation may intend for the Forest Service to pick *one* category under § 220.6(a)(1) but allow *multiple* categories under § 220.6(a)(2).

Finally, the regulatory definition of a "categorical exclusion" supports using multiple categories.  The previous NEPA regulations defined a categorical exclusion as "a category of actions which do not individually or *cumulatively* have a significant effect on the human environment[.]"   40 C.F.R. § 1508.4 (2017) (emphasis added). Today, regulations define categorical exclusions as "categories of actions that normally do not have a significant effect on the human environment."  40 C.F.R. § 1508.1(d) (2020).  If the proposed actions would not significantly affect the environment *cumulatively*, why not allow the use of multiple categories?

\* \* \*

Ultimately, however, this textual debate is unnecessary to resolve.  I explain why next.

**B.**

We don't need to resolve this tricky regulatory debate because any error in applying the categorical exclusions here was harmless. Even if the Forest Service erred by invoking two categorical exclusions to justify the mineral exploration project, the record supports that the overall project would not significantly affect the environment. As the district court reasoned, it would be "pointless to set aside the Forest Service's decision in this case if its sole error was a failure to process KORE's proposal as two 'actions' rather than one." So relying on two categorical exclusions to satisfy NEPA constitutes, at most, harmless error.

We do not just freely vacate agency decisions at the slightest inkling of error. Instead, our review of NEPA violations is limited to "prejudicial error." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016) (quoting 5 U.S.C. § 706). So we ask whether any error "caused the agency not to be fully aware of the environmental consequences" of its action. *Id*. We focus on whether violating NEPA would have "somehow materially altered the environmental review process, not whether a constituent body was harmed by the agency's ultimate decision." *Id*. at 1105.

Friends of the Inyo and the other environmental groups have identified no prejudice from the Forest Service invoking two categorical exclusions here. As stated above, categorical exclusions are reserved for "categories of actions that normally do not have a significant effect on the human environment[.]" 40 C.F.R. § 1501.4(a) (2020); *see also Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (categorical exclusions are "limited to situations where there is an insignificant or minor effect on

the environment"). The groups do not show that the Forest Service overlooked a significant effect on the environment based on the use of the two categorical exclusions. At most, they complain that the Forest Service did not prepare an environmental assessment. But it is uncontested that the project's two phases fit neatly into Categorical Exclusion-8 (short-term mineral investigation) and Categorical Exclusion-6 (wildlife improvements). Given that each phase would have no significant environmental impact *individually* or *cumulatively*, *see* 40 C.F.R. § 1508.4 (2017), analyzing the project as one would not yield any greater environmental impact. As the district court put it, "zero plus zero is zero."

And contrary to the majority's assumption, this harmless error analysis is neither speculative nor back-of-the-envelope. Indeed, nothing shows that the Forest Service failed to take the "hard look" that NEPA requires. *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). The district court rightfully noted that "the Forest Service [didn't] ignore[] the project's environmental effects" nor "attempt[] to obscure the project's environmental effects." In analyzing the project for any "extraordinary circumstances" under § 220.6(a)(2), the Forest Service extensively evaluated the project's impact on the Inyo's wildlife, botany, water, noise, and cultural heritage. It concluded none existed.

- The Forest Service found that any impact on the sage-grouse would be "minor and temporary" given that the bird would avoid the immediate vicinity of the drill sites. While it acknowledged that the drilling could lead to "physiological stress, reduced

foraging success, and exposure to higher predation rates" for the sage-grouse, the Service concluded the effect would be short-term and not affect their viability in the project area.

- The Forest Service also concluded that the project would have no long-term impact on the migration corridor of local wildlife, like the mule deer, given the small area involved.

- The Forest Service foresaw no impact on plant species of conservation concern.

- The Forest Service saw no effect on surface water, floodplains, wetlands, or groundwater.

- The Forest Service consulted local Indian tribes and invited tribal monitors to observe the project's implementation.   It also analyzed any impact on religious, cultural, archaeological, and historical sites and found none.

- The Forest Service further considered the impact on riparian conservation, recreational management, and scenery.   Again, it concluded the project would have little to no impact on these areas.

So after considering all this, it is hard to see what further environmental analysis would uncover.

If anything, it was the Forest Service's hypervigilance as the Inyo's environmental steward that caused this issue. After all, it was the Forest Service's insistence that the mineral-exploration phase be followed with re-habitation

and revegetation efforts that took the project out of Categorical Exclusion-8's one-year time limit. If KORE was allowed to proceed without the Forest Service-mandated reclamation, then § 220(a)(2) would have easily been satisfied. So even if the Forest Service erred by relying on two categorical exclusions, it didn't materially alter the environmental review process and thus any "error" was harmless.

Think of it this way: The Forest Service could have complied with § 220.6(a)(2) by simply breaking the mineral exploration project into two separate "proposed actions." Remember the regulation excuses an environmental impact statement or assessment if "[t]he proposed action is within a category listed in § 220.6(d) and (e)."   36 C.F.R. § 220.6(a)(2). But the regulation doesn't directly define what constitutes a "proposed action."[1] So the Forest Service could have just said that the mineral exploration phase constituted one "proposed action" and that the reclamation phase was another "proposed action." Under that approach, the two "proposed action[s]" would have easily fallen into the two separate categorical exclusions.

Indeed, the Forest Service's decision memo all but says that the two phases are two distinct "action[s]." According to the decision memo, despite the majority's assumption, the "[restoration] activities are not required to support the mineral exploration activities." As a result, the Forest

---

[1] Under the regulations, "Major Federal action or action" broadly includes any "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals."  40 C.F.R. § 1508.1(q)(2) (2020).

Service determined it would "us[e] an additional [categorical exclusion] category to cover these [restoration] activities." It makes sense to consider the two phases as different "proposed action[s]" because the habitat restoration would come only after the mining operation had been completed and all equipment removed. While this approach might not work for all projects, it does here and so any error in reading § 220.6(a)(2) was harmless.

## II.

Because any error in relying on two categorical exclusions was harmless, I respectfully dissent.